**EXHIBIT 1**

## TRANSFER AGREEMENT

This Transfer Agreement is entered into by and between John W. McKay, whose mailing address is 440 S. Third Street, Suite 205, St. Charles, Illinois 60174 ("**McKay**") and Faith Lawley, LLC, an Ohio limited liability company whose mailing address is 8544 Meadowbluff Court, Cincinnati, Ohio 45249 ("**Faith Lawley**"), effective as of this 26th day of February, 2010.

## BACKGROUND:

A.     McKay is a limited partner in Granite Creek FlexCap I, L.P., a Delaware limited partnership (the "**Limited Partnership**").

B.     Faith Lawley desires to purchase from McKay all of McKay's right, title and interest in and to McKay's limited partnership interest in the Limited Partnership.

C.     Faith Lawley is willing to grant McKay the option to repurchase all right, title and interest in and to said limited partnership interest, upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE, FOR VALUABLE CONSIDERATION,** the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.     **Background Statements**. Each party hereby affirms the truth and accuracy of the background statements set forth hereinabove. Each party acknowledges that the background statements are an integral part of this Agreement, and are specifically incorporated into this Agreement as the statements and representations of each party.

2.     **Limited Partnership Interest**. McKay is a limited partner in the Limited Partnership, with a commitment of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to the Limited Partnership (the "**Limited Partnership Interest**"), of which, ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ has been contributed to the Limited Partnership. McKay represents and warrants that McKay is not in default of its obligations to the Limited Partnership for payment of its Limited Partnership Interest or in default of any other material obligation owed to the Limited Partnership. McKay has delivered to Faith Lawley and Faith Lawley acknowledges receipt of a true and correct copy of the Amended and Restated Agreement of Limited Partnership of Granite Creek FlexCap I, L.P. (the "**Limited Partnership Agreement**"). The Limited Partnership Agreement remains in full force and effect and has not been modified, amended, or terminated.

3.     **Purchase and Sale**. Upon the terms and conditions of this Agreement effective as of the date of Closing, McKay hereby sells, assigns, transfers, and conveys to Faith Lawley, and Faith Lawley hereby purchases from McKay, McKay's Limited Partnership Interest. The consideration to be received for the transfer of McKay's Limited Partnership Interest shall be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "**Purchase Price**"), payable at the Closing, as hereinafter defined.

4.     **Assumption of Obligations**  Faith Lawley (i) accepts the transfer of the Limited Partnership Interest, (ii) agrees to comply with, be bound by and subject to all of the terms, conditions, and provisions of the Limited Partnership Agreement, (iii) undertakes and assumes all of McKay's duties and obligations under the Limited Partnership Agreement, including but not limited to the obligation to contribute any unfunded commitment attributable to the Limited Partnership Interest, and (iv) makes all representations required of a limited partner under the Limited Partnership Agreement.  Faith Lawley specifically acknowledges that it will timely make the ███████████████████████████ cash call payment to the Limited Partnership on or before the due date of February 26, 2010 (the "**Initial Cash Call**").

5.     **Limited Partnership and SBA Approval**.  Faith Lawley agrees that it shall execute and deliver any and all documents required by the Limited Partnership and/or the Small Business Administration ("**SBA**") in order to obtain the consent of the Limited Partnership and its general partner, and/or the consent of the SBA to the transactions contemplated hereby.  Faith Lawley and McKay shall each execute and deliver to the SBA the Request for Approval of Transfer Certificate in the form provided by the SBA.

6.     **Ownership of Limited Partnership Interests**.  McKay hereby represents and warrants to Faith Lawley that McKay is hereby selling, assigning, transferring, and conveying to Faith Lawley, good and marketable title to the Limited Partnership Interest free and clear of any liens and encumbrances other than the Option to repurchase described in Section 8 hereinbelow.  Upon the completion of such transfer, Faith Lawley will be the owner of the Limited Partnership Interest.

7.     **Closing**.  This transaction shall be consummated, and all of the actions required to occur at Closing shall take place, on Friday, February 26, 2010, at such time and place as the parties may mutually agree.

8.     **Option to Repurchase**.  Faith Lawley hereby grants to McKay the right to repurchase the Limited Partnership Interest, at the option of McKay (the "**Option**"), upon the following terms and conditions:

      a.     Expiration of Option.  The Option may be exercised at any time from the date hereof through and including December 31, 2012 (the "**Option Period**").  In order to timely exercise said Option, McKay must give Faith Lawley written notice of an intent to exercise said Option delivered to the address of Faith Lawley as first set forth hereinabove, and must pay Faith Lawley the Option Price, as hereinafter defined, prior to the expiration of the Option Period.

      b.     Option Price.  In order to exercise the Option to repurchase the Limited Partnership Interest, McKay must pay Faith Lawley the following (the "**Option Price**"):

          i. The original Purchase Price of ██████████████████████ ████████████████████ plus interest accruing at the rate of twenty-five

percent (25%) per annum from the date of Closing through the date of payment of the Option Price; plus

    ii.  The Initial Cash Call paid by Faith Lawley in the amount of ████████ ████████████████████, plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of payment of the Initial Cash Call through the date of payment of the Option Price; plus

    iii.  The amount of any other cash call paid by Faith Lawley with respect to the Limited Partnership Interest, plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of payment of any such cash call through the date of payment of the Option Price; plus

    iv.  An amount equal to the Tax Adjustment Payment, if any, calculated pursuant to Section 8(e) hereinbelow;

provided, however, the total accrued interest pursuant to clauses i, ii, and iii hereinabove shall not be less than a total of ███████████████; and provided further, however, in the event that Faith Lawley fails to make any cash call payment with respect to the Limited Partnership Interest when due, or within five (5) days prior to the expiration of any grace period for the payment of any such cash call (an "**Event of Default**"), then the total Option Price shall only be an amount equal to ██████████, and shall not include any payment or reimbursement for the original Purchase Price of ███████████████████, any interest accrual, nor any amounts paid by Faith Lawley with respect to any cash call.

c.    <u>Residual Rights</u>.  Following the repurchase by McKay of the Limited Partnership Interest pursuant to the Option, Faith Lawley shall continue to be entitled to receive from McKay the "Applicable Percentage", as hereinafter defined, of any dividends or other distributions of profit (but not of principal or capital repayment) made to McKay by the Limited Partnership with respect to McKay's Limited Partnership Interest.  For purposes of this Agreement, the "Applicable Percentage" shall be as follows:

    i.  If Faith Lawley did not make any cash call payments during the period of time Faith Lawley owned the Limited Partnership Interest, other than payment of the Initial Cash Call, or upon an Event of Default, then the Applicable Percentage shall be zero percent (0%).

    ii.  Otherwise, the Applicable Percentage shall be the sum of all cash calls paid by Faith Lawley during the period of its ownership of the Limited Partnership Interest, including the amount of the Initial Cash Call, divided by ███████████████████.

    d.    <u>Distribution Adjustment</u>. In the event that the Limited Partnership makes dividend distributions or other distributions of profit to Faith Lawley during the period of its ownership of the Limited Partnership Interest, then upon the exercise of the Option by McKay, Faith Lawley shall transfer and pay to McKay an amount equal to such distributions, less the Applicable Percentage of such distributions, with the Applicable Percentage being calculated as of the time of such distribution.

    e.    <u>Tax Adjustment Payment</u>. The parties understand and agree that during the period of time Faith Lawley owns the Limited Partnership Interest, it will be allocated for federal and state income tax purposes a portion of any gains or losses incurred by the Limited Partnership. Upon the exercise of the Option by McKay, to the extent that the distributions retained by Faith Lawley pursuant to Section 8 d. hereinabove are less than the federal and state income tax liability incurred by the members of Faith Lawley with respect to the income recognized by virtue of ownership of said Limited Partnership Interest, net of any losses or other deductions recognized with respect to ownership of such Limited Partnership Interest, the Tax Adjustment Payment shall be an amount equal to such deficiency, plus interest accruing at the rate of five percent (5%) per annum from the date of payment of such tax liability, on a portion of such deficiency, which portion is equal to the deficiency multiplied by the remainder of one minus Faith Lawley's Applicable Percentage. For example, assume that the members of Faith Lawley incurred tax liability of ███████ as a result of their ownership of the Limited Partnership Interest, and retained ██████ of distributions pursuant to Section 8 d. above, upon exercise by McKay of his Option to repurchase the Limited Partnership Interest. Further, assume that Faith Lawley's Applicable Percentage calculated pursuant to Section 8 c. above is 40%. In such an example, there would be a ██████ deficiency between the tax liability incurred by the members ███████ and amount of distributions retained by Faith Lawley ███████. The Tax Adjustment Payment would be an amount equal to the ███████ deficiency, plus interest accruing at the rate of 5% per annum from the date of payment of such tax liability on a portion of such deficiency. The portion of the deficiency which would accrue interest would be an amount equal to the deficiency ███████ multiplied by one minus the Applicable Percentage (40%), which is equal to 60%, which would mean that ███████ of the deficiency would accrue interest and the remaining ██████ of the deficiency would not accrue interest in calculating the Tax Adjustment Payment.

9.    **Parties Bound; Specific Performance**. This Agreement shall be binding upon the parties, their respective heirs, administrators, executors, successors and assigns; provided, however, it is understood and agreed that Faith Lawley shall not sell, transfer, assign or convey the Limited Partnership Interest, or any interest therein, to any other person or entity prior to the expiration of the Option. The parties do hereby agree for themselves and their heirs, administrators, executors, successors or assigns, as aforesaid, to execute any instruments in writing which might be necessary or proper to carry out the purposes and intent of this Agreement and to protect the parties hereto. The parties hereto acknowledge that the Limited

Partnership Interest which is the subject matter of this Agreement is unique, and as a result, this Agreement may be specifically enforced.

10. **Good Faith; Further Assurances**. The parties to this Agreement shall in good faith undertake to perform their obligations under this Agreement, to satisfy all conditions and to cause the transactions contemplated by this Agreement to be carried out promptly in accordance with the terms of this Agreement. Upon the execution of this Agreement and thereafter, each party shall do such things as may be reasonably requested by the other party hereto in order more effectively to consummate or document the transactions contemplated by this Agreement.

11. **Securities Investment Representation**. Faith Lawley warrants, represents, agrees and acknowledges: (A) that Faith Lawley has adequate means of providing for its own current needs and foreseeable future contingencies, and anticipates no need now or in the foreseeable future to sell the Limited Partnership Interest; (B) that it is acquiring the Limited Partnership Interest for its own account as a long-term investment and without a present view to make any distribution, resale or fractionalization thereof; (C) that it and its independent counselors have such knowledge and experience in financial and business matters that they are capable of evaluation the merits and risks of the investment involved in its acquisition of the Limited Partnership Interest and they have evaluated the same; (D) that it is able to bear the economic risks of such investment; (E) that it and its independent counselors have made such investigation of the Company (including its business prospects and financial condition ) and it has had access to all information regarding the Company and it has had an opportunity to ask all of the questions regarding the Company as it deems necessary to fully evaluate its investment therein; (F) that in connection with its acquisition of the Limited Partnership Interest, it has been fully informed by its independent counsel as to the applicability of the requirements of the Securities Act of 1933 and all applicable state securities or "blue sky" laws to the Limited Partnership Interest; and (G) that it understands that (1) the Limited Partnership Interest is not registered under the Securities Act or any state securities law, (2) there is no market for the Limited Partnership Interest and that it will be unable to transfer the Limited Partnership Interest unless such is so registered or unless the transfer complies with an exemption from such registration, (3) such Limited Partnership Interest cannot be expected to be readily transferred or liquidated; and (4) its acquisition of a Limited Partnership Interest in the Company involves a high degree of risk.

12. **Survival of Representations and Warranties**. The warranties, representations and agreements set forth herein shall be continuous and shall survive the consummation of the transaction contemplated hereby.

13. **Severability**. If fulfillment of any provision of this Agreement or performance of any act contemplated hereby, at the time such fulfillment or performance shall be due, shall exceed the limit of validity prescribed by law, then the obligation to be fulfilled or performed shall be reduced to the limit of such validity; and, if any clause or provision contained in this Agreement or in any document or instrument to be delivered pursuant hereto, operates or would operate to invalidate this Agreement or such document or instrument, in whole or in part, such clause or provision shall be held ineffective, as though not herein or therein contained, and the

remainder of this Agreement or such document or instrument shall remain operative and in full force and effect.

14.     **Arbitration**.  This Agreement shall be governed and construed under the laws of the State of Ohio, not including the choice of law rules thereof.  Any and all disputes, complaints, controversies, claims and grievances arising under, out of, in connection with, or in any manner related to this Agreement or the relationship of parties hereunder shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  Any decision and award of the arbitrator shall be final, binding and conclusive upon all of the parties hereto and said decision and award may be entered as a final judgment in any Court of competent jurisdiction.  Notwithstanding said Rules, any arbitration hearing to take place hereunder shall be conducted in Cincinnati, Ohio, before one (1) arbitrator who shall be an attorney who has substantial experience in business law issues, unless the parties to the arbitration agree to some other arbitrator.  However, no party shall institute an arbitration, or any other proceeding to resolve such disputes until that party has sought to resolve such disputes through direct negotiation with the other party or parties.  If such disputes are not resolved within three (3) weeks after a demand for direct negotiation, the parties to the dispute shall attempt to resolve such disputes through mediation conducted in Cincinnati, Ohio.  If the parties to the dispute do not agree on a mediator within ten (10) days, any party to the dispute may request the American Arbitration Association to appoint a mediator who shall be an attorney who has substantial experience in business law issues.  If the mediator is unable to facilitate a settlement of disputes within forty-five (45) days, the mediator shall issue a written statement to the parties to that effect and the aggrieved party may then seek relief through arbitration as provided above.  The fees and expenses of the mediator shall be split and paid equally by each of the parties to the dispute.  In the event of any arbitration between any of the parties hereto involving this Agreement or the respective rights of the parties hereunder, each party shall pay his own attorneys' fees, costs and expenses of such arbitration.  Each party hereby consents to a single, consolidated arbitration proceeding of multiple claims, or claims involving more than two (2) parties. Each party may apply to any Court of competent jurisdiction for injunctive relief or other interim measures (i) as provided for elsewhere in this Agreement, (ii) in aid of the arbitration proceedings, or (iii) to enforce the arbitration award, but not otherwise.  Any such application to a Court shall not be deemed incompatible or a waiver of this section.  The arbitrator shall be required to make written findings of fact and conclusions of law to support its award. Notwithstanding anything to the contrary in the Commercial Arbitration Rules and supplementary procedures, the arbitrator shall not be authorized or empowered to award punitive, exemplary, consequential or special damages, or attorney's fees, and the parties expressly waive any claim to such damages or fees.

15.     **Miscellaneous**.  This instrument contains the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior oral or written understandings, agreement or contracts, formal or informal, between the parties hereto with respect thereto. THIS PROVISION, AND EACH AND EVERY OTHER PROVISION OF THIS AGREEMENT MAY NOT UNDER ANY CIRCUMSTANCE BE MODIFIED, CHANGED, AMENDED OR PROVISIONS HEREUNDER WAIVED VERBALLY, BUT MAY ONLY BE MODIFIED, CHANGED, AMENDED OR WAIVED BY AN AGREEMENT IN WRITING EXECUTED BY ALL PARTIES HERETO.  All headings set forth herein are included for the convenience of

reference only and shall not affect the interpretation hereof, nor shall any weight or value be given to the relative position of any part or provision hereof in relation to any other provision in determining such construction. This Agreement may be signed in any number of counterparts with the same effect as if the signature on each such counterpart were on the same instrument. Facsimiles, or other electronic transmissions (e.g. PDFs), of signatures will be deemed to be originals.

      16.    **Attorney Representation.**  The parties hereby acknowledge that legal counsel for McKay, the law firm of Kahn, Dees, Donovan & Kahn, LLP, has disclosed that potential conflicts between McKay's interests and the interests of Faith Lawley may exist now or in the future, and that said legal counsel has advised Faith Lawley that it might find it beneficial to obtain individual and separate legal counsel to review this Agreement prior to its execution, as well as all future legal instruments prepared by said legal counsel for its execution. Faith Lawley hereby further acknowledges that it understands that Kahn, Dees, Donovan & Kahn, LLP is representing McKay, and not Faith Lawley, in this transaction.

**IN WITNESS WHEREOF**, the parties have executed this Agreement the year and date first above written.

_____

John W. McKay

"MCKAY"

FAITH LAWLEY, LLC

By:_____

Chris Lawley, Member

By:_____

Eric Novicki, Member

"FAITH LAWLEY"

**IN WITNESS WHEREOF**, the parties have executed this Agreement the year and date first above written.

John W. McKay

"MCKAY"


FAITH LAWLEY, LLC

By:_____
       Chris Lawley, Member

By:_____
       Eric Novicki, Member

"FAITH LAWLEY"

**EXHIBIT 2**

**From:** John McKay [mailto:jmckay@theridgeohio.com]
**Sent:** Tuesday, February 19, 2013 1:20 PM
**To:** ERIC NOVICKI
**Subject:** RE:

Hey eric – since chris said he needed 2 weeks before regrouping I took extra time to gain perspective. I did not want the meeting to turn out the way it did. We are better friends than that. I'd like to resolve something we could both live with and move forward with our friendship. Two things I think we agree on are the uncertainty of the fund and what outcomes will be. The banter I started about the annual meeting didn't matter and had no relevance – it's in the past. The money is committed.

To do that I think you and me are best to agree on something for chri to approve. Part of my reason for this is I felt I had a good conversation with him after you left. He referred to the taxes coming back as real money and that was the only point you and me were stuck on. we solve that and I think we are done.

Since the meeting 2 things happened: the cash call I know you got and Mark confirming he's sure the least the ordinary loss will be for 2012 is $6.3 million which would leave $4-$5 million for 2013. He still hopes the loss could be as high as $9.4 million for 2012 but won't know til early april. $6.3 mil makes $340,000 of ordinary loss for my unit. Way overdue (.054x6.3 mil). With the 2013 loss it should completely reverse what you've paid on taxes unless mark is wrong. Have you talked to mark? he said $1 million of call is a united healthcare-related deal with potential big upside with them guaranteeing the $1 mil thru a put, so they can't lose, and they put $1.75 million in some type of chia protein seed co. mark said has at least doubled in value. But I know – who the hell knows where anything will end up.

Cuz we don't know what will happen, why not reconcile everything at the end – all ins and all outs including taxes? My intent is still the same, put you guys preferred at a big return and I claw back for a little before you take the rest. Sorry bout my frustration meeting, but I feel I have always looked out for you and a bone, only after you make a good return, as oyu should for the risk, is fair.

Propose whatever you want – I know my contract rights are gone.

I suggest you guys impute an annual return for the whole life of the investment (and after taxes so you don't get stung on that) at 20%. Then I clawback for the next 250K and you guys have everything after, which I'd hope would be a big chunk more. Keep it all and I hope you make a ton. I sleep at night then knowing I sold at a rate other investors bought most of the next best opportunity at. This would have some accounting work at the end (we could give to cpas) and save the braindeath and guessing til then. I realized this since a lot of our meeting was about uncertainty. What do you think?

Something else is lingering. I have a short amount of time to try to buy a house Jackie and me are renting (without a mortgage I can't qualify for). I'm trying to scrape together $300,000 before my option runs out. In 2006 – I was so busy with the CPI sale and jackie's birth that I wired you 150K to payoff your 75K loan. I later calculated that I owed you 114K at that time which made you a 28% annual return. but that 36K overpayment is a huge number to me now. It's not an easy thing to ask for – I know a lot of time has passed. But I also feel 28% annual return for borrowing money is great and doesn't need to be more. I feel I have always looked out for you and it's a crucial thing for me now without banking options. Can we square this up?

PS – I'm happy to meet in cincy or elsewhere as soon as I can if you want to do in person. Whatever we do, let's figure something out and put it behind us. thx John

04321557-1

**EXHIBIT 3**

Kane County Circuit Court     THOMAS M. HARTWELL     ACCEPTED: 3/8/2018 2:41 PM     By: PS     Env #682875

**IN THE CIRCUIT COURT OF THE SIXTEENTH JUDICIAL DISTRICT**
**KANE COUNTY, ILLINOIS**

Clerk of the Circuit Court
Kane County, Illinois

**3/8/2018 1:50 PM**

**FILED/IMAGED**

JOHN MCKAY,

    PLAINTIFF,

v.

FAITH LAWLEY, LLC, ERIC NOVICKI AND CHRIS

LAWLEY, INDIVIDUALLY AND AS MEMBERS AND/OR

MANAGERS OF FAITH LAWLEY, LLC

    DEFENDANT.

No.18-L-000134

## COMPLAINT

Plaintiff, John McKay (hereinafter "McKay"), by and through his attorney, for his Complaint against Defendant, Faith Lawley LLC an Ohio limited liability company (hereinafter "Faith Lawley"), alleges and states as follows:

### PARTIES AND RELATED ENTITY

1. Plaintiff, McKay (hereinafter also referred to as "Plaintiff"), is a resident of Kane County, Illinois.

2. Defendant Faith Lawley (hereinafter "Defendant") is an Ohio based entity in good standing with the State of Ohio, doing business in Warren County, Ohio with registered agent located in Mason, Ohio.

3. In June of 2006, an entity known as Granite Creek LLC (hereinafter "Granite Creek") is an Illinois Limited Liability Company formed as a small business investment company for the purpose of investing in small business(es). McKay, Eric Novicki (hereinafter "Novicki") and Chris Lawley (hereinafter "Lawley") own a unit in the Granite Creek fund.

**NOTICE**
**BY ORDER OF THE COURT THIS CASE IS HEREBY SET FOR CASE MANAGEMENT CONFERENCE ON THE DATE BELOW. FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR AN ORDER OF DEFAULT BEING ENTERED.**
**Judge: Murphy, James R**
**5/23/2018 9:00 AM**

4.     Novicki and Lawley are, and were all times relevant hereto, the members/manager of Faith Lawley.

### COMMON ALLEGATIONS

5.     From the period of approximately June 2006 through the first quarter of 2013, Granite Creek is funded by McKay, Novicki and Lawley in an amount equal to $1,320,000. Of the $1,320,000, McKay personally funded $900,000.

6.     In early 2010, in order to avoid losing his investment and/or diluting McKay's investment due to a capital call of $75,000, it was agreed between McKay, Novicki and Lawley that the defendant entity, Faith Lawley would be formed in order to buy and hold McKay's investment in Granite Creek, pending repayment to McKay from any future return on the original Granite Creek investment. For consideration (agreed to be reduced from market value as part of the agreement between McKay, Novicki and Lawley), McKay transferred his membership interest in Granite Creek into the Defendants' Faith Lawley entity.

7.     Contemporaneously with the transfer by McKay of his membership interest in Granite Creek to Faith Lawley, the newly formed Faith Lawley entity paid, constructively on McKay's behalf, the capital call of $75,000.

8.     Over the remainder of 2010 and during the years of 2011 and 2012, Novicki and Lawley would orally discuss with McKay the status of the Granite Creek business and distribution predictions by Granite Creek to Faith Lawley/McKay.

9.     In an effort to memorialize and further evidence the discussions between McKay, Novicki and Lawley from 2010 through 2012, McKay sent an e-mail to Novicki on or about December 17, 2012 outlining the understanding between McKay, Novicki and Lawley as members of and acting with the authority of and on behalf of Faith Lawley LLC.

10.     Then, on or about January 7, 2013, McKay met in person with Novicki and Lawley who, on behalf of Faith Lawley, outlined and presented in writing to McKay the status of the Granite Creek investment being held in the Faith Lawley entity.

11.     On or about January 8, 2013, Novicki e-mailed McKay advising that going forward McKay should finalize details and timing of the return to McKay of his Granite Creek investment (as being held by Faith Lawley) directly with Lawley who was authorized to act as agent of Faith Lawley.

12.     McKay and Lawley, throughout the period from March 2013 and June of 2016 communicated multiple times, including but not limited to March 23, 2013, April 21, 2013, May 25, 2013, June 12, 2013, September 22, 2013, October 12, 2013, October 1, 2014 and various communications continuing through May of 2016 discussing and evidencing the agreement whereby Faith Lawley, authorized and agreed to by Lawley, when funds were available, pay to McKay his share of the following: (a) return of initial $861,570.15 from Granite Creek to Faith Lawley, (b) the next $200,000 from Granite Creek to be paid equally to McKay and Faith Lawley, (c) the next $100,000 to Faith Lawley and (d) all remaining proceeds and distributions to be paid and split between Faith Lawley receiving 80% and McKay 20%.

## COUNT I - BREACH OF ORAL CONTRACT

13.     Plaintiff hereby realleges paragraphs 1 through 12 above as paragraph 13 of this Count I as fully set forth herein.

14.     Defendant breached the Contract with Plaintiff when it failed and refused, despite demand, to pay to McKay monies owed, which now exceed $391,000 and are anticipated to grow another $309,000 to a sum equal or greater than $700,000.

15.     As a direct result of the Defendant's breach of the Contract, Plaintiff has been damaged as set forth in the preceding paragraph.

16.     Plaintiff has performed all obligations that it was required to perform under the Contract.

**WHEREFORE**, Plaintiff, John McKay, prays that this Court enter judgment in his favor and against Defendants as follows:

i.      Damages in favor of Plaintiff resulting from Defendants' breach of contract in the amount of: $391,000, plus McKay's share of future distributions;

ii.     For Plaintiff's costs, including reasonable attorneys' fees incurred in this action; and

iii.    For such further relief as this Court deems just and equitable.

## COUNT II - BREACH OF WRITTEN CONTRACT

17.     Plaintiff, in the alternative, hereby realleges paragraphs 1 through 16 above as paragraph 16 of this Count II as fully set forth herein.

18.     On or about May 4, 2016 McKay accepted, in writing, the written offer of Faith Lawley made and given to McKay in January of 2013.

19.     Defendant breached the Contract by not paying McKay in accordance with the terms of the agreement and as set forth in paragraph 14 above.

20.     Plaintiff has performed all obligations that it was required to perform under the Contract.

**WHEREFORE**, Plaintiff, John McKay, prays that this Court enter judgment in his favor and against Defendants as follows:

iv.   Damages in favor of Plaintiff resulting from Defendants' breach of contract in
      the amount of: $391,000, plus McKay's share of future distributions;

v.    For Plaintiff's costs, including reasonable attorneys' fees incurred in this action;
      and

vi.   For such further relief as this Court deems just and equitable.

By: _____

Keith A. Chadwick
GARFIELD & MEREL, LTD.
180 N Stetson
Suite 1300
Chicago, IL  60601
(312) 583-1600 Telephone
(312) 583-1700 Facsimile
chadwick@garfield-merel.com

EXHIBIT 4

## IN THE COURT OF COMMON PLEAS
## WARREN COUNTY, OHIO

COMMON PLEAS COURT
WARREN COUNTY, OHIO
FILED

FAITH LAWLEY, LLC
c/o Robbins, Kelly, Patterson & Tucker
7 West Seventh Street, Suite 1400
Cincinnati, Ohio 45202

and

ERIC NOVICKI
c/o Robbins, Kelly, Patterson & Tucker
7 West Seventh Street, Suite 1400
Cincinnati, Ohio 45202

and

CHRISTOPHER LAWLEY
c/o Robbins, Kelly, Patterson & Tucker
7 West Seventh Street, Suite 1400
Cincinnati, Ohio 45202

Plaintiffs,

vs.

JOHN W. MCKAY
507 Windett Lane
Geneva, Illinois 60134

Defendant.

Case No.:
18CV91051

Judge:
Peeler

2018 APR 23 PM 2: 00

JAMES L. SPAETH
CLERK OF COURTS

**COMPLAINT FOR
DECLARATORY JUDGMENT**

Now come Co-Plaintiffs, Faith Lawley, LLC, Eric Novicki, and Christopher Lawley, and for their Complaint for Declaratory Judgment against Defendant John W. McKay state as follows:

1.      Defendant, John W. McKay ("McKay"), entered into a certain Transfer Agreement with Plaintiff, Faith Lawley, LLC, and effective February 26, 2010.

03093748-1

2.      A true and accurate copy of the Transfer Agreement is attached hereto as Exhibit A, redacted for certain private information.  McKay has a full unredacted copy of the Transfer Agreement.

3.      McKay is a resident of Kane County, Illinois, and frequently travels to and spends time in Warren County, Ohio and conducts business in Warren County, Ohio.

4.      All actions as described herein took place in Warren County, Ohio.

5.      Plaintiff, Faith Lawley, LLC, is a limited liability company organized under the laws of the State of Ohio doing business in Warren County, Ohio.

6.      Plaintiff, Eric Novicki, is a resident of the State of Ohio, Warren County, and resides at 6901 Man O'War Lane, Mason, Ohio 45040, and is a member of Faith Lawley, LLC.

7.      Plaintiff, Christopher Lawley, is a resident of the State of Ohio, Warren County, and resides at 8544 Meadowbluff Court, Cincinnati, Ohio 45249, and is a member of Faith Lawley, LLC.

8.      Under the terms of the Transfer Agreement, McKay sold limited partnership interests in a separate company to Faith Lawley, LLC.

9.      The transfer was completed and the ownership interest was transferred to Faith Lawley, LLC, in exchange for payment to McKay as provided for in the Transfer Agreement.

10.      Under the terms of the Transfer Agreement, McKay retained an option to repurchase those limited partnership ownership interests.  The option to repurchase expired on or about December 31, 2012.

11.      McKay did not exercise his option to repurchase prior to the expiration time frame, as set forth in the Transfer Agreement.

12.     McKay now seeks to modify the terms of the Transfer Agreement improperly and contrast to the terms of the Transfer Agreement and without consideration for any such modification.

13.     McKay asserts there was an oral agreement for Faith Lawley, LLC to pay monies owed on investments which McKay had transferred to Faith Lawley, LLC under the Transfer Agreement.

14.     The Transfer Agreement specifically provides in paragraph 15:

> **Miscellaneous.**   This instrument contains the entire agreement between parties with respect to the subject matter hereof, and supersedes all prior oral or written understandings, agreements or contracts, formal or informal, between the parties hereto with respect thereto.   THIS PROVISION, AND EACH AND EVERY OTHER PROVISION OF THIS AGREEMENT, MAY NOT UNDER ANY CIRCUMSTANCE BE MODIFIED, CHANGED, AMENDED, OR PROVISIONS HEREUNDER WAIVED VERBALLY, BUT MAY ONLY BE MODIFIED, CHANGED, AMENDED, OR WAIVED BY AN AGREEMENT IN WRITING EXECUTED BY ALL PARTIES HERETO.

15.     As a result of the Transfer Agreement, there can be no oral modification of McKay's sale of his interest.

16.     McKay further alleges that there was a written offer by Faith Lawley, LLC given to McKay in January of 2013.  No such written offer exists.

17.     Regardless, McKay alleges that on or about May 4, 2016, he accepted that written offer he allegedly received in January of 2013.

18.     Pursuant to the aforementioned excerpt in the Transfer Agreement, any such modification to the Transfer Agreement must be made in writing and executed by all parties.

19.     No written and executed modification, amendment, addendum, or any other document changing the Transfer Agreement exists.

## COUNT ONE
## DECLARATORY JUDGMENT

20.     Plaintiffs incorporate by reference all prior allegations as if fully rewritten.

21.     Any agreement to modify the Transfer Agreement requires that it be in writing and executed by all parties.

22.     Plaintiffs request determination that McKay is not entitled to (1) any alleged share of initial funds that may have been invested in the limited partnership, (2) any distributions from the limited partnership payable to Faith Lawley, LLC, (3) any remaining proceeds or distributions to be paid to Faith Lawley, LLC, and (4) a finding the Transfer Agreement has not been modified, amended, or otherwise altered in anyway, and McKay is not entitled to any additional compensation as a result of the investment in the limited partnership, which was the subject matter of the Transfer Agreement.

23.     This declaratory judgment action is asserted pursuant to Ohio Revised Code Section 2721.04.

WHEREFORE, Plaintiffs, Faith Lawley, LLC, Eric Novicki, and Christopher Lawley, pray for judgment against Defendant, John W. McKay, as follows:

A.     For determinations that Defendant, John W. McKay, is not entitled to:

     a.   any alleged share of initial funds that may have been invested in the limited partnership,

     b.   any distributions from the limited partnership payable to Faith Lawley, LLC,

     c.   any remaining proceeds or distributions to be paid to Faith Lawley, LLC, and

    d. a finding the Transfer Agreement has not been modified, amended, or otherwise altered in any way, and

    e. McKay is barred from any other claim for additional compensation from any Plaintiff as a result of the Transfer Agreement;

    B.    An award to Plaintiffs, Faith Lawley, LLC, Eric Novicki, and Christopher Lawley, against the Defendant, John W. McKay, for all costs, reasonable attorney's fees, and for such other relief this Court deems just and equitable, including, but not limited to, costs of this action.

Respectfully submitted,

Richard O. Hamilton, Jr. (0072643)
Robert M. Ernst (0084096)
Robbins, Kelly, Patterson & Tucker
7 West Seventh Street, Suite 1400
Cincinnati, Ohio 45202-2417
(513) 721-3330; (513) 721-5001 fax
*rhamilton@rkpt.com*
*rernst@rkpt.com*
**Attorney for Plaintiffs**

## INSTRUCTIONS TO THE CLERK

    Please serve the Summons and Complaint by certified mail to the Defendant at the addresses set forth in the caption of the Complaint.

SUMMONS & COPY TO
DEF Via CM 23 APR 18 EAC

**EXHIBIT A**

## TRANSFER AGREEMENT

      This Transfer Agreement is entered into by and between John W. McKay, whose mailing address is 440 S. Third Street, Suite 205, St. Charles, Illinois 60174 ("**McKay**") and Faith Lawley, LLC, an Ohio limited liability company whose mailing address is 8544 Meadowbluff Court, Cincinnati, Ohio 45249 ("**Faith Lawley**"), effective as of this 26th day of February, 2010.

### BACKGROUND:

      A.     McKay is a limited partner in Granite Creek FlexCap I, L.P., a Delaware limited partnership (the "**Limited Partnership**").

      B.     Faith Lawley desires to purchase from McKay all of McKay's right, title and interest in and to McKay's limited partnership interest in the Limited Partnership.

      C.     Faith Lawley is willing to grant McKay the option to repurchase all right, title and interest in and to said limited partnership interest, upon the terms and conditions hereinafter set forth.

      **NOW, THEREFORE, FOR VALUABLE CONSIDERATION**, the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

      1.     **Background Statements**. Each party hereby affirms the truth and accuracy of the background statements set forth hereinabove. Each party acknowledges that the background statements are an integral part of this Agreement, and are specifically incorporated into this Agreement as the statements and representations of each party.

      2.     **Limited Partnership Interest**. McKay is a limited partner in the Limited Partnership, with a commitment of ███████████████████████ to the Limited Partnership (the "**Limited Partnership Interest**"), of which, █████████████████████ has been contributed to the Limited Partnership. McKay represents and warrants that McKay is not in default of its obligations to the Limited Partnership for payment of its Limited Partnership Interest or in default of any other material obligation owed to the Limited Partnership. McKay has delivered to Faith Lawley and Faith Lawley acknowledges receipt of a true and correct copy of the Amended and Restated Agreement of Limited Partnership of Granite Creek FlexCap I, L.P. (the "**Limited Partnership Agreement**"). The Limited Partnership Agreement remains in full force and effect and has not been modified, amended, or terminated.

      3.     **Purchase and Sale**. Upon the terms and conditions of this Agreement effective as of the date of Closing, McKay hereby sells, assigns, transfers, and conveys to Faith Lawley, and Faith Lawley hereby purchases from McKay, McKay's Limited Partnership Interest. The consideration to be received for the transfer of McKay's Limited Partnership Interest shall be ███████████████████████████ (the "**Purchase Price**"), payable at the Closing, as hereinafter defined.

4.     **Assumption of Obligations**  Faith Lawley (i) accepts the transfer of the Limited Partnership Interest, (ii) agrees to comply with, be bound by and subject to all of the terms, conditions, and provisions of the Limited Partnership Agreement, (iii) undertakes and assumes all of McKay's duties and obligations under the Limited Partnership Agreement, including but not limited to the obligation to contribute any unfunded commitment attributable to the Limited Partnership Interest, and (iv) makes all representations required of a limited partner under the Limited Partnership Agreement.  Faith Lawley specifically acknowledges that it will timely make the ███████████████████████████████ cash call payment to the Limited Partnership on or before the due date of February 26, 2010 (the "**Initial Cash Call**").

5.     **Limited Partnership and SBA Approval**.  Faith Lawley agrees that it shall execute and deliver any and all documents required by the Limited Partnership and/or the Small Business Administration ("**SBA**") in order to obtain the consent of the Limited Partnership and its general partner, and/or the consent of the SBA to the transactions contemplated hereby.  Faith Lawley and McKay shall each execute and deliver to the SBA the Request for Approval of Transfer Certificate in the form provided by the SBA.

6.     **Ownership of Limited Partnership Interests**.  McKay hereby represents and warrants to Faith Lawley that McKay is hereby selling, assigning, transferring, and conveying to Faith Lawley, good and marketable title to the Limited Partnership Interest free and clear of any liens and encumbrances other than the Option to repurchase described in Section 8 hereinbelow. Upon the completion of such transfer, Faith Lawley will be the owner of the Limited Partnership Interest.

7.     **Closing**.  This transaction shall be consummated, and all of the actions required to occur at Closing shall take place, on Friday, February 26, 2010, at such time and place as the parties may mutually agree.

8.     **Option to Repurchase**.  Faith Lawley hereby grants to McKay the right to repurchase the Limited Partnership Interest, at the option of McKay (the "**Option**"), upon the following terms and conditions:

      a.     Expiration of Option.  The Option may be exercised at any time from the date hereof through and including December 31, 2012 (the "**Option Period**").  In order to timely exercise said Option, McKay must give Faith Lawley written notice of an intent to exercise said Option delivered to the address of Faith Lawley as first set forth hereinabove, and must pay Faith Lawley the Option Price, as hereinafter defined, prior to the expiration of the Option Period.

      b.     Option Price.  In order to exercise the Option to repurchase the Limited Partnership Interest, McKay must pay Faith Lawley the following (the "**Option Price**"):

            i.     The original Purchase Price of ████████████████████ ██████████████████ plus interest accruing at the rate of twenty-five

percent (25%) per annum from the date of Closing through the date of payment of the Option Price; plus

    ii.   The Initial Cash Call paid by Faith Lawley in the amount of ███████, plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of payment of the Initial Cash Call through the date of payment of the Option Price; plus

   iii.   The amount of any other cash call paid by Faith Lawley with respect to the Limited Partnership Interest, plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of payment of any such cash call through the date of payment of the Option Price; plus

   iv.   An amount equal to the Tax Adjustment Payment, if any, calculated pursuant to Section 8(e) hereinbelow;

provided, however, the total accrued interest pursuant to clauses i, ii, and iii hereinabove shall not be less than a total of ██████; and provided further, however, in the event that Faith Lawley fails to make any cash call payment with respect to the Limited Partnership Interest when due, or within five (5) days prior to the expiration of any grace period for the payment of any such cash call (an "**Event of Default**"), then the total Option Price shall only be an amount equal to ██████, and shall not include any payment or reimbursement for the original Purchase Price of ████████████, any interest accrual, nor any amounts paid by Faith Lawley with respect to any cash call.

c.    <u>Residual Rights</u>. Following the repurchase by McKay of the Limited Partnership Interest pursuant to the Option, Faith Lawley shall continue to be entitled to receive from McKay the "Applicable Percentage", as hereinafter defined, of any dividends or other distributions of profit (but not of principal or capital repayment) made to McKay by the Limited Partnership with respect to McKay's Limited Partnership Interest. For purposes of this Agreement, the "Applicable Percentage" shall be as follows:

    i.   If Faith Lawley did not make any cash call payments during the period of time Faith Lawley owned the Limited Partnership Interest, other than payment of the Initial Cash Call, or upon an Event of Default, then the Applicable Percentage shall be zero percent (0%).

    ii.   Otherwise, the Applicable Percentage shall be the sum of all cash calls paid by Faith Lawley during the period of its ownership of the Limited Partnership Interest, including the amount of the Initial Cash Call, divided by ██████████.

    d.    <u>Distribution Adjustment</u>. In the event that the Limited Partnership makes dividend distributions or other distributions of profit to Faith Lawley during the period of its ownership of the Limited Partnership Interest, then upon the exercise of the Option by McKay, Faith Lawley shall transfer and pay to McKay an amount equal to such distributions, less the Applicable Percentage of such distributions, with the Applicable Percentage being calculated as of the time of such distribution.

    e.    <u>Tax Adjustment Payment</u>. The parties understand and agree that during the period of time Faith Lawley owns the Limited Partnership Interest, it will be allocated for federal and state income tax purposes a portion of any gains or losses incurred by the Limited Partnership. Upon the exercise of the Option by McKay, to the extent that the distributions retained by Faith Lawley pursuant to Section 8 d. hereinabove are less than the federal and state income tax liability incurred by the members of Faith Lawley with respect to the income recognized by virtue of ownership of said Limited Partnership Interest, net of any losses or other deductions recognized with respect to ownership of such Limited Partnership Interest, the Tax Adjustment Payment shall be an amount equal to such deficiency, plus interest accruing at the rate of five percent (5%) per annum from the date of payment of such tax liability, on a portion of such deficiency, which portion is equal to the deficiency multiplied by the remainder of one minus Faith Lawley's Applicable Percentage. For example, assume that the members of Faith Lawley incurred tax liability of ▮▮▮▮ as a result of their ownership of the Limited Partnership Interest, and retained ▮▮▮▮ of distributions pursuant to Section 8 d. above, upon exercise by McKay of his Option to repurchase the Limited Partnership Interest. Further, assume that Faith Lawley's Applicable Percentage calculated pursuant to Section 8 c. above is 40%. In such an example, there would be a ▮▮▮▮ deficiency between the tax liability incurred by the members ▮▮▮▮ and amount of distributions retained by Faith Lawley ▮▮▮▮. The Tax Adjustment Payment would be an amount equal to the ▮▮▮▮ deficiency, plus interest accruing at the rate of 5% per annum from the date of payment of such tax liability on a portion of such deficiency. The portion of the deficiency which would accrue interest would be an amount equal to the deficiency ▮▮▮▮ multiplied by one minus the Applicable Percentage (40%), which is equal to 60%, which would mean that ▮▮▮▮ of the deficiency would accrue interest and the remaining ▮▮▮▮ of the deficiency would not accrue interest in calculating the Tax Adjustment Payment.

    9.    <u>**Parties Bound; Specific Performance**</u>. This Agreement shall be binding upon the parties, their respective heirs, administrators, executors, successors and assigns; provided, however, it is understood and agreed that Faith Lawley shall not sell, transfer, assign or convey the Limited Partnership Interest, or any interest therein, to any other person or entity prior to the expiration of the Option. The parties do hereby agree for themselves and their heirs, administrators, executors, successors or assigns, as aforesaid, to execute any instruments in writing which might be necessary or proper to carry out the purposes and intent of this Agreement and to protect the parties hereto. The parties hereto acknowledge that the Limited

Partnership Interest which is the subject matter of this Agreement is unique, and as a result, this Agreement may be specifically enforced.

        10.     **Good Faith; Further Assurances**. The parties to this Agreement shall in good faith undertake to perform their obligations under this Agreement, to satisfy all conditions and to cause the transactions contemplated by this Agreement to be carried out promptly in accordance with the terms of this Agreement. Upon the execution of this Agreement and thereafter, each party shall do such things as may be reasonably requested by the other party hereto in order more effectively to consummate or document the transactions contemplated by this Agreement.

        11.     **Securities Investment Representation**. Faith Lawley warrants, represents, agrees and acknowledges: (A) that Faith Lawley has adequate means of providing for its own current needs and foreseeable future contingencies, and anticipates no need now or in the foreseeable future to sell the Limited Partnership Interest; (B) that it is acquiring the Limited Partnership Interest for its own account as a long-term investment and without a present view to make any distribution, resale or fractionalization thereof; (C) that it and its independent counselors have such knowledge and experience in financial and business matters that they are capable of evaluation the merits and risks of the investment involved in its acquisition of the Limited Partnership Interest and they have evaluated the same; (D) that it is able to bear the economic risks of such investment; (E) that it and its independent counselors have made such investigation of the Company (including its business prospects and financial condition ) and it has had access to all information regarding the Company and it has had an opportunity to ask all of the questions regarding the Company as it deems necessary to fully evaluate its investment therein; (F) that in connection with its acquisition of the Limited Partnership Interest, it has been fully informed by its independent counsel as to the applicability of the requirements of the Securities Act of 1933 and all applicable state securities or "blue sky" laws to the Limited Partnership Interest; and (G) that it understands that (1) the Limited Partnership Interest is not registered under the Securities Act or any state securities law, (2) there is no market for the Limited Partnership Interest and that it will be unable to transfer the Limited Partnership Interest unless such is so registered or unless the transfer complies with an exemption from such registration, (3) such Limited Partnership Interest cannot be expected to be readily transferred or liquidated; and (4) its acquisition of a Limited Partnership Interest in the Company involves a high degree of risk.

        12.     **Survival of Representations and Warranties**. The warranties, representations and agreements set forth herein shall be continuous and shall survive the consummation of the transaction contemplated hereby.

        13.     **Severability**. If fulfillment of any provision of this Agreement or performance of any act contemplated hereby, at the time such fulfillment or performance shall be due, shall exceed the limit of validity prescribed by law, then the obligation to be fulfilled or performed shall be reduced to the limit of such validity; and, if any clause or provision contained in this Agreement or in any document or instrument to be delivered pursuant hereto, operates or would operate to invalidate this Agreement or such document or instrument, in whole or in part, such clause or provision shall be held ineffective, as though not herein or therein contained, and the

remainder of this Agreement or such document or instrument shall remain operative and in full force and effect.

14. **Arbitration**. This Agreement shall be governed and construed under the laws of the State of Ohio, not including the choice of law rules thereof. Any and all disputes, complaints, controversies, claims and grievances arising under, out of, in connection with, or in any manner related to this Agreement or the relationship of parties hereunder shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any decision and award of the arbitrator shall be final, binding and conclusive upon all of the parties hereto and said decision and award may be entered as a final judgment in any Court of competent jurisdiction. Notwithstanding said Rules, any arbitration hearing to take place hereunder shall be conducted in Cincinnati, Ohio, before one (1) arbitrator who shall be an attorney who has substantial experience in business law issues, unless the parties to the arbitration agree to some other arbitrator. However, no party shall institute an arbitration, or any other proceeding to resolve such disputes until that party has sought to resolve such disputes through direct negotiation with the other party or parties. If such disputes are not resolved within three (3) weeks after a demand for direct negotiation, the parties to the dispute shall attempt to resolve such disputes through mediation conducted in Cincinnati, Ohio. If the parties to the dispute do not agree on a mediator within ten (10) days, any party to the dispute may request the American Arbitration Association to appoint a mediator who shall be an attorney who has substantial experience in business law issues. If the mediator is unable to facilitate a settlement of disputes within forty-five (45) days, the mediator shall issue a written statement to the parties to that effect and the aggrieved party may then seek relief through arbitration as provided above. The fees and expenses of the mediator shall be split and paid equally by each of the parties to the dispute. In the event of any arbitration between any of the parties hereto involving this Agreement or the respective rights of the parties hereunder, each party shall pay his own attorneys' fees, costs and expenses of such arbitration. Each party hereby consents to a single, consolidated arbitration proceeding of multiple claims, or claims involving more than two (2) parties. Each party may apply to any Court of competent jurisdiction for injunctive relief or other interim measures (i) as provided for elsewhere in this Agreement, (ii) in aid of the arbitration proceedings, or (iii) to enforce the arbitration award, but not otherwise. Any such application to a Court shall not be deemed incompatible or a waiver of this section. The arbitrator shall be required to make written findings of fact and conclusions of law to support its award. Notwithstanding anything to the contrary in the Commercial Arbitration Rules and supplementary procedures, the arbitrator shall not be authorized or empowered to award punitive, exemplary, consequential or special damages, or attorney's fees, and the parties expressly waive any claim to such damages or fees.

15. **Miscellaneous**. This instrument contains the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior oral or written understandings, agreement or contracts, formal or informal, between the parties hereto with respect thereto. THIS PROVISION, AND EACH AND EVERY OTHER PROVISION OF THIS AGREEMENT MAY NOT UNDER ANY CIRCUMSTANCE BE MODIFIED, CHANGED, AMENDED OR PROVISIONS HEREUNDER WAIVED VERBALLY, BUT MAY ONLY BE MODIFIED, CHANGED, AMENDED OR WAIVED BY AN AGREEMENT IN WRITING EXECUTED BY ALL PARTIES HERETO. All headings set forth herein are included for the convenience of

reference only and shall not affect the interpretation hereof, nor shall any weight or value be given to the relative position of any part or provision hereof in relation to any other provision in determining such construction. This Agreement may be signed in any number of counterparts with the same effect as if the signature on each such counterpart were on the same instrument. Facsimiles, or other electronic transmissions (e.g. PDFs), of signatures will be deemed to be originals.

16.     **Attorney Representation.**  The parties hereby acknowledge that legal counsel for McKay, the law firm of Kahn, Dees, Donovan & Kahn, LLP, has disclosed that potential conflicts between McKay's interests and the interests of Faith Lawley may exist now or in the future, and that said legal counsel has advised Faith Lawley that it might find it beneficial to obtain individual and separate legal counsel to review this Agreement prior to its execution, as well as all future legal instruments prepared by said legal counsel for its execution.  Faith Lawley hereby further acknowledges that it understands that Kahn, Dees, Donovan & Kahn, LLP is representing McKay, and not Faith Lawley, in this transaction.

**IN WITNESS WHEREOF**, the parties have executed this Agreement the year and date first above written.

_____

John W. McKay

"MCKAY"

FAITH LAWLEY, LLC

By:_____

Chris Lawley, Member

By:_____

Eric Novicki, Member

"FAITH LAWLEY"

**IN WITNESS WHEREOF**, the parties have executed this Agreement the year and date first above written.

_John W. McKay_
John W. McKay

"MCKAY"

FAITH LAWLEY, LLC

By:_____
       Chris Lawley, Member

By:_____
       Eric Novicki, Member

"FAITH LAWLEY"

**EXHIBIT 5**

# IN THE COURT OF COMMON PLEAS
## WARREN COUNTY, OHIO

FAITH LAWLEY, LLC, *et.al.*      :
                                    :

      PLAINTIFFS,      :
                                      :

          v.      :

JOHN W. MCKAY,      :

      DEFENDANT.      :

---

JOHN MCKAY,      :

      COUNTER-PLAINTIFF,      :

          V.      :

FAITH LAWLEY, LLC      :

      and      :      Case No. 18CV091051

ERIC NOVICKI      :      JUDGE ROBERT W. PEELER

      and      :      DEFENDANT'S ANSWER,
                                      :      AFFIRMATIVE DEFENSES, AND

CHRISTOPHER LAWLEY      :      COUNTERCLAIMS

      COUNTER-DEFENDANTS.      :      JURY TRIAL REQUESTED

      Defendant/Counter-Plaintiff, John McKay (McKay), by counsel, hereby offers his answer, affirmative defenses, and counterclaims, against Plaintiffs/Counter-Defendants Faith Lawley LLC, Eric Novicki, and Christopher Lawley (collectively "Lawley").

      Defendant/Counter-Plaintiff states as follows:

### A.     <u>ANSWER</u>

1. Defendant/Counter-Plaintiff admits the allegations contained in paragraph one (1) of

Plaintiff/Counter-Defendants' Complaint to the extent that McKay attempted to enter into the Transfer Agreement with Lawley.

2. Defendant/Counter-Plaintiff admits the allegations contained in paragraph two (2) of Plaintiff/Counter-Defendants' Complaint.

3. Defendant/Counter-Plaintiff admits the allegations contained in paragraph three (3) of Plaintiff/Counter-Defendants' Complaint.

4. Defendant/Counter-Plaintiff has insufficient knowledge to admit or deny the allegations contained in paragraph four (4) of Plaintiff/Counter-Defendants' Complaint and therefore denies the same.

5. Defendant/Counter-Plaintiff admits the allegations contained in paragraph five (5) of Plaintiff/Counter-Defendants' Complaint.

6. Defendant/Counter-Plaintiff admits the allegations contained in paragraph six (6) of Plaintiff/Counter-Defendants' Complaint.

7. Defendant/Counter-Plaintiff admits the allegations contained in paragraph seven (7) Of Plaintiff/Counter-Defendants' Complaint.

8. Defendant/Counter-Plaintiff denies the allegations contained in paragraph eight (8) of Plaintiffs/Counter-Defendants' Complaint.

9. Defendant/Counter-Plaintiff denies the allegations contained in paragraph nine (9) of Plaintiffs/Counter-Defendants' Complaint.

10. Defendant/Counter-Plaintiff denies the allegations contained in paragraph ten (10) of Plaintiffs/Counter-Defendants' Complaint.

11. Defendant/Counter-Plaintiff denies the allegations contained in paragraph eleven (11) of Plaintiffs/Counter-Defendants' Complaint.

12. Defendant/Counter-Plaintiff denies the allegations contained in paragraph twelve (12) of Plaintiffs/Counter-Defendants' Complaint.

13. Defendant/Counter-Plaintiff admits the allegations contained in paragraph thirteen (13) of Plaintiff/Counter-Defendants' Complaint.

14. Defendant/Counter-Plaintiff admits the allegations contained in paragraph fourteen (14) of Plaintiff/Counter-Defendants' Complaint.

15. Defendant/Counter-Plaintiff denies the allegations contained in paragraph fifteen (15) of Plaintiffs/Counter-Defendants' Complaint.

16. Defendant/Counter-Plaintiff admits the allegations contained in paragraph sixteen (16) of Plaintiff/Counter-Defendants' Complaint to the extent that a written offer was made by Lawley.

17. Defendant/Counter-Plaintiff admits the allegations contained in paragraph seventeen (17) of Plaintiff/Counter-Defendants' Complaint.

18. Defendant/Counter-Plaintiff denies the allegations contained in paragraph eighteen (18) of Plaintiffs/Counter-Defendants' Complaint.

19. Defendant/Counter-Plaintiff denies the allegations contained in paragraph nineteen (19) of Plaintiffs/Counter-Defendants' Complaint.

20. Defendant/Counter-Plaintiff admits the allegations contained in paragraph twenty (20) of Plaintiff/Counter-Defendants' Complaint.

21. Defendant/Counter-Plaintiff admits the allegations contained in paragraph twenty-one (21) of Plaintiff/Counter-Defendants' Complaint.

22. Defendant/Counter-Plaintiff has insufficient knowledge to admit or deny the

allegations contained in paragraph twenty-two (22) of Plaintiff/Counter-Defendants' Complaint and therefore denies the same.

23. Defendant/Counter-Plaintiff has insufficient knowledge to admit or deny the allegations contained in paragraph twenty-three (23) of Plaintiff/Counter-Defendants' Complaint and therefore denies the same.

WHEREFORE, Defendant/Counter-Plaintiff respectfully prays that the Plaintiff/Counter-Defendants take nothing by their complaint, and that the Defendant/Counter-Plaintiff be awarded Judgment against Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income, for incidental and consequential damages, attorney fees, for the costs of this action, exemplary damages, for pre-judgment interest at the statutory rate on the value of McKay's pre-transfer equity in Granite Creek from the date of the alleged transfer to the date of judgment, and all other just and proper relief.

## B.  <u>AFFIRMATIVE DEFENSES</u>

Defendant/Counter-Plaintiff, John McKay, by counsel, hereby offers his affirmative defenses, as more fully set forth in his counterclaims, and states as follows:

a.  Plaintiff/Counter-Defendants failed to fulfill the terms of the agreement they seek to enforce and should be denied the relief they seek because of breach of contract;

b.  Plaintiff/Counter-Defendants made representations to Defendant/Counter-Plaintiff to induce him to enter into the contract in question, when Plaintiff/Counter-Defendants knew or should have known that said representations were untrue, so that the contract should be void or voidable.

   c. Plaintiff/Counter-Defendants have constructively and intentionally waived the terms of the contract they seek to enforce.

   d. Plaintiff/Counter-Defendants have made representations to Defendant/Counter-Plaintiff when they should have known those representations were untrue, and Defendant/Counter-Plaintiff relied on those representations to his detriment, so that Plaintiff/Counter-Defendants should be barred by equitable estoppels from enforcing the terms of the contract.

   e. Plaintiff/Counter-Defendants' claims are barred by failure of consideration and impossibility.

WHEREFORE, Defendant/Counter-Plaintiff respectfully prays that the Plaintiff/Counter-Defendants take nothing by their complaint, and that the Defendant/Counter-Plaintiff be awarded damages including rescission of contract, restitution, out-of-pocket expenses, prejudgment interest, equitable relief, exemplary damages, the benefit of Defendant/Counter-Plaintiff's bargain, and all other just and proper relief in the premises.

## C.    **COUNTERCLAIMS**

Defendant/Counter-Plaintiff, John McKay (McKay), by counsel, for his counterclaims againt Plaintiffs/Counter-Defendants Faith Lawley LLC, Eric Novicki, and Christopher Lawley (collectively "Lawley"), states as follows:

### STATEMENT OF FACTS

1.    From the period of approximately June 2006 through the first quarter of 2013, Granite Creek Flexcap I, L.P. (Granite Creek) is funded by McKay, Novicki and Lawley in an amount equal to $1,320,000. Of the $1,320,000, McKay personally funded $900,000.

2.     In early 2010, in order to avoid losing his investment and/or diluting McKay's investment due to a capital call of $75,000, it was agreed between McKay, Novicki, and Lawley that the defendant entity, Faith Lawley, LLC would be formed in order to buy and hold McKay's investment in Granite Creek. The Transfer Agreement set forth consideration (agreed to be reduced from market value as part of the agreement between McKay, Novicki and Lawley), to be paid to McKay to transfer his membership interest in Granite Creek into the Plaintiffs' Faith Lawley entity (Transfer Agreement). The Transfer Agreement attached here as Exhibit "A" is identical to the to the signed copy attached to Plaintiffs' Complaint for Declaratory Judgment without redactions.

3.     Paragraph 2 of the executed Transfer Agreement provides:

> "The (Granite Creek) Limited Partnership Agreement remains in full force and effect and has not been modified, amended, or terminated."

4.     Paragraph 4 of the executed Transfer Agreement provides:

> "Faith Lawley (i) accepts the transfer of the Limited Partnership Interest, (ii) agrees to comply with, be bound by and subject to all of the terms, conditions, and provisions of the Limited Partnership Agreement, (iii) undertakes and assumes all of McKay's duties and obligations under the Limited Partnership Agreement, including but not limited to the obligation to contribute any unfunded commitment attributable to the Limited Partnership Interest, and (iv) makes all representations required of a limited partner under the Limited Partnership Agreement."

The Granite Creek Limited Partnership Agreement in effect at the time of the Transfer Agreement, and incorporated by reference in the Transfer Agreement, is attached here as Exhibit "B".

5.     Paragraph 5 of the executed Transfer Agreement provides:

"Faith Lawley agrees that it shall execute and deliver any and all documents required by the Limited Partnership and/or the Small Business Administration ("**SBA**") in order to obtain the consent of the Limited Partnership and its general partner, and/or the consent of the SBA to the transactions contemplated hereby."

6.  Section 10.01 of the Granite Creek LP Agreement provides:

    "10.01 Assignability.

    (a) Limited Partner Transfer.  No Limited Partner may assign, pledge or otherwise grant a security interest in its or his interest in the Partnership or in this Agreement, except: (i) by operation of law; (ii) to a receiver or trustee in bankruptcy for that Partner; or (iii) with the prior written consent of the General Partner (which consent may be withheld in the reasonable discretion of the General Partner) . . ."

Lawley failed to obtain written consent and updated forms necessary to complete the transfer of McKay's Granite Creek interest from the General Partner of Granite Creek.  Lawley further failed to obtain written consent of the General Partner to McKay's option to repurchase his interest in the Transfer Agreement.

7.  Contemporaneously with the attempted transfer by McKay of his membership interest in Granite Creek to Faith Lawley, the newly formed Faith Lawley entity paid, constructively on McKay's behalf, the capital call of $75,000.

8.  Paragraph 8 of the executed Transfer Agreement provides:

"Faith Lawley hereby grants to McKay the right to repurchase the Limited Partnership Interest, at the option of McKay (the "**Option**"), upon the following terms and conditions:

    a.  Expiration of Option.  The Option may be exercised at any time from the date hereof through and including December 31, 2012 (the "**Option Period**").  In order to timely exercise said Option, McKay must give Faith Lawley written notice of an intent to exercise said Option delivered to the address of Faith Lawley as first set forth hereinabove, and must pay Faith Lawley the Option Price, as hereinafter defined, prior to the expiration of the Option Period.

7

    b.    <u>Option Price</u>.  In order to exercise the Option to repurchase the Limited Partnership Interest, McKay must pay Faith Lawley the following (the "**Option Price**"):

        i.  The original Purchase Price of One Hundred Twenty-five Thousand Dollars ($125,000.00) plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of Closing through the date of payment of the Option Price; plus

       ii.  The Initial Cash Call paid by Faith Lawley in the amount of Seventy-five Thousand Dollars ($75,000.00), plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of payment of the Initial Cash Call through the date of payment of the Option Price; plus

      iii.  The amount of any other cash call paid by Faith Lawley with respect to the Limited Partnership Interest, plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of payment of any such cash call through the date of payment of the Option Price; plus

      iv.  An amount equal to the Tax Adjustment Payment, if any, calculated pursuant to Section 8(e) hereinbelow;

provided, however, the total accrued interest pursuant to clauses i, ii, and iii hereinabove shall not be less than a total of Twenty Thousand Dollars ($20,000.00); and provided further, however, in the event that Faith Lawley fails to make any cash call payment with respect to the Limited Partnership Interest when due, or within five (5) days prior to the expiration of any grace period for the payment of any such cash call (an "**Event of Default**"), then the total Option Price shall only be an amount equal to One Hundred Dollars ($100.00), and shall not include any payment or reimbursement for the original Purchase Price of One Hundred Twenty-five Thousand Dollars ($125,000.00), any interest accrual, nor any amounts paid by Faith Lawley with respect to any cash call.

    c.    <u>Residual Rights</u>.  Following the repurchase by McKay of the Limited Partnership Interest pursuant to the Option, Faith Lawley shall continue to be entitled to receive from McKay the "Applicable Percentage", as hereinafter defined, of any dividends or other distributions of profit (but not of principal or capital repayment) made to McKay by the Limited Partnership with respect to McKay's Limited Partnership Interest.  For purposes of this Agreement, the "Applicable Percentage" shall be as follows:

        i.  If Faith Lawley did not make any cash call payments during the period of time Faith Lawley owned the Limited Partnership Interest, other

8

> than payment of the Initial Cash Call, or upon an Event of Default, then the Applicable Percentage shall be zero percent (0%).

> ii. Otherwise, the Applicable Percentage shall be the sum of all cash calls paid by Faith Lawley during the period of its ownership of the Limited Partnership Interest, including the amount of the Initial Cash Call, divided by One Million Five Hundred Thousand Dollars ($1,500,000.00).

d. <u>Distribution Adjustment</u>. In the event that the Limited Partnership makes dividend distributions or other distributions of profit to Faith Lawley during the period of its ownership of the Limited Partnership Interest, then upon the exercise of the Option by McKay, Faith Lawley shall transfer and pay to McKay an amount equal to such distributions, less the Applicable Percentage of such distributions, with the Applicable Percentage being calculated as of the time of such distribution.

e. <u>Tax Adjustment Payment</u>. The parties understand and agree that during the period of time Faith Lawley owns the Limited Partnership Interest, it will be allocated for federal and state income tax purposes a portion of any gains or losses incurred by the Limited Partnership. Upon the exercise of the Option by McKay, to the extent that the distributions retained by Faith Lawley pursuant to Section 8 d. hereinabove are less than the federal and state income tax liability incurred by the members of Faith Lawley with respect to the income recognized by virtue of ownership of said Limited Partnership Interest, net of any losses or other deductions recognized with respect to ownership of such Limited Partnership Interest, the Tax Adjustment Payment shall be an amount equal to such deficiency, plus interest accruing at the rate of five percent (5%) per annum from the date of payment of such tax liability, on a portion of such deficiency, which portion is equal to the deficiency multiplied by the remainder of one minus Faith Lawley's Applicable Percentage. For example, assume that the members of Faith Lawley incurred tax liability of $120,000 as a result of their ownership of the Limited Partnership Interest, and retained $20,000 of distributions pursuant to Section 8 d. above, upon exercise by McKay of his Option to repurchase the Limited Partnership Interest. Further, assume that Faith Lawley's Applicable Percentage calculated pursuant to Section 8 c. above is 40%. In such an example, there would be a $100,000 deficiency between the tax liability incurred by the members ($120,000) and amount of distributions retained by Faith Lawley ($20,000). The Tax Adjustment Payment would be an amount equal to the $100,000 deficiency, plus interest accruing at the rate of 5% per annum from the date of payment of such tax liability on a portion of such deficiency. The portion of the deficiency which would accrue interest would be an amount equal to the deficiency ($100,000) multiplied by one minus the Applicable Percentage (40%), which is equal to 60%, which would mean that $60,000 of the deficiency would

9

accrue interest and the remaining $40,000 of the deficiency would not accrue interest in calculating the Tax Adjustment Payment."

9.     Faith Lawley did not obtain the written approval of the General Partner of Granite Creek LP to the Transfer Agreement repurchase option set forth in paragraph eight (8) above.

10.    Over the remainder of 2010 and during the years of 2011 and 2012, Novicki and Lawley would orally discuss with McKay the status of the Granite Creek business and distribution predictions by Granite Creek to Faith Lawley/McKay. During that period Plaintiffs and Defendant discussed the transfer of John McKay's remaining interest for additional consideration.

11.    In an effort to memorialize and further evidence the discussions between McKay, Novicki, and Lawley from 2010 through 2012, McKay sent an e-mail to Novicki on or about ▮▮▮▮▮▮▮▮▮▮▮▮▮ outlining the understanding between McKay, Novicki, and Lawley as members of and acting with the authority of and on behalf of Faith Lawley, LLC.

12.    On or about January 7, 2013, McKay met in person with Novicki and Lawley who, on behalf of Faith Lawley LLC, outlined and presented in writing to McKay the status of the Granite Creek investment being held in the Faith Lawley entity. The presentation included a proposal for Plaintiffs to compensate John McKay for his remaining interest in Faith Lawley LLC and Granite Creek, and in return McKay would abandon his option to repay and retake full ownership.

13.    On or about January 8, 2013, Novicki e-mailed McKay advising that going forward McKay should finalize details of the deal directly with Lawley who was authorized to act as agent of Faith Lawley.

10

14.     McKay and Lawley, throughout the period from March 2013 and June of 2016 communicated multiple times, including but not limited to March 23, 2013, April 21, 2013, May 25, 2013, June 12, 2013, September 22, 2013, October 12, 2013, October 1, 2014 and various communications continuing through May of 2016 discussing and evidencing the agreement whereby Faith Lawley, authorized and agreed to by Lawley, when funds were available, pay to McKay his share of the following: (a) return of initial $861,570.15 from Granite Creek to Faith Lawley, (b) the next $200,000 from Granite Creek to be paid equally to McKay and Faith Lawley, (c) the next $100,000 to Faith Lawley and (d) all remaining proceeds and distributions to be paid and split between Faith Lawley receiving 80% and McKay 20%.

15.     On May 4, 2016 John McKay formally accepted the proposed agreement for his remaining interest in Granite Creek.  Lawley then repudiated their offer and reneged on consummating the agreement.  Christopher Lawley emailed McKay on behalf of Lawley, "I don't see a way to do that at this time".  Novicki also separately emailed McKay repudiating the offer.

## COUNT I: BREACH OF CONTRACT

16.     Defendant/Counter-Plaintiff McKay realleges and incorporates by reference each and every allegation contained in paragraphs one (1) through fifteen (15) above.

17.     Lawley has not complied with the Granite Creek Limited Partnership agreement requirement to obtain prior written consent from the General Partner of Granite Creek for the transfer of McKay's interest.

18.     Lawley did not obtain prior written approval from the General Partner of Granite Creek LP to the option to repurchase interest for McKay included in the Transfer Agreement.

11

19.     Lawley failed to complete the transfer by not obtaining approval from the General Partner of Granite Creek LP to the transfer and repurchase option. These failures are a material and fatal breach of contract.

20.     McKay sustained damages because of Lawley's breach, including incidental and consequential expenses, attorney fees, loss of interest and income, and the illegitimate exercise of ownership and control over McKay's Granite Creek interest by Lawley.

21.     Because Lawley breached the contract by failing to complete the transfer, said contract should be held as void, and restitution so the parties are placed in the position they would be in at this time if the transfer agreement never existed.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income and interest, for incidental and consequential damages, attorney fees, for the costs of this action, that Plaintiffs take nothing by way of their complaint, and all other just and proper relief.

## COUNT II: FRAUD IN THE INDUCEMENT TO CONTRACT

22.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs one (1) through twenty-one (21) above.

23.     Lawley misrepresented to McKay that they would perform all formalities required to complete the transfer, including obtaining prior written consent from the General Partner of Granite Creek for the transfer of the interest and prior written consent to the option to repurchase by McKay.

24. Lawley never obtained prior written consent of the Granite Creek General Partner or updated documents to complete the transfer, and never obtained prior written consent for the option to repurchase.

25. This was a material misrepresentation.

26. Lawley's misrepresentations were made knowingly or with reckless disregard for truth of the matter.

27. McKay relied on the misrepresentations made by the Lawley in signing the Transfer Agreement with Lawley.

28. McKay was damaged as a direct and proximate result of the Lawley's fraudulent misrepresentations.

29. McKay sustained damages, including incidental and consequential cost, attorney fees, loss of interest and income, and the illegitimate exercise of ownership and control over McKay's Granite Creek interest by Lawley. The Transfer Agreement should therefore be held as void, and restitution awarded so the parties are placed in the position they would be in at this time if the transfer agreement never existed.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income and interest, for incidental and consequential damages, attorney fees, for the costs of this action, that Plaintiffs take nothing by way of their complaint, and all other just and proper relief.

## COUNT III: ESTOPPEL BARRING CONTRACT ENFORCEMENT

30. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs one (1) through twenty-nine (29) above.

13

31.    Lawley misrepresented to McKay that Lawley would complete all formalities to transfer McKay's interest in Granite Creek and retain an option for McKay to repurchase, which Lawley failed to do.

32.    Lawley reasonably expected McKay to rely upon Lawley's misrepresentations.

33.    McKay did rely on the Lawleys' representations in signing the Transfer Agreement with Lawley.

34.    McKay was damaged by the misrepresentations of Lawley. McKay sustained damages including incidental and consequential costs, attorney fees, loss of interest and income, and the illegitimate exercise of ownership and control over McKay's Granite Creek interest by Lawley.

35.    Injustice can only be avoided by barring defendants through equitable estoppel from enforcing the terms of the contract, and by ordering accounting and restitution, repayment of consideration, lost interest and income, as well as incidental and consequential damages.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income and interest, for incidental and consequential damages, attorney fees, for the costs of this action, that Plaintiffs take nothing by way of their complaint, and all other just and proper relief.

## COUNT IV:  FAILURE OF CONSIDERATION AND IMPOSSIBILITY

36.    Defendant/Counter-Plaintiff McKay realleges and incorporates by reference each and every allegation contained in paragraphs one (1) through thirty-five (35) above.

37.    Lawley never obtained prior written consent of the Granite Creek General Partner to complete the transfer and retain an option for McKay to repurchase.

14

38.     At this time it is impossible for Lawley to complete the transfer of McKay's interest in Granite Creek.

39.     Because McKay's interest in Granite Creek cannot be transferred, there is a failure of consideration for the Transfer Agreement.

40.     McKay sustained damages including incidental and consequential costs, attorney fees, loss of interest and income, and the illegitimate exercise of ownership and control over McKay's Granite Creek interest by Lawley.

41.     Because of failure of consideration and impossibility, said Transfer Agreement should be held as void, and restitution awarded so the parties are placed in the position they would be in at this time if the contract never existed.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income and interest, for incidental and consequential damages, attorney fees, for the costs of this action, and all other just and proper relief.

## COUNT V: ESTOPPEL AND WAIVER
## OF LIMITATION OF TIME TO EXECUTE REPURCHASE OPTION

42.     Counter-Plaintiff McKay realleges and incorporates by reference each and every allegation contained in paragraphs one (1) through forty-one (41) above.

43.     The executed Transfer Agreement provided that McKay had the option to repurchase his transferred interest in Granite Creek until December 31, 2012.

44.     Lawley represented to McKay that Lawley would pay additional consideration to McKay for his remaining interest and option to repurchase McKay's Granite Creek equity position.   Lawley made these representations both before and after December 31, 2012.

15

45.     Lawley reasonably expected McKay to rely upon Lawley's promises to pay additional consideration to McKay for his remaining interest and option to repurchase McKay's Granite Creek Limited Partner interest.

46.     McKay did rely on the Lawley's promises of additional consideration in failing to exercise McKay's option to repurchase the Granite Creek Limited Partnership interest by December 31, 2012.

47.     McKay was damaged because of his reliance on Lawley's promises to pay additional consideration to McKay for his remaining interest and option to repurchase McKay's Granite Creek equity position.

48.     Lawley should be found to have waived the time limitation on McKay's option to repurchase his interest in Granite Creek by Lawley's continued negotiation and unfulfilled promises to pay additional consideration for those rights and interests.

49.     Equity and justice require Lawley be barred by equitable estoppel from enforcing the contractual limitation of time on McKay's option to repurchase his interest in Granite Creek.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income and interest, for an order allowing McKay to exercise his option to repurchase his interest, for incidental and consequential damages, attorney fees, for the costs of this action, and all other just and proper relief.

## COUNT VI:  TORTIOUS BAD FAITH

50.     Defendant/Counter-Plaintiff McKay incorporates herein by reference paragraphs

16

one (1) through forty-nine (49) of his complaint above.

51.     Lawley owes McKay a common law duty to deal with McKay in a good faith, fair, and forthright manner.

52.     Further, Lawley owes McKay a contractual duty under paragraph 10 of the executed Transfer Agreement to deal with McKay in a good faith, fair, and forthright manner.

53.     Through Lawley's knowing misrepresentations as detailed above, Lawley acted in bad faith.

54.     Lawley further acted in bad faith by continuing to negotiate with McKay for payment of additional consideration to McKay for his remaining interest and option to repurchase McKay's Granite Creek Limited Partner interest, when Lawley had no intention to deliver additional consideration.

55.     Lawley acted with malice, fraud, gross negligence, or oppressiveness which was not the result of mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing.

56.     As a result of Lawley's tortious bad faith, McKay has suffered damages, and continues to suffer damages, proximately caused and directly traceable to the wrongful conduct of Lawley, including attorney fees, and the cost of this action. Lawley should further be subject to judgment for exemplary damages based on their tortious bad faith.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income and interest, for incidental and consequential damages, attorney fees, for the costs of this action, for exemplary damages for bad faith, prejudgment

interest, that Plaintiffs take nothing by way of their complaint, and all other just and proper relief.

## COUNT VII: PREJUDGMENT INTEREST

57.     Defendant/Counter-Plaintiff McKay incorporates herein by reference paragraphs one through fifty-six of his complaint as if fully set forth herein.

58.     McKay is entitled to the full present value of his interest in Granite Creek as if the Transfer Agreement was never executed.

59.     In order to be fully compensated for his loss of use of his money, McKay should also be paid interest from the date of the execution of the Transfer Agreement.

60.     Ohio Rev. Code § 1343.03(A) provides:

[W]hen money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or contract or other transaction, the creditor is entitled to interest in the rate per annum determined pursuant to section 5703.47 of the Revised Code.

61.     Ohio courts agree that an award of prejudgment interest is compensation to the claimant for the period of time between accrual of the claim and judgment. *Royal Elec. Constr. Corp. v. Ohio State Univ.* (1995), 73 Ohio St.3d 110, 117, 652 N.E.2d 687.

62.     Lawley had the beneficial use of the McKay's funds and Lawley will enjoy a windfall due to its delay of payment of this claim.

63.     McKay is entitled to recover prejudgment interest on the present value of his interest in Granite Creek as if the Transfer Agreement was never executed, at the rate provided by section 5703.47 of the Ohio Revised Code at the time judgment is entered.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the

Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income, for incidental and consequential damages, attorney fees, for the costs of this action, exemplary damages, for pre-judgment interest at the statutory rate on the value of McKay's pre-transfer equity in Granite Creek from the date of the alleged transfer to the date of judgment, that Plaintiffs take nothing by way of their complaint, and all other just and proper relief.

## REQUEST FOR JURY TRIAL

Defendant/Counter-Plaintiff McKay respectfully requests that all matters herein be set for trial by jury.

Respectfully submitted,

_____
Craig R. Karpe (PHV20654)

Attorney for Defendant/
Counter-Plaintiff John McKay

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing has been served upon the following counsel of record through US mail, postage prepaid, this 9 day of October, 2018.

Richard O. Hamilton Jr.
Robbins, Kelly Patterson & Tucker, LPA
7 West 7th Street, Suite 1400
Cincinnati, OH, 45202

_____

Craig R. Karpe

KARPE LITIGATION GROUP
19 West 19th Street
Indianapolis, IN 46202
(317) 251-1840

## TRANSFER AGREEMENT

This Transfer Agreement is entered into by and between John W. McKay, whose mailing address is 440 S. Third Street, Suite 205, St. Charles, Illinois 60174 ("**McKay**") and Faith Lawley, LLC, an Ohio limited liability company whose mailing address is 8544 Meadowbluff Court, Cincinnati, Ohio 45249 ("**Faith Lawley**"), effective as of this 26th day of February, 2010.

## BACKGROUND:

A.  McKay is a limited partner in Granite Creek FlexCap I, L.P., a Delaware limited partnership (the "**Limited Partnership**").

B.  Faith Lawley desires to purchase from McKay all of McKay's right, title and interest in and to McKay's limited partnership interest in the Limited Partnership.

C.  Faith Lawley is willing to grant McKay the option to repurchase all right, title and interest in and to said limited partnership interest, upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE, FOR VALUABLE CONSIDERATION,** the receipt and adequacy of which is hereby acknowledged, the parties agree as follows:

1.  **Background Statements**. Each party hereby affirms the truth and accuracy of the background statements set forth hereinabove. Each party acknowledges that the background statements are an integral part of this Agreement, and are specifically incorporated into this Agreement as the statements and representations of each party.

2.  **Limited Partnership Interest**. McKay is a limited partner in the Limited Partnership, with a commitment of One Million Five Hundred Thousand Dollars ($1,500,000.00) to the Limited Partnership (the "**Limited Partnership Interest**"), of which, Nine Hundred Thousand Dollars ($900,000.00) has been contributed to the Limited Partnership. McKay represents and warrants that McKay is not in default of its obligations to the Limited Partnership for payment of its Limited Partnership Interest or in default of any other material obligation owed to the Limited Partnership. McKay has delivered to Faith Lawley and Faith Lawley acknowledges receipt of a true and correct copy of the Amended and Restated Agreement of Limited Partnership of Granite Creek FlexCap I, L.P. (the "**Limited Partnership Agreement**"). The Limited Partnership Agreement remains in full force and effect and has not been modified, amended, or terminated.

3.  **Purchase and Sale**. Upon the terms and conditions of this Agreement effective as of the date of Closing, McKay hereby sells, assigns, transfers, and conveys to Faith Lawley, and Faith Lawley hereby purchases from McKay, McKay's Limited Partnership Interest. The consideration to be received for the transfer of McKay's Limited Partnership Interest shall be One Hundred Twenty-five Thousand Dollars ($125,000.00) (the "**Purchase Price**"), payable at the Closing, as hereinafter defined.

EXHIBIT "A"

4.    **Assumption of Obligations**  Faith Lawley (i) accepts the transfer of the Limited Partnership Interest, (ii) agrees to comply with, be bound by and subject to all of the terms, conditions, and provisions of the Limited Partnership Agreement, (iii) undertakes and assumes all of McKay's duties and obligations under the Limited Partnership Agreement, including but not limited to the obligation to contribute any unfunded commitment attributable to the Limited Partnership Interest, and (iv) makes all representations required of a limited partner under the Limited Partnership Agreement. Faith Lawley specifically acknowledges that it will timely make the Seventy-five Thousand Dollar ($75,000.00) cash call payment to the Limited Partnership on or before the due date of February 26, 2010 (the "**Initial Cash Call**").

5.    **Limited Partnership and SBA Approval**.  Faith Lawley agrees that it shall execute and deliver any and all documents required by the Limited Partnership and/or the Small Business Administration ("**SBA**") in order to obtain the consent of the Limited Partnership and its general partner, and/or the consent of the SBA to the transactions contemplated hereby. Faith Lawley and McKay shall each execute and deliver to the SBA the Request for Approval of Transfer Certificate in the form provided by the SBA.

6.    **Ownership of Limited Partnership Interests**.  McKay hereby represents and warrants to Faith Lawley that McKay is hereby selling, assigning, transferring, and conveying to Faith Lawley, good and marketable title to the Limited Partnership Interest free and clear of any liens and encumbrances other than the Option to repurchase described in Section 8 hereinbelow. Upon the completion of such transfer, Faith Lawley will be the owner of the Limited Partnership Interest.

7.    **Closing**.  This transaction shall be consummated, and all of the actions required to occur at Closing shall take place, on Friday, February 26, 2010, at such time and place as the parties may mutually agree.

8.    **Option to Repurchase**.  Faith Lawley hereby grants to McKay the right to repurchase the Limited Partnership Interest, at the option of McKay (the "**Option**"), upon the following terms and conditions:

      a.    Expiration of Option.  The Option may be exercised at any time from the date hereof through and including December 31, 2012 (the "**Option Period**"). In order to timely exercise said Option, McKay must give Faith Lawley written notice of an intent to exercise said Option delivered to the address of Faith Lawley as first set forth hereinabove, and must pay Faith Lawley the Option Price, as hereinafter defined, prior to the expiration of the Option Period.

      b.    Option Price.  In order to exercise the Option to repurchase the Limited Partnership Interest, McKay must pay Faith Lawley the following (the "**Option Price**"):

           i.  The original Purchase Price of One Hundred Twenty-five Thousand Dollars ($125,000.00) plus interest accruing at the rate of twenty-five

percent (25%) per annum from the date of Closing through the date of payment of the Option Price; plus

ii. The Initial Cash Call paid by Faith Lawley in the amount of Seventy-five Thousand Dollars ($75,000.00), plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of payment of the Initial Cash Call through the date of payment of the Option Price; plus

iii. The amount of any other cash call paid by Faith Lawley with respect to the Limited Partnership Interest, plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of payment of any such cash call through the date of payment of the Option Price; plus

iv. An amount equal to the Tax Adjustment Payment, if any, calculated pursuant to Section 8(e) hereinbelow;

provided, however, the total accrued interest pursuant to clauses i, ii, and iii hereinabove shall not be less than a total of Twenty Thousand Dollars ($20,000.00); and provided further, however, in the event that Faith Lawley fails to make any cash call payment with respect to the Limited Partnership Interest when due, or within five (5) days prior to the expiration of any grace period for the payment of any such cash call (an "**Event of Default**"), then the total Option Price shall only be an amount equal to One Hundred Dollars ($100.00), and shall not include any payment or reimbursement for the original Purchase Price of One Hundred Twenty-five Thousand Dollars ($125,000.00), any interest accrual, nor any amounts paid by Faith Lawley with respect to any cash call.

c. <u>Residual Rights</u>. Following the repurchase by McKay of the Limited Partnership Interest pursuant to the Option, Faith Lawley shall continue to be entitled to receive from McKay the "Applicable Percentage", as hereinafter defined, of any dividends or other distributions of profit (but not of principal or capital repayment) made to McKay by the Limited Partnership with respect to McKay's Limited Partnership Interest. For purposes of this Agreement, the "Applicable Percentage" shall be as follows:

i. If Faith Lawley did not make any cash call payments during the period of time Faith Lawley owned the Limited Partnership Interest, other than payment of the Initial Cash Call, or upon an Event of Default, then the Applicable Percentage shall be zero percent (0%).

ii. Otherwise, the Applicable Percentage shall be the sum of all cash calls paid by Faith Lawley during the period of its ownership of the Limited Partnership Interest, including the amount of the Initial Cash Call, divided by One Million Five Hundred Thousand Dollars ($1,500,000.00).

      d.        <u>Distribution Adjustment</u>. In the event that the Limited Partnership makes dividend distributions or other distributions of profit to Faith Lawley during the period of its ownership of the Limited Partnership Interest, then upon the exercise of the Option by McKay, Faith Lawley shall transfer and pay to McKay an amount equal to such distributions, less the Applicable Percentage of such distributions, with the Applicable Percentage being calculated as of the time of such distribution.

      e.        <u>Tax Adjustment Payment</u>. The parties understand and agree that during the period of time Faith Lawley owns the Limited Partnership Interest, it will be allocated for federal and state income tax purposes a portion of any gains or losses incurred by the Limited Partnership. Upon the exercise of the Option by McKay, to the extent that the distributions retained by Faith Lawley pursuant to Section 8 d. hereinabove are less than the federal and state income tax liability incurred by the members of Faith Lawley with respect to the income recognized by virtue of ownership of said Limited Partnership Interest, net of any losses or other deductions recognized with respect to ownership of such Limited Partnership Interest, the Tax Adjustment Payment shall be an amount equal to such deficiency, plus interest accruing at the rate of five percent (5%) per annum from the date of payment of such tax liability, on a portion of such deficiency, which portion is equal to the deficiency multiplied by the remainder of one minus Faith Lawley's Applicable Percentage. For example, assume that the members of Faith Lawley incurred tax liability of $120,000 as a result of their ownership of the Limited Partnership Interest, and retained $20,000 of distributions pursuant to Section 8 d. above, upon exercise by McKay of his Option to repurchase the Limited Partnership Interest. Further, assume that Faith Lawley's Applicable Percentage calculated pursuant to Section 8 c. above is 40%. In such an example, there would be a $100,000 deficiency between the tax liability incurred by the members ($120,000) and amount of distributions retained by Faith Lawley ($20,000). The Tax Adjustment Payment would be an amount equal to the $100,000 deficiency, plus interest accruing at the rate of 5% per annum from the date of payment of such tax liability on a portion of such deficiency. The portion of the deficiency which would accrue interest would be an amount equal to the deficiency ($100,000) multiplied by one minus the Applicable Percentage (40%), which is equal to 60%, which would mean that $60,000 of the deficiency would accrue interest and the remaining $40,000 of the deficiency would not accrue interest in calculating the Tax Adjustment Payment.

      9.    <u>**Parties Bound; Specific Performance**</u>. This Agreement shall be binding upon the parties, their respective heirs, administrators, executors, successors and assigns; provided, however, it is understood and agreed that Faith Lawley shall not sell, transfer, assign or convey the Limited Partnership Interest, or any interest therein, to any other person or entity prior to the expiration of the Option. The parties do hereby agree for themselves and their heirs, administrators, executors, successors or assigns, as aforesaid, to execute any instruments in writing which might be necessary or proper to carry out the purposes and intent of this Agreement and to protect the parties hereto. The parties hereto acknowledge that the Limited

Partnership Interest which is the subject matter of this Agreement is unique, and as a result, this Agreement may be specifically enforced.

10. **Good Faith; Further Assurances**. The parties to this Agreement shall in good faith undertake to perform their obligations under this Agreement, to satisfy all conditions and to cause the transactions contemplated by this Agreement to be carried out promptly in accordance with the terms of this Agreement. Upon the execution of this Agreement and thereafter, each party shall do such things as may be reasonably requested by the other party hereto in order more effectively to consummate or document the transactions contemplated by this Agreement.

11. **Securities Investment Representation**. Faith Lawley warrants, represents, agrees and acknowledges: (A) that Faith Lawley has adequate means of providing for its own current needs and foreseeable future contingencies, and anticipates no need now or in the foreseeable future to sell the Limited Partnership Interest; (B) that it is acquiring the Limited Partnership Interest for its own account as a long-term investment and without a present view to make any distribution, resale or fractionalization thereof; (C) that it and its independent counselors have such knowledge and experience in financial and business matters that they are capable of evaluation the merits and risks of the investment involved in its acquisition of the Limited Partnership Interest and they have evaluated the same; (D) that it is able to bear the economic risks of such investment; (E) that it and its independent counselors have made such investigation of the Company (including its business prospects and financial condition ) and it has had access to all information regarding the Company and it has had an opportunity to ask all of the questions regarding the Company as it deems necessary to fully evaluate its investment therein; (F) that in connection with its acquisition of the Limited Partnership Interest, it has been fully informed by its independent counsel as to the applicability of the requirements of the Securities Act of 1933 and all applicable state securities or "blue sky" laws to the Limited Partnership Interest; and (G) that it understands that (1) the Limited Partnership Interest is not registered under the Securities Act or any state securities law, (2) there is no market for the Limited Partnership Interest and that it will be unable to transfer the Limited Partnership Interest unless such is so registered or unless the transfer complies with an exemption from such registration, (3) such Limited Partnership Interest cannot be expected to be readily transferred or liquidated; and (4) its acquisition of a Limited Partnership Interest in the Company involves a high degree of risk.

12. **Survival of Representations and Warranties**. The warranties, representations and agreements set forth herein shall be continuous and shall survive the consummation of the transaction contemplated hereby.

13. **Severability**. If fulfillment of any provision of this Agreement or performance of any act contemplated hereby, at the time such fulfillment or performance shall be due, shall exceed the limit of validity prescribed by law, then the obligation to be fulfilled or performed shall be reduced to the limit of such validity; and, if any clause or provision contained in this Agreement or in any document or instrument to be delivered pursuant hereto, operates or would operate to invalidate this Agreement or such document or instrument, in whole or in part, such clause or provision shall be held ineffective, as though not herein or therein contained, and the

remainder of this Agreement or such document or instrument shall remain operative and in full force and effect.

14. **Arbitration**. This Agreement shall be governed and construed under the laws of the State of Ohio, not including the choice of law rules thereof. Any and all disputes, complaints, controversies, claims and grievances arising under, out of, in connection with, or in any manner related to this Agreement or the relationship of parties hereunder shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any decision and award of the arbitrator shall be final, binding and conclusive upon all of the parties hereto and said decision and award may be entered as a final judgment in any Court of competent jurisdiction. Notwithstanding said Rules, any arbitration hearing to take place hereunder shall be conducted in Cincinnati, Ohio, before one (1) arbitrator who shall be an attorney who has substantial experience in business law issues, unless the parties to the arbitration agree to some other arbitrator. However, no party shall institute an arbitration, or any other proceeding to resolve such disputes until that party has sought to resolve such disputes through direct negotiation with the other party or parties. If such disputes are not resolved within three (3) weeks after a demand for direct negotiation, the parties to the dispute shall attempt to resolve such disputes through mediation conducted in Cincinnati, Ohio. If the parties to the dispute do not agree on a mediator within ten (10) days, any party to the dispute may request the American Arbitration Association to appoint a mediator who shall be an attorney who has substantial experience in business law issues. If the mediator is unable to facilitate a settlement of disputes within forty-five (45) days, the mediator shall issue a written statement to the parties to that effect and the aggrieved party may then seek relief through arbitration as provided above. The fees and expenses of the mediator shall be split and paid equally by each of the parties to the dispute. In the event of any arbitration between any of the parties hereto involving this Agreement or the respective rights of the parties hereunder, each party shall pay his own attorneys' fees, costs and expenses of such arbitration. Each party hereby consents to a single, consolidated arbitration proceeding of multiple claims, or claims involving more than two (2) parties. Each party may apply to any Court of competent jurisdiction for injunctive relief or other interim measures (i) as provided for elsewhere in this Agreement, (ii) in aid of the arbitration proceedings, or (iii) to enforce the arbitration award, but not otherwise. Any such application to a Court shall not be deemed incompatible or a waiver of this section. The arbitrator shall be required to make written findings of fact and conclusions of law to support its award. Notwithstanding anything to the contrary in the Commercial Arbitration Rules and supplementary procedures, the arbitrator shall not be authorized or empowered to award punitive, exemplary, consequential or special damages, or attorney's fees, and the parties expressly waive any claim to such damages or fees.

15. **Miscellaneous**. This instrument contains the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior oral or written understandings, agreement or contracts, formal or informal, between the parties hereto with respect thereto. THIS PROVISION, AND EACH AND EVERY OTHER PROVISION OF THIS AGREEMENT MAY NOT UNDER ANY CIRCUMSTANCE BE MODIFIED, CHANGED, AMENDED OR PROVISIONS HEREUNDER WAIVED VERBALLY, BUT MAY ONLY BE MODIFIED, CHANGED, AMENDED OR WAIVED BY AN AGREEMENT IN WRITING EXECUTED BY ALL PARTIES HERETO. All headings set forth herein are included for the convenience of

reference only and shall not affect the interpretation hereof, nor shall any weight or value be given to the relative position of any part or provision hereof in relation to any other provision in determining such construction. This Agreement may be signed in any number of counterparts with the same effect as if the signature on each such counterpart were on the same instrument. Facsimiles, or other electronic transmissions (e.g. PDFs), of signatures will be deemed to be originals.

      16.    **Attorney Representation**. The parties hereby acknowledge that legal counsel for McKay, the law firm of Kahn, Dees, Donovan & Kahn, LLP, has disclosed that potential conflicts between McKay's interests and the interests of Faith Lawley may exist now or in the future, and that said legal counsel has advised Faith Lawley that it might find it beneficial to obtain individual and separate legal counsel to review this Agreement prior to its execution, as well as all future legal instruments prepared by said legal counsel for its execution. Faith Lawley hereby further acknowledges that it understands that Kahn, Dees, Donovan & Kahn, LLP is representing McKay, and not Faith Lawley, in this transaction.

**IN WITNESS WHEREOF**, the parties have executed this Agreement the year and date first above written.

_____

John W. McKay

"MCKAY"

FAITH LAWLEY, LLC

By:_____

Chris Lawley, Member

By:_____

Eric Novicki, Member

"FAITH LAWLEY"

*FINAL*

THE PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER ANY FEDERAL OR STATE SECURITIES LAWS AND CANNOT BE SOLD, TRANSFERRED, ASSIGNED, HYPOTHECATED OR OTHERWISE DISPOSED UNLESS THEY ARE REGISTERED THEREUNDER OR EXEMPTIONS FROM SUCH REGISTRATIONS ARE AVAILABLE, AND THE REQUIREMENTS OF THE PARTNERSHIP AGREEMENT ARE SATISFIED.

# AMENDED AND RESTATED

# AGREEMENT OF LIMITED PARTNERSHIP OF

# GRANITE CREEK FLEXCAP I, L.P.

**Effective as of May 28, 2007**

DC-741659 v11

**EXHIBIT "B"**

Table of Contents

1.   General Provisions. ........................................................................................................ 1
     1.01   Definitions. ........................................................................................................ 1
     1.02   Name. ................................................................................................................. 9
     1.03   Principal Office; Registered Office; and Qualification. .................................. 10
     1.04   Commencement and Duration. ........................................................................ 10
     1.05   Admission of Partners. ..................................................................................... 10
     1.06   Representations of Partners. ............................................................................. 11
     1.07   Notices With Respect to Representations by Limited Partners. ...................... 12
     1.08   Liability of Partners. ........................................................................................ 12
     1.09   Repayment of Capital Contributions of Partners. ........................................... 12
     1.10   No Priorities of Limited Partners. ................................................................... 13

2.   Purpose and Powers. ................................................................................................... 13
     2.01   Purpose and Powers. ......................................................................................... 13
     2.02   Restrictions on Powers. .................................................................................... 13
     2.03   Venture Capital Operating Company. .............................................................. 14

3.   Management. ................................................................................................................. 14
     3.01   Authority of General Partner. ......................................................................... 14
     3.02   Authority of the Limited Partners. ................................................................. 15
     3.03   Acknowledgment of SBA Authority. .............................................................. 15
     3.04   The Investment Adviser/Manager. .................................................................. 16
     3.05   Restrictions on Other Activities of the General Partner and its Affiliates. ..... 16
     3.06   Management Compensation. ............................................................................ 17
     3.07   Payment of Management Compensation. ......................................................... 17
     3.08   Management Compensation Offset. .................................................................. 17
     3.09   Partnership Expenses. ....................................................................................... 18
     3.10   Valuation of Assets. ......................................................................................... 19
     3.11   Standard of Care. .............................................................................................. 19
     3.12   Indemnification. ................................................................................................ 20
     3.13   Advisory Board and Sub-Advisory Board. ..................................................... 22

4.   Small Business Investment Company Matters. ........................................................... 22
     4.01   SBIC Act. .......................................................................................................... 22
     4.02   Consent or Approval of, and Notice to, SBA. ................................................. 22
     4.03   Provisions Required by the SBIC Act for Issuers of Debentures. ................... 23
     4.04   Effective Date of Incorporated SBIC Act Provisions. ..................................... 23
     4.05   SBA as Third Party Beneficiary. ..................................................................... 23
     4.06   Interest of the General Partner After Withdrawal. .......................................... 23

5.   Partners' Capital Contributions. ................................................................................. 24
     5.01   Capital Commitments. ...................................................................................... 24
     5.02   Capital Contributions by Limited Partners. .................................................... 24
     5.03   Capital Contributions by the General Partner. ................................................ 25
     5.04   Conditions to the Commitments of the General Partner and the Limited Partners. ..... 25

i

|      |                                                                                          |      |
|------|------------------------------------------------------------------------------------------|------|
| 5.05 | Failure to Make Required Capital Contributions.                                          | 25   |
| 5.06 | Termination of the Obligation to Contribute Capital.                                     | 25   |
| 5.07 | Notice and Opinion of Counsel.                                                           | 26   |
| 5.08 | Cure, Termination of Capital Contributions and Withdrawal.                               | 26   |
| 5.09 | Additional Limited Partners and Increased Commitments.                                   | 26   |
| 5.10 | Notice and Consent of SBA with Respect to Capital Contribution Defaults.                 | 26   |
| 5.11 | Interest on Overdue Contributions.                                                       | 27   |
| 5.12 | Termination of a Limited Partner's Right to Make Further Capital Contributions.          | 28   |
| 5.13 | Forfeiture of a Limited Partner's Interest in the Partnership.                           | 28   |
| 5.14 | Withholding and Application of a Limited Partner's Distributions                          | 28   |
| 5.15 | Required Sale of a Limited Partner's Interest in the Partnership                          | 29   |

| 6.   | Adjustment of Capital Accounts.                                                           | 30   |
|------|------------------------------------------------------------------------------------------|------|
| 6.01 | Establishment of Capital Accounts.                                                       | 30   |
| 6.02 | Time of Adjustment of Capital Accounts.                                                  | 30   |
| 6.03 | Capital Accounts; Allocations.                                                           | 31   |
| 6.04 | Tax Matters.                                                                             | 31   |
| 6.05 | Other Allocation Rules.                                                                  | 32   |
| 6.06 | Tax Allocations.                                                                         | 32   |
| 6.07 | Tax Controversies.                                                                       | 33   |
| 6.08 | Proceedings.                                                                             | 33   |

| 7.   | Distributions.                                                                           | 33   |
|------|------------------------------------------------------------------------------------------|------|
| 7.01 | Distributions to Partners.                                                               | 33   |
| 7.02 | Distributions of Noncash Assets in Kind.                                                 | 35   |
| 7.03 | Distributions Violative of the Act Prohibited.                                           | 35   |
| 7.04 | Distributions in Respect of Interests Transferred.                                       | 35   |
| 7.05 | Clawback.                                                                                | 36   |

| 8.   | Dissolution, Liquidation, Winding Up and Withdrawal.                                     | 36   |
|------|------------------------------------------------------------------------------------------|------|
| 8.01 | Dissolution.                                                                             | 36   |
| 8.02 | Winding Up.                                                                              | 37   |
| 8.03 | Withdrawal of the General Partner.                                                       | 38   |
| 8.04 | Continuation of the Partnership After the Withdrawal of the General Partner              | 39   |
| 8.05 | Withdrawals of Capital.                                                                  | 39   |
| 8.06 | Withdrawal by ERISA Regulated Pension Plans.                                             | 39   |
| 8.07 | Withdrawal by Government Plans Complying with State and Local Law.                        | 39   |
| 8.08 | Withdrawal by Government Plans Complying with ERISA.                                      | 40   |
| 8.09 | Withdrawal by Tax Exempt Limited Partners.                                               | 40   |
| 8.10 | Withdrawal by Registered Investment Companies.                                           | 40   |
| 8.11 | Distributions on Withdrawal.                                                             | 40   |
| 8.12 | Liquidation of General Partner's Interest Upon Election of Limited Partners to Continue the Partnership. | 41   |

| 9.   | Accounts, Reports and Auditors.                                                          | 41   |
|------|------------------------------------------------------------------------------------------|------|
| 9.01 | Books of Account.                                                                        | 41   |
| 9.02 | Audit and Reports.                                                                       | 42   |

ii

| | | |
|---|---|---|
| 9.03 | Fiscal Year. | 42 |
| 9.04 | Banking and Portfolio Securities. | 42 |
| | | |
| 10. | Miscellaneous. | 43 |
| 10.01 | Assignability. | 43 |
| 10.02 | Binding Agreement. | 45 |
| 10.03 | Gender. | 45 |
| 10.04 | Notices. | 45 |
| 10.05 | Consents and Approvals. | 45 |
| 10.06 | Counterparts. | 45 |
| 10.07 | Amendments. | 45 |
| 10.08 | Limited Partner Consents. | 46 |
| 10.09 | Power of Attorney. | 47 |
| 10.10 | Applicable Law. | 48 |
| 10.11 | Severability. | 48 |
| 10.12 | Entire Agreement. | 48 |
| 10.13 | Section Headings. | 48 |
| 10.14 | Right to Rely upon the Authority of General Partner. | 48 |
| 10.15 | Jurisdiction. | 48 |
| 10.16 | Description of Partnership. | 49 |
| 10.17 | Written Consent. | 49 |
| 10.18 | Partition. | 49 |
| 10.19 | Legal Counsel. | 49 |

Schedule A   -   Partners and Commitments

Exhibit A   -   Valuation Guidelines

**AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP OF**
**GRANITE CREEK FLEXCAP I, L.P.**

This Amended and Restated Agreement of Limited Partnership is dated and effective as of May __, 2007, among Granite Creek GP FlexCap I, L.L.C. a Delaware limited liability company, in its capacity as a general partner (the "General Partner"), the individuals and entities whose names appear on *Schedule A* as Limited Partners (collectively, the "Limited Partners"), and such other individuals and entities as shall become parties as hereinafter provided.

The parties, in consideration of their mutual agreements stated in this Agreement, agree to become partners and to form a limited partnership under the Act.

1. <u>General Provisions.</u>

    1.01   Definitions. For the purposes of this Agreement, the following terms have the following meanings:

"Act" means the Delaware Revised Uniform Limited Partnership Act as set forth in Title 6, Chapter 17 of the Delaware Code.

"Active Portfolio Company" means a company in which the Partnership has not written off its investment and which remains an ongoing concern, subject to SBA review.

"Additional Limited Partners" has the meaning stated in Section 5.09.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

    (i)   Credit to such Capital Account any amounts that such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

    (ii)   Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adjusted Capital Contribution" means, as of any day, the aggregate Capital Contributions of a Partner, adjusted as follows:

1

    (i)  Increased by the amount of any Partnership liabilities which, in connection with a distribution to a Partner (in his capacity as such) are (a) assumed by such Partner or (b) secured by any Partnership property distributed to such Partner.

    (ii)  Reduced by the amount of cash and the gross asset value of any Partnership property distributed to or with respect to such Partner in his capacity as such.

In the event any Partner transfers all or any portion of his interest in the Partnership in accordance with the terms of this Agreement, such Partner's transferee shall succeed to such Partner's Adjusted Capital Contribution to the extent it relates to the transferred interest.

    "Advisory Board" shall mean the Advisory Board selected as and whose members shall perform the functions as set forth in Section 3.13(a).

    "Affiliate" has the meaning stated in the SBIC Act.

    "Affiliated Venture Capital Fund" means any entity commonly referred to as a venture capital or private equity fund managed or controlled by the General Partner to the extent that management or control is not contrary to the SBIC Act or in which any Principal participates as a general partner or as a general partner, officer, director, manager, or employee of a general partner or investment manager of any such venture capital or private equity fund. There are no Affiliated Venture Capital Funds at the time of the formation of the Partnership.

    "Agreement" means this agreement of limited partnership, as amended from time to time. References to this Agreement will be deemed to include all provisions incorporated in this Agreement by reference.

    "Allocable Share" means the fraction, but in no event greater than one, obtained by dividing (i) the Partnership's aggregate Investment Contributions invested in all Realized Investments by (ii) until the fifth anniversary of the final closing date, the Partners' aggregate Commitments, and thereafter, the Partnership's aggregate Investment Contributions invested in the securities of all of the Partnership's existing and former Portfolio Companies.

    "Assets" means common and preferred stock (including warrants, rights and other options relating to such stock), notes, bonds, debentures, trust receipts and other obligations, instruments or evidences of indebtedness, and other properties or interests commonly regarded as securities, and in addition, interests in real property, whether improved or unimproved, and interests in personal property of all kinds (tangible or intangible), choses in action, and cash, bank deposits and so-called "money market instruments".

    "Assets Under Management" means, as of any specified date, the value of all Assets owned by the Partnership (the value to be determined as provided in this Agreement), including contributions requested and due from Partners and uncalled amounts of Commitments that are included in the Partnership's Regulatory Capital, less the amount of any liabilities of the Partnership, determined in accordance with generally accepted accounting principles, consistently applied.

    "Associate" has the meaning stated in the SBIC Act.

"Assumed Leverage" means the maximum amount of Leverage available to the Partnership under the SBIC Act; but not to exceed two tiers of Leverage.

"Available Profits" means, with respect to any Waived Fee Amount, the excess, if any, of (i) as of the time of determination, the cumulative amount of all items of Partnership profit, excluding any items of Partnership loss or expense, as computed for purposes of maintaining Capital Accounts for all fiscal years ("Partnership Profits") over (ii) the sum of (A) all Partnership profits realized prior to the time the Waived Fee Notice relating to such Waived Fee Amount was given and (B) to the extent not otherwise included in clause (ii)(A) above, all Partnership profits attributable to the sum of the excesses, if any, of (1) the fair market value (as determined by the General Partner), at the time the Waived Fee Notice relating to such Waived Fee Amount was given, of each Investment then held by the Partnership over (2) the federal income tax basis of each such Investment at such time. Notwithstanding the preceding sentence, the aggregate amount of all items of Partnership profits for any taxable year included in Available Profits shall not exceed the total amount of the Partnership's net income, as determined for U.S. federal income tax purposes, for such taxable year. The General Partner shall be entitled to irrevocably elect to exclude from Available Profits any item of Partnership profits that would otherwise be included in Available Profits; provided that such election must be made not later than the date for filing the Partnership's federal income tax return for the year that includes such item (determined without regard to any extensions). If an amendment to the Code after the formation of the Partnership changes the rate of individual federal income tax imposed on items of gain or income, the General Partner may amend this definition without the consent of any other Person to include in Partnership profits additional items of Partnership gain or income for which the rate of individual U.S. federal income tax is no greater than the rate then applicable to items of long-term capital gain. The General Partner's determination of the amount of Available Profits shall be binding on the Partnership and all Limited Partners.

"Book Value" means, with respect to any Partnership asset, the asset's adjusted basis for federal income tax purposes, except that the Book Values of all Partnership assets shall be adjusted to equal their respective fair market values (as determined in good faith by the General Partner), in accordance with the rules set forth in Section 1.704-1(b)(2)(iv)(f) of the Regulations, except as otherwise provided herein, immediately prior to: (a) the date of the acquisition of any additional Interest by any new or existing Partner in exchange for more than a *de minimis* Capital Contribution; (b) the date of the actual distribution of more than a *de minimis* amount of Partnership property (other than a *pro rata* distribution) to a Partner; (c) the acquisition of an Interest in the Partnership as consideration for services provided to or for the benefit of the Partnership by an existing Partner acting in a Partner capacity, or by a new Partner acting in a Partner capacity or in anticipation of becoming a Partner; or (c) the date of the actual liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations; provided that adjustments pursuant to clauses (a), (b), and (c) above shall be made only if the General Partner determines in its sole discretion that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners. The Book Value of any Partnership asset distributed to any Partner shall be adjusted immediately prior to such distribution to equal its Fair Market Value. The Book Value of any Partnership asset shall be adjusted to reflect any write-down which constitutes a Disposition.

3

"Capital Account" means the account of each Partner that reflects its interest in the Partnership determined in accordance with Section 6.

"Capital Call Notice" has the meaning stated in Section 5.02(d).

"Capital Contribution" in respect of the General Partner means the amount of cash contributed by the General Partner, as such, to the capital of the Partnership, and in respect of any other Partner means the amount of cash (or the cost basis of any Portfolio Securities contributed to the capital of the Partnership with the approval of SBA as provided in Section 5.02) contributed by such Partner, as such, to the capital of the Partnership, including any Waiver Contributions.

"Carried Interest" means the General Partner's right to receive distributions pursuant to Section 7.01(b)(iv) and 7.01(b)(v)(A) and obligation to contribute amounts pursuant to Section 7.06 and allocations of items of Partnership income, gain, loss or deduction related thereto.

"Certificate of Limited Partnership" means the certificate of limited partnership with respect to the Partnership filed for record in the office of the Secretary of State of Delaware.

"Closing Capital Account" means, with respect to any fiscal period, the Opening Capital Account of each Partner for the fiscal period after allocations have been made to the Capital Account in accordance with Section 6.03.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder and interpretations thereof promulgated by the Internal Revenue Service, as in effect from time to time.

"Combined Capital" shall have the meaning set forth in the SBIC Act.

"Commencement Date" means the date on which the first Capital Contribution by a Limited Partner is made to the Partnership and the first date on which Management Compensation based upon Assumed Leverage begins to accrue or is paid, whichever is first to occur.

"Commitments" means the Capital Contributions to the Partnership that the Partners have made or are obligated to make to the Partnership. The amounts and terms of the Commitments of the General Partner and the Limited Partners will be as stated in this Agreement and Schedule A attached hereto.

"Control Person" has the meaning stated in the SBIC Act.

"Cost Contributions" means, subject to Section 5.06, Capital Contributions (other than Investment Contributions) that are used to pay an expense of the Partnership (including, without limitation, Waiver Contributions); provided that upon the liquidation of the Partnership, any Capital Contribution, if any, that is not an Investment Contribution shall be a Cost Contribution.

4

"Debentures" has the meaning stated in the SBIC Act.

"Designated Party" means any of the General Partner, any Investment Adviser/Manager, and any partner, member, manager, stockholder, director, officer, employee or Affiliate of the General Partner and any Investment Adviser/ Manager.

"Disposition" means the sale, exchange, redemption, assignment, transfer, repayment, repurchase, or other disposition by the Partnership of all or any portion of a Portfolio Company or Portfolio Security for cash or for securities which can be distributed to the Partners and shall include the receipt by the Partnership of a liquidating dividend, distribution upon a sale of all or substantially all of the assets of a Portfolio Company or other like distribution for cash or other property which can be distributed to the Partners, dividends or interest on a Portfolio Security, and shall also include a distribution in kind to the Partners of all or a portion of a Portfolio Security as permitted by this Agreement. A Disposition shall be deemed to include a Portfolio Security becoming worthless within the meaning of Section 165(g) of the Code or written down to reflect an impairment in value that in the good faith judgment of the General Partner is permanent (to the extent of any such write-down only).

"Distributable Security" has the meaning stated in the SBIC Act.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder and interpretations thereof promulgated by the Department of Labor, as in effect from time to time.

"Fifty percent (50%) in interest of the Limited Partners" or similar references to percentage interest mean Limited Partners whose Capital Contributions represent such percentage of the Capital Contributions of all Limited Partners as of the time of determination.

"Fiscal Year" has the meaning stated in Section 9.03.

"General Partner" means the general partner or general partners of the Partnership, as set forth in this Agreement.

"Indemnifiable Costs" means all costs, expenses, damages, claims, liabilities, fines and judgments (including the reasonable cost of the defense, and any sums which may be paid with the consent of the Partnership in settlement), incurred in connection with or arising from a claim, action, suit, proceeding or investigation, by or before any court or administrative or legislative body or authority.

"Investment" means any investment made by the Partnership in a Portfolio Company (including, without limitation, follow-on investments).

"Investment Adviser/Manager" has the meaning stated in the SBIC Act and for the Partnership shall initially be Granite Creek Partners, L.L.C.

"Investment Advisers Act" means the Investment Advisers Act of 1940, as amended, and the regulations thereunder and interpretations thereof promulgated by the SEC, as in effect from time to time.

5

"Investment Company Act" means the Investment Company Act of 1940, as amended, and the regulations thereunder and interpretations thereof promulgated by the SEC, as in effect from time to time.

"Investment Contributions" means, subject to Section 5.06, Capital Contributions (including, without limitation, Waiver Contributions) that are used to make an Investment or, as determined by the General Partner, to pay expenses incurred in direct connection with the making, maintaining or disposing of such Investment.

"Leverage" has the meaning stated in the SBIC Act.

"Limited Partners" means any limited partners of the Partnership.

"Majority in Interest of the Limited Partners" means Limited Partners whose Capital Contributions aggregate in excess of fifty percent (50%) of the Capital Contributions of all Limited Partners as of the time of determination.

"Management Compensation" means the amounts payable by the Partnership to the General Partner or Investment Adviser/Manager, as provided in Section 3.07.

"Management Compensation Base" means the cost of loans and investments for all Active Portfolio Companies as of the first day of the Partnership's fiscal quarter for which Management Compensation is paid or begins to accrue, whichever is earlier.

"Management Expenses" shall have the meaning set forth in Section 3.09(a).

"Net Profits and Net Losses" means, for each fiscal year or other period, the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting method used by the Partnership for federal income tax purposes with the following adjustments: (a) all items of income, gain, loss, deduction or expense specially allocated pursuant to Section 6.04 of this Agreement shall not be taken into account in computing such taxable income or loss; (b) any income of the Partnership that is exempt from federal income taxation and not otherwise taken into account in computing Net Income and Net Loss shall be added to such taxable income or loss; (c) if the Book Value of any asset differs from its adjusted tax basis for federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Book Value; (d) upon an adjustment to the Book Value of any asset pursuant to the definition of Book Value, the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss; (e) if the Book Value of any asset differs from its adjusted tax basis for federal income tax purposes the amount of depreciation, amortization or cost recovery deductions with respect to such asset for purposes of determining Net Income and Net Loss shall be an amount which bears the same ratio to such Book Value as the federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (*provided* that, if the federal income tax depreciation, amortization or other cost recovery deduction is zero, the General Partner may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Net Income and Net Loss); (f) except for items in (a) above, any expenditures of the Partnership not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Net Income and Net

6

Loss pursuant to this definition, shall be treated as deductible items; and (g) items included in the definition of Short-Term Investment Income shall not be taken into account in determining Net Profits and Net Losses.

"Noncash Asset" means any Asset of the Partnership other than cash.

"Opening Capital Account" with respect to any fiscal period, means:

(i)     with respect to any Partner admitted during the fiscal period, the Partner's initial Capital Contribution (or in the case of any Partner admitted as a transferee of all or part of the interest in the Partnership of another Partner, with respect to such transferred interest in the Partnership, that portion of the transferor's initial Capital Contribution transferred to the transferee); and

(ii)     with respect to any Partner admitted during any prior fiscal period (other than a Partner who has withdrawn as of the last day of the preceding fiscal period), the Partner's Closing Capital Account for the preceding fiscal period (or in the case of any Partner admitted as a transferee of all or part of the interest in the Partnership of another Partner, with respect to such transferred interest in the Partnership, that portion of the transferor's Closing Capital Account transferred to the transferee).

"Organization Expenses" means the fees, costs and expenses of and incidental to the formation of the Partnership and the General Partner and the licensing of the Partnership as an SBIC.

"Outstanding Leverage" means the total amount of outstanding securities (including, but not limited to, Debentures) issued by the Partnership which qualify as Leverage and have not been redeemed or repaid as provided in the SBIC Act.

"Partners" means the General Partner and the Limited Partners.

"Partnership" means the limited partnership established by this Agreement.

"Partnership Percentage" in respect of any Partner means that fraction, expressed as a percentage, having as its numerator the Capital Contribution of such Partner and having as its denominator the total Capital Contributions of all Partners.

"Preferred Return" means, with respect to each Partner, as of any date of determination, an amount calculated from the day on which such Partner is treated as making a Capital Contribution with respect to the Realized Investments and the Allocable Share of Cost Contributions through the date of determination equal to 8% per annum, compounded annually, of the excess, if any, of (i) such Partner's aggregate Capital Contributions with respect to the Realized Investments and the Allocable Share of Cost Contributions on each day during such period over (ii) the aggregate amount of all distributions made on or prior to such day to such Partner by the Partnership (regardless of the source or character thereof other than distributions to the General Partner with respect to its Carried Interest).  For purposes of calculations of Preferred Return pursuant to this paragraph, (x) each Capital Contribution shall be treated as having been made on the last day of the calendar month in which such Capital Contribution was

7

required to be paid to the Partnership (as set forth in the applicable Capital Call Notice) and (y) distributions made shall be taken into account in chronological order and distributions shall only be taken into account to the minimum extent necessary to achieve the 8% internal rate of return referenced above.

"Portfolio Companies" means the issuers of Assets acquired by the Partnership, other than issuers of certificates of deposits, shares or other participations in mutual funds or similar money market type instruments, direct obligations of or obligations guaranteed as to principal and interest by the United States and repurchase agreements with federally insured institutions with respect to such obligations. Reference to a "Portfolio Company" is to any one of the Portfolio Companies.

"Portfolio Securities" means the Assets of the Portfolio Companies acquired by the Partnership. Reference to a "Portfolio Security" is to any one of the Portfolio Securities.

"Principal" means Mark Radzik, Brian Boorstein and Peter Lehman, so long as that individual is an employee of the Investment Adviser/Manager of the Partnership, and any other individual who the General Partner designates as a Principal, so long as that individual is an employee of the Investment Adviser/Manager.

"Qualified Nonprivate Funds" has the meaning stated in the SBIC Act.

"Realized Investments" means the portion of the securities of each Portfolio Company that has been disposed of (including distributions in kind to the Partners) or written-down or written off by the Partnership.

"Regulations" means a provision of the regulations of the Department of the Treasury promulgated under the Code, as amended from time to time, or the corresponding provision or provisions of succeeding regulations.

"Regulatory Capital" has the meaning stated in the SBIC Act.

"Retained Earnings Available for Distribution" has the meaning stated in the SBIC Act.

"SBA" means the United States Small Business Administration.

"SBA Agreements" has the meaning stated in Section 10.12.

"SBIC" means a small business investment company licensed under the SBIC Act.

"SBIC Act" means the Small Business Investment Act of 1958, as amended, and the rules and regulations thereunder and interpretations thereof promulgated by SBA, as in effect from time to time.

"SEC" means the Securities and Exchange Commission.

8

"Securities Act" means the Securities Act of 1933, as amended, and the regulations thereunder and interpretations thereof promulgated by the SEC, as in effect from time to time.

"Short-Term Investments" means only those "permitted investments of idle funds" described in 13 C.F.R. § 107.530(b).

"Short-Term Investment Income" means the income earned on Short-Term Investments, including any gains and net of any losses from dispositions of Short-Term Investments and also net of any costs and expenses attributable directly thereto. All Short-Term Investment Income will be paid only from Retained Earnings Available for Distribution.

"Special Limited Partner" has the meaning stated in Section 8.03(c).

"Sub-Advisory Board" shall mean the Sub-Advisory Board selected as and whose members shall perform the functions as set forth in Section 3.13(b).

"Unpaid Preferred Return" with respect to each Partner means, as of any date of determination, the excess, if any, of (i) such Partner's Preferred Return, over (ii) the aggregate amount of all distributions made to such Partner pursuant to Section 7.01(b)(iii) and Section 7.01(b)(v)(B).

"Unreduced Regulatory Capital means the sum of:

(i)    Regulatory Capital at the time Management Compensation is paid or begins to accrue, whichever is earlier. Increases or decreases to Regulatory Capital will be recognized on the first day of the fiscal quarter in which the Partnership notifies SBA of the increase or decrease;

(ii)    Any distributions previously made under § 107.1570(b) of the SBIC Act which reduced Regulatory Capital; and

(iii)    Any distributions made under § 107.585 of the SBIC Act which have reduced Regulatory Capital by no more than two percent (2%) or which SBA approves for inclusion in the calculation of Management Compensation.

"Waiver Contribution" has the meaning stated in Section 5.02(d).

1.02    Name.

(a)    The name of the Partnership is Granite Creek FlexCap I, L.P.

(b)    Subject to the prior approval of SBA, the General Partner has the power at any time to:  (i) change the name of the Partnership; and (ii) qualify the Partnership to do business under any name when the Partnership's name is unavailable for use, or may not be used, in a particular jurisdiction.

9

(c)     The General Partner will give prompt notice of any action taken under this Section to each Partner and SBA.

1.03    Principal Office; Registered Office; and Qualification.

(a)     The principal office of the Partnership will be at 222 West Adams Street, Suite 1980, Chicago, IL 60606, or such other place as may from time to time be designated by the General Partner, subject to the approval of SBA.

(b)     The registered office of the Partnership in the State of Delaware will be located at 1209 Orange Street, Wilmington, DE 19801 (County of New Castle). The name of the registered agent for the Partnership will be Corporation Trust Center. The General Partner may from time to time change the registered agent and registered office of the Partnership.

(c)     The General Partner will qualify the Partnership to do business in each jurisdiction where the activities of the Partnership make such qualification necessary.

(d)     The General Partner will give prompt notice of any action taken under this Section 1.03 to each Partner and SBA.

1.04    Commencement and Duration.

(a)     The Partnership will commence upon the filing for record of the Certificate of Limited Partnership.

(b)     The Partnership will be dissolved and wound up at the time and in the manner provided for in Article 8.

1.05    Admission of Partners.

(a)     No person may be admitted as a General Partner or a Limited Partner without subscribing and delivering to the Partnership (i) a counterpart of this Agreement, or other written instrument, which sets forth:  (A) the name and address of the Partner, (B) the Commitment of the Partner, and (C) the agreement of the Partner to be bound by the terms of this Agreement; and (ii) such other agreements and instruments as the General Partner requests.

(b)     Without the prior approval of SBA, no person may be admitted as: (i) a General Partner, or (ii) a Limited Partner with an ownership interest of ten percent (10%) or more of the Partnership's capital.

(c)     The General Partner will compile, and amend from time to time as necessary, Schedule A attached to this Agreement, which will list: (i) the name and address of the General Partner and each Limited Partner, and (ii) the Commitment of the General Partner and each Limited Partner to the Partnership.

(d)     The addition to the Partnership at any time of one or more Partners will not be a cause for dissolution of the Partnership, and all the Partners will continue to be subject to the provisions of this Agreement in all respects.

10

1.06    Representations of Partners.

(a)    General Partner.  This Agreement is made with the General Partner in reliance upon the General Partner's representation to the Partnership and SBA, that:

(i)    it is duly organized, validly existing and in good standing under the laws of the State of Delaware, and is qualified to do business under the laws of each state where such qualification is required to carry on the business of the Partnership;

(ii)    it has full power and authority to execute and deliver this Agreement and to act as General Partner under this Agreement;

(iii)    this Agreement has been authorized by all necessary actions by it, has been duly executed and delivered by it, and is a legal, valid and binding obligation of it, enforceable according to its terms; and

(iv)    the execution and delivery of this Agreement and the performance of its obligations under this Agreement will not conflict with, or result in any violation of, or default under, any provision of any governing instrument applicable to it, or any agreement or other instrument to which it is a party or by which it or any of its properties are bound, or any provision of law, statute, rule or regulation, or any ruling, writ, order, injunction or decree of any court, administrative agency or governmental body applicable to it.

(b)    Limited Partners.  This Agreement is made with each Limited Partner in reliance upon each Limited Partner's representation to the General Partner, the Partnership and SBA, that:

(i)    it has full power and authority to execute and deliver this Agreement and to act as a Limited Partner under this Agreement; this Agreement has been authorized by all necessary actions by it; this Agreement has been duly executed and delivered by it; and this Agreement is a legal, valid and binding obligation of it, enforceable against it according to its terms;

(ii)    the execution and delivery of this Agreement and the performance of its obligations under this Agreement do not require the consent of any third party not previously obtained, and will not conflict with, or result in any violation of, or default under, any provision of any governing instrument applicable to it, or any agreement or other instrument to which it is a party or by which it or any of its properties are bound, or any provision of law, statute, rule or regulation, or any ruling, writ, order, injunction or decree of any court, administrative agency or governmental body applicable to it;

(iii)    if the Limited Partner is a bank (as the term is used in the SBIC Act, at 15 U.S.C. §682(b)), the total amount of such Limited Partner's investments in SBICs, including such Limited Partner's interest in the Partnership, does not exceed five percent (5%) of such Limited Partner's capital and surplus;

(iv)    unless otherwise disclosed to the Partnership in writing, the Limited Partner is a citizen or resident of the United States, an entity organized under the laws of

11

the United States or a state within the United States or an entity engaged in a trade or business within the United States; and

           (v)    unless otherwise disclosed to the Partnership in writing, the Limited Partner is not subject to Title 1 of ERISA.

           (c)    <u>Tax Information</u>.  Each Limited Partner who has disclosed to the Partnership in writing that it is not a person described in Section 1.06(b)(iv) agrees to provide the Partnership with any information or documentation necessary to permit the Partnership to fulfill any tax withholding or other obligation relating to the Limited Partner, including but not limited to any documentation necessary to establish the Limited Partner's eligibility for benefits under any applicable tax treaty.

      1.07    <u>Notices With Respect to Representations by Limited Partners</u>.

           (a)    If any representation made by a Limited Partner in Section 1.06(b)(i), (ii) or (iii) ceases to be true, then the Limited Partner will promptly provide the Partnership with a correct separate written representation as provided in each such Section.

           (b)    The Partnership will give SBA prompt notice of any corrected representation received from any Limited Partner under Section 1.07(a).

      1.08    <u>Liability of Partners</u>.

           (a)    The General Partner will not: (i) be obligated to restore by way of Capital Contribution or otherwise any deficits in the respective Capital Accounts of the Limited Partners should such deficits occur, or (ii) have any greater obligation with respect to any Outstanding Leverage than is required by the SBIC Act.

           (b)    Except as otherwise provided under the Act, no Limited Partner will be liable for any loss, liability or expense whatsoever of the Partnership. Notwithstanding the preceding sentence, a Limited Partner will remain liable for any portion of such Limited Partner's Commitment not paid to the Partnership.

           (c)    If a Limited Partner is required to return to the Partnership, for the benefit of creditors of the Partnership, amounts previously distributed to the Limited Partner, the obligation of the Limited Partner to return any such amount to the Partnership will be the obligation of the Limited Partner and not the obligation of the General Partner. No Limited Partner will be liable under this Agreement for the obligations under this Agreement of any other Partner.

           (d)    Nothing in this Agreement limits any liability of any Partner under any agreement between the Partner and SBA.

      1.09    <u>Repayment of Capital Contributions of Partners</u>. Except as expressly provided in this Agreement, no specific time has been agreed upon for the repayment of the Capital Contributions of the Partners, and no Partner, or any successor-in-interest, shall have a right to withdraw any capital contributed to the Partnership.

1.10    No Priorities of Limited Partners.    Except as expressly provided in this Agreement or the SBIC Act, no Limited Partner shall have the right to demand or receive property other than cash in return for its Capital Contribution, nor shall any Limited Partner have priority over any other Partner either as to the return of its Capital Contribution or as to profits, losses or distributions.

2.    Purpose and Powers.

2.01    Purpose and Powers.

(a)    The Partnership is being organized solely for the purpose of operating as a venture capital fund.  The Partnership shall apply to the SBA for a license to operate as an SBIC under the SBIC Act.  Prior to such license being granted and if such license is granted, the Partnership shall (i) conduct only the activities described under Title III of the SBIC Act, and (ii) have the powers, responsibilities, and be subject to the limitations provided in the SBIC Act.

(b)    Subject to Section 2.01(a), the Partnership may make, manage, own and supervise investments of every kind and character in conducting its business.

(c)    Subject to the provisions of the SBIC Act, the Partnership has all powers necessary, suitable or convenient for the accomplishment of the purposes set forth in Sections 2.01(a) and (b), alone or with others, as principal or agent, and can engage in any lawful act or activity for which limited partnerships may be organized under the Act.

2.02    Restrictions on Powers.    Notwithstanding any provision of Section 2.01, the Partnership will not:

(a)    acquire hedges, make short sales, purchase puts or calls or enter into straddles, in any uncovered position;

(b)    lend any Assets of the Partnership to or guarantee any obligations of the General Partner, the Investment Adviser/Manager, or any director, officer, partner, stockholder, employee or Affiliate of the General Partner or the Investment Adviser/Manager (excluding any Portfolio Company);

(c)    allow any Assets of the Partnership to become commingled with the assets of the General Partner or the Investment Adviser/Manager, or any director, officer, partner, stockholder, employee or Affiliate of the General Partner or the Investment Adviser/Manager;

(d)    invest at any time in Portfolio Securities if at the time of such investment the aggregate cost of (A) the investments of the Partnership in a Portfolio Company and its Affiliates plus (B) such additional investment would exceed the greater of (x) twenty percent (20%) of the Partnership's Regulatory Capital or (y) such other amount as the SBA (and the Advisory Board) shall permit in order to protect the Partnership's investment;

(e)    if the Partnership is an SBIC, invest at any time in Portfolio Securities issued by any company in which an SBIC is prohibited from investing by the SBIC Act;

13

        (f)     borrow, guarantee the obligations of others or otherwise incur indebtedness if any such borrowings, guarantees or other indebtedness shall create Limited Partner liability, other than the obligation to make Capital Contributions pursuant to the Commitment of the Limited Partner; or

        (g)     if the Partnership is an SBIC, have outstanding any debt in an amount in excess of the maximum amount of debt permitted under the SBIC Act.

    2.03   <u>Venture Capital Operating Company</u>.  At any time that a Limited Partner is subject to Title I of ERISA and 25% or more in interest of all Limited Partners (as measured by their aggregate Capital Accounts) are "benefit plan investors" (within the meaning of Department of Labor Regulation §2510.3-101(f)(2), 51 Fed. Reg. 41,282 (November 13, 1986) or any amendment or successor regulation), the Partnership will use reasonable efforts to ensure that the Partnership qualifies as a "venture capital operating company" (within the meaning of Department of Labor Regulation §2510.3-101(d), 51 Fed. Reg. 41,281 (November 13, 1986) or any amendment or successor regulation).  Subject to SBA approval if and to the extent required, the General Partner shall have the authority to take any action it deems necessary in order to implement this Section 2.03.  Such authority shall include, but  shall not be limited to, the authority to prevent any Limited Partner from acquiring or disposing of an interest under the Agreement in such a way as to cause the Assets of the Partnership to be deemed to be assets of a "benefit plan investor" or to delay the Capital Contribution of any Limited Partner.

3.    <u>Management.</u>

    3.01   <u>Authority of General Partner</u>.

        (a)     The management and operation of the Partnership and the formulation of investment policy is vested exclusively in the General Partner, which shall have the rights and powers which may be possessed by a general partner under the Act, and such rights and powers as are otherwise conferred by law and are necessary, advisable or convenient to the discharge of its duties under this Agreement and to the management of the operations and affairs of the Partnership. The General Partner is expressly authorized to make any election or take any other action on behalf of the Partnership permitted under the Code with respect to the election of tax classification.

        (b)     The act of the General Partner in carrying on the business of the Partnership will bind the Partnership.

        (c)     In the case of any General Partner other than a natural person, at any time that the Partnership is licensed as an SBIC, the General Partner will not allow any natural person to serve as a general partner, director, officer or manager of the General Partner, unless such person has been approved by SBA.

        (d)     So long as the General Partner remains the general partner of the Partnership and so long as the Partnership is licensed as an SBIC:

           (i)     it will comply with the requirements of the SBIC Act, including, without limitation, 13 C.F.R. §107.160(a) and (b), as in effect from time to time; and

(ii)    in the case of any General Partner other than a natural person, except as set forth in Section 3.01(d)(iii), it will devote all of its activities to the conduct of the business of the Partnership and will not engage actively in any other business, unless its engagement is related to and in furtherance of the affairs of the Partnership.

(iii)    The General Partner may, however:

(A)    act as the general partner or Investment Adviser/Manager for one or more other SBICs; and

(B)    receive, hold, manage and sell Assets received by it from the Partnership (or other SBIC for which it acts as general partner or Investment Adviser/Manager), or through the exercise or exchange of Assets received by it from the Partnership (or other SBIC for which it acts as general partner or Investment Adviser/Manager).

3.02    Authority of the Limited Partners.  No Limited Partner shall take part in the control or management of the business or affairs of the Partnership, and no Limited Partner shall have any authority to act for or on behalf of the Partnership or to vote on any matter relative to the Partnership and its affairs except as is specifically permitted by this Agreement.  No Limited Partner that is subject to the Bank Holding Company Act of 1956, as amended, will have the right to vote on any matter for so long as such right to vote, in the opinion of counsel to such Limited Partner, would be inconsistent with the requirements of such act, or any rules or regulations promulgated thereunder.  A Limited Partner or an employee, agent, member, director or officer of a Limited Partner also may be an employee, agent, member, director or officer of the Partnership, the General Partner or the Investment Adviser/Manager.  The existence of these relationships and acting in such capacities will not result in a Limited Partner's being deemed to be participating in the control of the business of the Partnership or otherwise affect the liability of the Limited Partner or the person so acting; provided however, any person serving in such capacity shall be responsible to SBA for any loss arising from his or her breach of the fiduciary standard enunciated in Section 3.11(d) of this Agreement.

3.03    Acknowledgment of SBA Authority.

(a)    The Partners acknowledge that, in addition to the rights of SBA under this Agreement in SBA's capacity as a third party beneficiary, SBA also has regulatory authority over the Partnership as a licensed small business investment company under the provisions of the SBIC Act.  SBA exercises its regulatory authority over the Partnership under the SBIC Act independent of and separate from its rights and actions in its capacity as a third party beneficiary, and actions taken by SBA under its regulatory authority will not be deemed to be actions taken in SBA's capacity as a third party beneficiary.

(b)    The Partners acknowledge that in addition to the rights of SBA under this Agreement in SBA's capacity as a third party beneficiary, SBA may also have additional rights with respect to the Partnership and any Partner or Partners under separate agreements between SBA and the Partnership or such Partner or Partners.  The exercise of rights by SBA under any such other agreement will not be deemed to be actions taken by SBA in its capacity as a third party beneficiary unless the other agreement expressly so provides.

15

3.04    The Investment Adviser/Manager.

(a)    Subject to the SBIC Act, the General Partner may delegate any part of its authority to an Investment Adviser/Manager, including but not limited to entering into an agreement on behalf of the Partnership with an Investment Adviser/Manager for the provision of management services.

(b)    Any agreement delegating any part of the authority of the General Partner to an Investment Adviser/Manager will: (i) be in writing, executed by the Partnership and the Investment Adviser/Manager, (ii) specify the authority so delegated, and (iii) expressly require that such delegated authority will be exercised by the Investment Adviser/Manager in conformity with the terms and conditions of such agreement, this Agreement and the SBIC Act.

(c)    Each agreement with an Investment Adviser/Manager, and any material amendment to any such agreement, is subject to the prior approval of SBA.

(d)    Granite Creek Partners, L.L.C. is the initial Investment Adviser/Manager.

3.05    Restrictions on Other Activities of the General Partner and its Affiliates.

(a)    Except as provided in the SBIC Act and as otherwise specifically provided in this Agreement, no provision of this Agreement will be construed to preclude any (i) Partner, (ii) Investment Adviser/Manager, or (iii) Affiliate, general partner, member, manager or stockholder of any Partner or Investment Adviser/Manager, from engaging in any activity whatsoever or from receiving compensation therefor or profit from any such activity. Such activities may include, without limitation, (A) receiving compensation from issuers of securities for investment banking services, (B) managing investments, (C) participating in investments, brokerage or consulting arrangements or (D) acting as an adviser to or participant in any corporation, partnership, limited liability company, trust or other business person.

(b)    Except as provided in the SBIC Act, the General Partner's Affiliates, each for its own account or for others (other than any Affiliated Venture Capital Fund), may not purchase participations of any amount in Portfolio Companies so long as the General Partner is the general partner of the Partnership; provided, however, that, subject to the SBIC Act, the General Partner's Affiliates each may make purchases and sales for its own account of publicly-held securities in the open market and may invest in or finance a Portfolio Company if the Partnership is securing or has previously secured its desired investment position in that company. Except as set forth in this Section 3.05, the General Partner's Affiliates each may, subject to the SBIC Act, make other investments of every type and nature for itself or for the account of others without offering the Partnership a participation in such investments and without the Partnership or any Partner becoming entitled by virtue of this Agreement to any interest therein or to the profits or income derived therefrom. Subject to the limitations contained herein, all the foregoing shall be in the sole and absolute discretion of the General Partner and without liability to the Partnership or the Limited Partners.

16

3.06   Management Compensation.

(a)   As compensation ("Management Compensation") for services rendered in the management of the Partnership, during the term of the Partnership, beginning on the Commencement Date, the Partnership will pay an annual management fee computed on a daily basis equal to 2.0% multiplied by:

(i)   during the first five (5) years following the Commencement Date, Unreduced Regulatory Capital plus Assumed Leverage, and

(ii)   after the fifth anniversary of the Commencement Date, the Management Compensation Base.

(b)   The Management Compensation will be paid by the Partnership to the Investment Adviser/Manager.  The Management Compensation is intended to constitute guaranteed payments within the meaning of Code Section 707(c) to the Investment Adviser/Manager and shall not be treated as distributions for purposes of computing the Capital Account of Granite Creek Partners, L.L.C.

(c)   The Partnership will not pay any Management Compensation with respect to any fiscal year in excess of the amount of Management Compensation approved by SBA.

(d)   Any Management Compensation payment shall be reduced by an amount (the "Waived Fee Amount") equal to the lesser of (i) the amount of the Management Compensation that the Investment Adviser/Manager has irrevocably elected to waive in a written notice (a "Waived Fee Notice") delivered to the Partnership with respect to each Management Compensation payment, at least 60 days prior to the due date for such Management Compensation payment (except that, in the case of the first installment of Management Compensation, this Agreement shall constitute a Waived Fee Notice that the Investment Adviser/Manager elects to waive 100% of such Management Compensation payment) or (ii) if a Waived Fee Notice has been so delivered under the preceding clause (i), the Management Compensation payment that would be payable to the Investment Adviser/Manager on such date in the absence of this Section 3.06(d).

3.07   Payment of Management Compensation.   Management Compensation will be paid in advance on the first day of each fiscal quarter or a portion thereof in cash.  If the Management Compensation payable for a fiscal quarter or other period calculated as provided in Section 3.06(a) is greater than the amount paid at the beginning of that fiscal quarter or period, the additional Management Compensation owed shall be paid then at the beginning of the next fiscal quarter.  If the Management Compensation payable for a fiscal quarter or other period calculated as provided in Section 3.06(a) is less than the amount paid at the beginning of that fiscal quarter or period, then Management Compensation payable for the following fiscal quarter or period shall be reduced by the amount of the overpayment or, if the Partnership will be wound up and liquidated by the end of such fiscal quarter or other period, the overpayment shall be repaid by the recipient to the Partnership.

3.08   Management Compensation Offset.   If the Investment Adviser/Manager or the General Partner (or any member or Affiliate thereof) receives Fees Subject to Offset, future

17

Management Compensation payable by the Partnership pursuant to Section 3.06 shall be reduced by an aggregate amount equal to one hundred percent (100%) of such Fees Subject to Offset (the "Management Offset") until such time as the total amount of the Management Compensation payable under Section 3.06 is totally offset. Thereafter, all Fees subject to Offset shall be paid to the Partnership. For purposes of this Agreement, "Fees Subject to Offset" shall mean all fees payable pursuant to 13 C.F.R. §§ 107.860 and 107.900, including all commitment, breakup, advisory, syndication, guarantee, directors, officers and management fees paid by a Portfolio Company.

   3.09    Partnership Expenses.

      (a)    The entity entitled to receive Management Compensation will be responsible for the payment of the following expenses ("Management Expenses"): the Partnership's normal operating expenses, including compensation and fringe benefits, services, rent, utilities and other overhead charges; expenses for business development, travel and entertainment incurred in connection with the affairs of the Partnership; insurance premiums and fees (excluding directors and officers liability insurance); telephone, telegram, cablegram, telegraph, facsimile, Internet and similar charges; postage expenses; dues, subscriptions, office supplies, equipment rental and similar expenses; fees for bookkeeping and other similar services relating to the affairs of the Partnership, the General Partner and the Investment Adviser/Manager, and other routine expenses incurred in connection with their affairs. Management Expenses shall not include the expenses borne by the Partnership and described in Section 3.09(b).

      (b)    The Partnership will pay the following Partnership expenses: the accounting fees, costs and expenses of the Partnership, including without limitation, the annual audit of the Partnership, the preparation of the annual and any interim financial statements of the Partnership and the Federal and state tax returns of the Partnership; examination fees payable to SBA; taxes payable by the Partnership; Management Compensation; costs and expenses associated with meetings of the Limited Partners of the Partnership, communications with Limited Partners and preparation of Partnership status reports; costs and expenses associated with informal meetings of Limited Partners with the General Partner and of committees and advisory boards of the Partnership; the costs and expenses of the Advisory Board; the legal fees, cost and expenses of counsel for the Partnership in any legal action or proceeding, including threatened action, proceeding or investigation, and the amount of any judgments or settlements paid in connection with such action, proceeding or investigation; the legal and other fees, costs and expenses of and incidental to the purchase and sale (including qualification and registration) of Portfolio Securities to the extent that such fees, costs and expenses are not paid by Portfolio Companies or others; all other legal fees, costs and expenses incident to the Partnership, its formation, its management and activities; Organization Expenses not to exceed $500,000; interest and other expenses relating to any Partnership indebtedness; dues payable to trade associations including the National Association of Small Business Investments Companies; bonding expenses; premiums for insurance protecting the Partnership and the managers, members and employees of the General Partner, the Investment Adviser/Manager and the Partnership and other persons entitled to indemnification from the Partnership from liabilities to third parties for activities on behalf of the Partnership; fees incurred by the Partnership for special advisory or consulting services; securities filing fees; SBA commitment, reservation,

18

custodian and other fees; fees and expenses incurred in connection with reserving, using or repaying SBA Leverage; and all extraordinary fees, costs and expenses.

(c)     All Partnership expenses paid by the Partnership will be made against appropriate supporting documentation. The payment by the Partnership of Partnership expenses will be due and payable as billed.

3.10     Valuation of Assets.

(a)     The Partnership will adopt written guidelines for determining the value of its Assets. Assets held by the Partnership will be valued by the General Partner in a manner consistent with the Partnership's written guidelines and the SBIC Act. The Valuation Guidelines attached to this Agreement as Exhibit A are the Partnership's written guidelines for valuation.

(b)     To the extent that the SBIC Act requires any Asset held by the Partnership to be valued other than as provided in this Agreement, the General Partner will value the Asset in such manner as it determines to be consistent with the SBIC Act.

(c)     Assets held by the Partnership will be valued at least annually (or more often, as SBA may require or as required by this Agreement or the Act), and will be valued at least semi-annually (or more often, as SBA may require) at any time that the Partnership has Outstanding Leverage.

(d)     In determining the value of the interest of any Partner in the Partnership, or in any accounting among the Partners or any of them, no value shall be placed on the goodwill or name of the Partnership. No tax reserves shall be set up for unrealized gains or profits unless the tax obligations of the Partnership are established by law.

3.11     Standard of Care.

(a)     No Designated Party will be liable to the Partnership or any Partner for any action taken or omitted to be taken by it or any other Partner or other person in good faith and in a manner it reasonably believed to be in or not opposed to the best interests of the Partnership, and, with respect to any criminal action or proceeding, for any conduct that it had no reasonable cause to believe was unlawful.

(b)     Neither any Limited Partner, nor any member of any Partnership committee or board who is not an Affiliate of the General Partner, will be liable to the Partnership or any Partner as the result of any decision made in good faith by the Limited Partner or member, in its capacity as such.

(c)     Any Designated Party, any Limited Partner and any member of a Partnership committee or board, may consult with independent legal counsel selected by it and will be fully protected, and will incur no liability to the Partnership or any Partner, in acting or refraining to act in good faith in reliance upon the opinion or advice of such counsel.

(d)     This Section does not constitute a modification, limitation or waiver of Section 314(b) of the SBIC Act, or a waiver by SBA of any of its rights under Section 314(b).

19

(e)     In addition to the standards of care stated in this Section, this Agreement may also provide for additional (but not alternative) standards of care that must also be met.

3.12    Indemnification.

(a)     The Partnership will indemnify and hold harmless, but only to the extent of Assets Under Management (less any Outstanding Leverage not included as a liability in the computation of Assets Under Management), any Designated Party, from any and all Indemnifiable Costs which may be incurred by or asserted against such person or entity, by reason of any action taken or omitted to be taken on behalf of the Partnership and in furtherance of its interests.

(b)     The Partnership will indemnify and hold harmless, but only to the extent of Assets Under Management (less any Outstanding Leverage not included as a liability in the computation of Assets Under Management), the Limited Partners, and members of any Partnership committee or board who are not Affiliates of the General Partner or any Investment Adviser/Manager from any and all Indemnifiable Costs which may be incurred by or asserted against such person or entity, by any third party on account of any matter or transaction of the Partnership, which matter or transaction occurred during the time that such person has been a Limited Partner or member of any Partnership committee or board.

(c)     The Partnership has power, in the discretion of the General Partner, to agree to indemnify on the same terms and conditions applicable to persons indemnified under Section 3.12(b), any person who is or was serving, under a prior written request from the Partnership, as a consultant to, agent for or representative of the Partnership as a director, manager, officer, employee, agent of or consultant to another corporation, partnership, limited liability company, joint venture, trust or other enterprise, against any liability asserted against such person and incurred by the person in any such capacity, or arising out of the person's status as such.

(d)     No person may be entitled to claim any indemnity or reimbursement under Section 3.12(a), (b) or (c) in respect of any Indemnifiable Cost that may be incurred by such person which results from the failure of the person to act in accordance with the provisions of this Agreement and the applicable standard of care stated in Section 3.11. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, will not, of itself, preclude a determination that such person acted in accordance with the applicable standard of care stated in Section 3.11.

(e)     To the extent that a person claiming indemnification under Section 3.12(a), (b) or (c) has been successful on the merits in defense of any action, suit or proceeding referred to in Section 3.12(a), (b) or (c) or in defense of any claim, issue or matter in any such action, suit or proceeding, such person must be indemnified with respect to such matter as provided in such Section. Except as provided in the foregoing sentence and as provided in Section 3.12(h) with respect to advance payments, any indemnification under this Section 3.12 will be paid only upon determination that the person to be indemnified has met the applicable standard of conduct stated in Section 3.11(a) or (b).

20

(f)  A determination that a person to be indemnified under this Section 3.12 has met the applicable standard stated in Section 3.11(a) or (b) may be made by (i) the General Partner, with respect to the indemnification of any person other than a person claiming indemnification under Section 3.12(a), (ii) a committee of the Partnership whose members are not affiliated with the General Partner or any Investment Adviser/Manager with respect to indemnification of any person indemnified under Section 3.12(a) or (iii) at the election of the General Partner, independent legal counsel selected by the General Partner, with respect to the indemnification of any person indemnified under this Section, in a written opinion.

(g)  In making any determination with respect to indemnification under Section 3.12(f), the General Partner, a committee of the Partnership whose members are not affiliated with the General Partner or any Investment Adviser/Manager or independent legal counsel, as the case may be, is authorized to make the determination on the basis of its evaluation of the records of the General Partner, the Partnership or any Investment Adviser/Manager to the Partnership and of the statements of the party seeking indemnification with respect to the matter in question and is not required to perform any independent investigation in connection with any determination. Any party making any such determination is authorized, however, in its sole discretion, to take such other actions (including engaging counsel) as it deems advisable in making the determination.

(h)  Expenses incurred by any person in respect of any Indemnifiable Cost may be paid by the Partnership before the final disposition of any such claim or action upon receipt of an undertaking by or on behalf of such person to repay such amount unless it is ultimately determined as provided in Section 3.12(e) or 3.12(f) that the person is entitled to be indemnified by the Partnership as authorized in this Section.

(i)  The rights provided by this Section will inure to the benefit of the heirs, executors, administrators, successors, and assigns of each person eligible for indemnification under this Agreement.

(j)  The rights to indemnification provided in this Section are the exclusive rights of all Partners to indemnification by the Partnership. No Partner may have any other rights to indemnification from the Partnership or enter into, or make any claim under, any other agreement with the Partnership (whether direct or indirect) providing for indemnification.

(k)  The Partnership may not enter into any agreement with any person (including, without limitation, any Investment Advisor/Manager, Partner or any person that is an employee, officer, director, partner or shareholder, or an Affiliate, Associate or Control Person of any Partner) providing for indemnification of any such person (i) except as provided for under this Section, and (ii) unless such agreement provides for a determination with respect to the indemnification as provided under Section 3.12(f).

(l)  The provisions of this Section do not apply to indemnification of any person which is not at the expense (whether in whole or in part) of the Partnership.

(m)  The Partnership may purchase and maintain insurance on its own behalf, or on behalf of any person or entity, with respect to liabilities of the types described in this

Section. The Partnership may purchase such insurance regardless of whether the person is acting in a capacity described in this Section or whether the Partnership would have the power to indemnify the person against such liability under the provisions of this Section.

3.13    Advisory Board and Sub-Advisory Board.

(a)    The Partnership shall have an Advisory Board. The duties of the Advisory Board will be to advise the General Partner on such matters concerning the Partnership and its investments as the General Partner may request. The General Partner shall make all final investment decisions regarding the Partnership. The Advisory Board members will have no responsibility for initial or ongoing evaluation or monitoring of the Partnership's portfolio. However, Advisory Board members will be encouraged to suggest potential new investments for the Partnership.

(b)    The Partnership shall have a Sub-Advisory Board made up of three (3) persons chosen by the General Partner and not objected to by more than twenty-five percent (25%) in interest of the Limited Partners. The duties of the Sub-Advisory Board will include (i) serving as the committee referenced in Sections 3.12(f) and 3.12(g), but no member of the Sub-Advisory Board that is a representative or affiliate of the person seeking to be indemnified shall participate in such function; (ii) making decisions with respect to conflicts of interest involving the Partnership or the General Partner and its Affiliates; and (iii) taking any other action delegated to it pursuant to this Agreement. The Sub-Advisory Board will meet as necessary. All actions, consents or approvals by the Sub-Advisory Board shall require the vote of a majority of its members serving at the time of such action.

4.    Small Business Investment Company Matters.

4.01    SBIC Act. The provisions of this Agreement must be interpreted to the fullest extent possible in a manner consistent with the SBIC Act. If any provision of this Agreement conflicts with any provision of the SBIC Act (including, without limitation, any conflict with respect to the rights of SBA or the respective Partners under this Agreement), the provisions of the SBIC Act will control.

4.02    Consent or Approval of, and Notice to, SBA.

(a)    The requirements of the prior consent or approval of, and notice to, SBA in this Agreement will be in effect at any time that the Partnership is licensed as an SBIC or has Outstanding Leverage. These requirements will not be in effect if the Partnership is not licensed as an SBIC and does not have any Outstanding Leverage.

(b)    Except as provided in the SBIC Act, a consent or approval required to be given by SBA under this Agreement will be deemed given and effective for purposes of this Agreement only if the consent or approval is:

(i)    given by SBA in writing; and

(ii)    delivered by SBA to the party requesting the consent or approval in the manner provided for notices to such party under Section 10.04.

22

4.03    Provisions Required by the SBIC Act for Issuers of Debentures.

(a)    The provisions of 13 C.F.R. §107.1810(i) are incorporated by reference in this Agreement as if fully stated in this Agreement.

(b)    The Partnership and the Partners consent to the exercise by SBA of all of the rights of SBA under 13 C.F.R. §107.1810(i), and agree to take all actions that SBA may require in accordance with 13 C.F.R. §107.1810(i).

(c)    This Section 4.03 will be in effect at any time that the Partnership has outstanding Debentures, and will not be in effect at any time that the Partnership does not have outstanding Debentures.

(d)    Nothing in this Section 4.03 may be construed to limit the ability or authority of SBA to exercise its regulatory authority over the Partnership as a licensed small business investment company under the SBIC Act.

4.04    Effective Date of Incorporated SBIC Act Provisions.

(a)    Any section of this Agreement which relates to Debentures issued by the Partnership and incorporates or refers to the SBIC Act or any provision of the SBIC Act (including, without limitation, 13 C.F.R. §§107.1810(i) and 107.1830-107.1850) will, with respect to each Debenture, be deemed to refer to the SBIC Act or such SBIC Act provision as in effect on the date on which the Debenture was purchased from the Partnership, as the case may be.

(b)    Section 4.04(a) will not be construed to apply to:

(i)    the provisions of the SBIC Act which relate to the regulatory authority of SBA under the SBIC Act over the Partnership as a licensed small business investment company; or

(ii)    the rights of SBA under any other agreement between the Partnership and SBA.

(c)    The parties acknowledge that references in this Agreement to the provisions of the SBIC Act relating to SBA's regulatory authority refer to the provisions as in effect from time to time.

4.05    SBA as Third Party Beneficiary.    SBA will be deemed an express third party beneficiary of the provisions of this Agreement to the extent of the rights of SBA under this Agreement and under the SBIC Act.  SBA will be entitled to enforce the provisions (including, without limitation, the obligations of each Partner to make Capital Contributions to the Partnership) for its benefit, as if SBA were a party to this Agreement.

4.06    Interest of the General Partner After Withdrawal.    If the General Partner withdraws as a general partner of the Partnership by notice from SBA as provided in the SBIC

Act or otherwise, then the entire interest of the General Partner in the Partnership will be converted into an interest as a Special Limited Partner on the terms provided in Section 8.03(d).

5.    Partners' Capital Contributions.

    5.01    Capital Commitments. The Limited Partners and the General Partner commit to make Capital Contributions to the Partnership in the amounts of the Commitments set forth by their respective names on Schedule A attached to this Agreement, as amended from time to time. For purposes of this Agreement, the General Partner shall, in its sole discretion, determine in an equitable manner, the portion of each Partner's Capital Contributions that are allocable to Cost Contributions and Investment Contributions.

    5.02    Capital Contributions by Limited Partners.

        (a)    All Capital Contributions to the Partnership by Limited Partners must be in cash, except for Portfolio Securities valued at cost which have been approved by the General Partner and SBA and as otherwise provided in this Agreement and approved by SBA.

        (b)    Each Limited Partner will pay as its initial Capital Contribution to the Partnership an amount determined by the General Partner. The General Partner will give the Limited Partners written notice of the amount and due date of the initial Capital Contribution.

        (c)    After the date of the initial Capital Contribution, the Limited Partners will pay the remaining balance of their Commitments in such amounts and at such times as will be determined by the General Partner in its sole discretion. The General Partner will give the Limited Partners notice before each such additional Capital Contribution is due. Each such notice will be given not less than ten (10) days before the payment to which such notice relates is due, and will specify the date on which the additional Capital Contribution will be due and the percentage or amount of the Limited Partners' Commitments then due.

        (d)    Notwithstanding the foregoing, at such time as the General Partner gives notice to the Limited Partners for a Capital Contribution (any such notice referred to herein as a "Capital Call Notice"), such Capital Contribution of the Investment Adviser/Manager, in an amount up to the lesser of (A) the amount of the Capital Contribution required to be made by the Investment Adviser/Manager pursuant to this Section 5.02 or (B) the amount of any existing Unapplied Waived Fee Amounts (as defined below), shall, at the Investment Adviser/Manager's election, be satisfied by an increase in the Capital Contributions by the Limited Partners (other than the Investment Adviser/Manager) pro rata in accordance with their respective Commitments (each amount so funded, a "Waiver Contribution"). As used herein, "Unapplied Waived Fee Amounts" means, as of any date of determination, the excess, if any, of (i) the aggregate Waived Fee Amount (as defined in Section 3.06) for all Management Compensation payment dates over (ii) the aggregate amount by which Waived Fee Amounts were applied prior to such time in payment of the Capital Contributions of the Investment Adviser/Manager. The Investment Adviser/Manager's right to distributions with respect to Waiver Contributions pursuant to Sections 7.01(b) and 8.02(b)(iii) is intended by the parties hereto to be treated as a "profits interest" for U.S. federal income tax purposes within the meaning of Rev. Proc. 93-27 (and any similar Rev. Proc., regulatory or other similar guidance subsequently issued by the Internal

Revenue Service), and the parties hereto agree to take no position or file any return for U.S. federal income tax purposes inconsistent with such treatment.

      5.03    <u>Capital Contributions by the General Partner</u>.

          (a)    All Capital Contributions to the Partnership by the General Partner must be in cash.

          (b)    The General Partner must pay its Commitment in installments at the same times and in the same percentage amounts as the Limited Partners.

      5.04    <u>Conditions to the Commitments of the General Partner and the Limited Partners</u>.

          (a)    Notwithstanding any provision in this Agreement to the contrary, on the earlier of (i) the completion of the liquidation of the Partnership or (ii) one year from the commencement of the liquidation, the General Partner and the Limited Partners will be obligated to contribute any amount of their respective Commitments, not previously contributed to the Partnership, if and to the extent that the other Assets of the Partnership have not been sufficient to permit at that time the redemption of all Outstanding Leverage, the payment of all amounts due with respect to the Outstanding Leverage as provided in the SBA Act, and the payment of all other amounts owed by the Partnership to SBA.

          (b)    The provisions of this Section do not apply to the Commitment of any Limited Partner whose obligation to make Capital Contributions has been terminated or who has withdrawn from the Partnership, with the consent of SBA, under a provision of this Section 5 or Section 8 or any agreement, release, settlement or action under any provision of this Agreement. No Limited Partner or General Partner has any right to delay, reduce or offset any obligation to contribute capital to the Partnership called under this Section 5.04 by reason of any counterclaim or right to offset by the Partner or the Partnership against SBA.

      5.05    <u>Failure to Make Required Capital Contributions</u>.

      The Partnership is entitled to enforce the obligations of each Partner to make the contributions to capital specified in this Agreement. The Partnership has all rights and remedies available at law or equity if any such contribution is not so made, including the remedies set forth in Sections 5.10 through 5.15.

      5.06    <u>Termination of the Obligation to Contribute Capital</u>.

          (a)    Any Limited Partner may elect to terminate its obligation in whole or in part to make a Capital Contribution required under this Agreement, or upon demand by the General Partner, will no longer be entitled to make such Capital Contribution, if the Limited Partner or the General Partner obtains an opinion of counsel as provided under Section 5.07 to the effect that making such contribution would require the Limited Partner to withdraw from the Partnership under Section 8.06 through Section 8.10.

          (b)    Upon receipt by the General Partner of a notice and opinion as provided under Section 5.07, unless cured within the period provided under Section 5.08, the Commitment

of the Limited Partner delivering or the subject of the opinion will be deemed to be reduced by the amount of such unfunded Capital Contribution and this Agreement will be deemed amended to reflect a corresponding reduction of aggregate Commitments to the Partnership.

5.07    Notice and Opinion of Counsel.

(a)    A copy of any opinion of counsel issued as described in Section 5.06 or Section 8.06 through Section 8.10 must be sent by the General Partner to SBA, together with (i) the written notice of the election of the Limited Partner or (ii) the written demand of the General Partner, to which the opinion relates.

(b)    An opinion rendered to the Partnership as provided in Section 5.06 or Section 8.06 through Section 8.10 will be deemed sufficient for the purposes of those Sections only if the General Partner and SBA each approve (i) the counsel rendering the opinion, and (ii) the form and substance of the opinion.

5.08    Cure, Termination of Capital Contributions and Withdrawal.

(a)    Unless within ninety (90) days after the giving of written notice and opinion of counsel, as provided in Section 5.07, the Limited Partner or the Partnership eliminates the necessity for termination of the obligation of the Limited Partner to make further Capital Contributions or for the withdrawal of the Limited Partner from the Partnership in whole or in part to the reasonable satisfaction of the Limited Partner and the General Partner, the Limited Partner will withdraw from the Partnership in whole or in part to the extent required, effective as of the end of the ninety (90) day period.

(b)    Subject to the provisions of Section 5.05, in its discretion the General Partner may waive all or any part of the ninety (90) day cure period and cause such termination of Capital Contributions or withdrawal to be effective at an earlier date as stated in the waiver.

(c)    Any distributions made to a Limited Partner with respect to such Partner's withdrawal under this Section will be subject to and made as provided in Section 8.11.

5.09    Additional Limited Partners and Increased Commitments.. From time to time after the date of this Agreement and on or before March 31, 2007, the General Partner may admit one or more new Limited Partners (the "Additional Limited Partners") or permit any Limited Partner to increase its Commitment under the following terms and conditions:

(a)    Each Additional Limited Partner (and Limited Partner increasing its Commitment) must execute and deliver to the Partnership a counterpart of this Agreement, or other written instrument, which sets forth:

(i)    the name and address of the Partner,

(ii)    the Commitment of the Partner, and

(iii)    in the case of an Additional Limited Partner, the agreement of the Partner to be bound by the terms of this Agreement.

Schedule A attached to this Agreement will be amended to reflect such Additional Limited Partner's name, address and Commitment (or the increase in the Limited Partner's Commitment, as the case may be).

5.10    Notice and Consent of SBA with Respect to Capital Contribution Defaults.

(a)    The Partnership must give SBA prompt written notice of any failure by a Limited Partner to make any Capital Contribution to the Partnership required under this Agreement when due, which failure continues beyond any applicable grace period specified in this Agreement.

(b)    Unless SBA has given its prior consent or the provisions of subsection (c) of this Section have become applicable, the Partnership will not (i) take any action (including entering into any agreement (whether oral or written), release or settlement with any Partner) which defers, reduces, or terminates the obligations of the Partner to make contributions to the capital of the Partnership, or (ii) commence any legal proceeding or arbitration, which seeks any such deferral, reduction or termination of such obligation. Without the consent of SBA (including SBA's deemed consent under subsection (c) of this Section), no such agreement, release, settlement or action taken will be effective with respect to the Partnership or any Partner.

(c)    If the Partnership has given SBA thirty (30) days prior written notice of any proposed legal proceeding, arbitration or other action described under subsection (b) of this Section with respect to any default by a Limited Partner in making any Capital Contribution to the Partnership, and the Partnership has not received written notice from SBA that it objects to the proposed action within the thirty (30) day period, then SBA will be deemed to have consented to the proposed Partnership action.

(d)    Any notice given by the Partnership to SBA under this Section must:

(i)    be given by separate copies directed to each of the Investment Division and the Office of the General Counsel of SBA;

(ii)    explicitly state in its caption or first sentence that the notice is being given with respect to a specified default by a Limited Partner in making a Capital Contribution to the Partnership and a proposed legal proceeding, arbitration, agreement, release, settlement or other action with respect to that default; and

(iii)    state the nature of the default, the identity of the defaulting Limited Partner, and the nature and terms of the proposed legal proceeding, arbitration, agreement, release, settlement or other action with respect to that default.

5.11    Interest on Overdue Contributions. In the event that any Limited Partner fails to make a contribution required under this Agreement within five (5) days after the date such contribution is due, then the General Partner may, in its sole discretion, elect to charge such Limited Partner interest at an annual rate equal to fifteen percent (15%) on the amount due from the date such amount became due until the earlier of (i) the date on which such payment is received by the Partnership from such Limited Partner or (ii) the date of any notice given to such Limited Partner by the General Partner pursuant to Section 5.12 or Section 5.13 or (iii) the date

27

on which such payment is received by the Partnership under Section 5.14 or Section 5.15. Any distributions to which such Limited Partner is entitled shall be reduced by the amount of such interest, and such interest shall be deemed to be income to the Partnership.

5.12    Termination of a Limited Partner's Right to Make Further Capital Contributions. In the event that any Limited Partner fails to make a contribution required under this Agreement within five (5) days after the date such contribution is due, the General Partner may, in its sole discretion (but only with the consent of SBA given as provided in Section 5.10), elect to declare, by notice to such Limited Partner, that:

(a)    Such Limited Partner's Commitment shall be deemed to be reduced to the amount of any contributions of capital timely made pursuant to this Agreement; and

(b)    Upon such notice (i) such Limited Partner shall have no right to make any Capital Contribution thereafter (including the contribution as to which the default occurred and any contribution otherwise required to be made thereafter pursuant to the terms of this Agreement) and (ii) this Agreement shall be deemed amended to reflect such reduced Commitment.

5.13    Forfeiture of a Limited Partner's Interest in the Partnership. In the event that any Limited Partner fails to make a contribution required under this Agreement within five (5) days after notice by the General Partner to such Limited Partner that it has failed to make its contribution on the date such contribution was due, the General Partner may in its sole discretion (but only with the consent of SBA given as provided in Section 5.10) elect to declare, by notice of forfeiture to such Limited Partner, that one hundred percent (100%) of the interest of such Limited Partner in the Partnership (including amounts in its Capital Account as well as any interest in future profits, losses or distributions of the Partnership) is forfeited, effective as of the date of such Limited Partner's failure to make such required contribution. As of the date such notice of forfeiture is given (i) the Limited Partner shall cease to be a Partner with respect to such forfeited interest; provided, however, that such forfeited Limited Partner shall cease to have any liability for the payment of the forfeited percentage of any Capital Contributions due at such time or in the future and (ii) the forfeited percentage of such Limited Partner's Capital Account shall be held by the Partnership and reallocated among the Capital Accounts of the Partners twenty percent (20%) to the General Partner and eighty percent (80%) to the Limited Partners (other than such forfeited Limited Partner) to be apportioned among such Limited Partners in accordance with their respective aggregate Capital Contributions.

5.14    Withholding and Application of a Limited Partner's Distributions. No part of any distribution shall be paid to any Limited Partner from which there is then due and owing to the Partnership, at the time of such distribution, any amount required to be paid to the Partnership. At the election of the General Partner, which it may make in its sole discretion, the Partnership may either (i) apply all or part of any such withheld distribution in satisfaction of the amount then due to the Partnership from such Limited Partner or (ii) withhold such distribution until all amounts then due are paid to the Partnership by such Limited Partner. Upon payment of all amounts due to the Partnership (by application of withheld distributions or otherwise), the General Partner shall distribute any unapplied balance of any such withheld distribution to such

28

Limited Partner. No interest shall be payable on the amount of any distribution withheld by the Partnership pursuant to this Section.

5.15    Required Sale of a Limited Partner's Interest in the Partnership. In the event that any Limited Partner fails to make a contribution required under the Agreement within five (5) days after notice by the General Partner to such Limited Partner that it has failed to make its contribution on the date such contribution was due, unless the General Partner has acted pursuant to Section 5.12 or Section 5.13, the General Partner may, in its sole discretion (but only with the consent of SBA given as provided in Section 5.10), elect to declare by notice of default to such Limited Partner that such Limited Partner is in default. If the General Partner so elects to declare such Limited Partner in default (such Limited Partner being hereinafter referred to as the "Optionor"), then the other Limited Partners of the Partnership which are not in default (the "Optionees") and the General Partner shall have the right and option to acquire one hundred percent (100%) of the Limited Partner's interest in the Partnership, which shall include one hundred percent (100%) of the Capital Account (the "Optioned Partnership Interest") of the Optionor on the following terms:

(a)    The General Partner shall give the Partners notice promptly after declaration of any such default. Such notice shall advise each Optionee of the portion of the Optioned Partnership Interest available to it and the price therefor. The portion available to each Optionee shall be that portion of the Optioned Partnership Interest that bears the same ratio to the Optioned Partnership Interest as each Optionee's Capital Contributions to the Partnership bears to the aggregate Capital Contributions to the Partnership, exclusive of the Capital Contributions to the Partnership of the Optionor. The aggregate price for the Optioned Partnership Interest shall be the assumption of the unpaid Commitment obligation (both that portion then due and amounts due in the future) of the Optionor (the "Option Price"). The Option Price for each Optionee shall be prorated according to the portion of the Optioned Partnership Interest purchased by each such Optionee so that the percentage of the unpaid Commitment assumed by each Optionee is the same as the percentage of the Optioned Partnership Interest purchased by such Optionee. The option granted hereunder shall be exercisable by each Optionee in whole only at any time within thirty (30) days of the date of the notice from the General Partner by the delivery to the General Partner of (i) a notice of exercise of option, and (ii) the Capital Contribution due in accordance with subsection (e)(i) of this Section. The General Partner shall forward the above notices of exercise of option received to the Optionor.

(b)    Should any Optionee not exercise its option within the period provided in subsection (a), the General Partner, within ten (10) days of the end of such period, shall notify the other Optionees who have previously exercised their options in full, which Optionees shall have the right and option ratably among them to acquire the portion of the Optioned Partnership Interest not so acquired (the "Remaining Portion") within ten (10) days of the date of the notice specified in this subsection on the same terms as provided in subsection (a).

(c)    The amount of the Remaining Portion not acquired by the Optionees pursuant to subsection (b) may be acquired by the General Partner within ten (10) days of the expiration of the period specified in subsection (b) on the same terms as set forth in subsection (a).

29

(d)     The amount of the Remaining Portion not acquired by the Optionees and the General Partner pursuant to subsection (c) may, if the General Partner deems it in the best interest of the Partnership, be sold to any other persons on terms not more favorable to such purchaser than the Optionees' option (and the General Partner may admit any such third party purchaser as a Limited Partner, subject to the approval of SBA, if required under the SBIC Act). Any consideration received by the Partnership for such amount of the Optionor's interest in the Partnership in excess of the Option Price therefor shall be retained by the Partnership and allocated among the Partners' Capital Accounts in proportion to the respective Partners' Capital Contributions.

(e)     Upon exercise of any option hereunder, such Optionee (or the General Partner, if it has exercised its rights pursuant to subsection (c)) shall be deemed to have assumed the portion of the Optionor's unpaid Commitment that constitutes the Option Price for the portion of the Optioned Partnership Interest purchased by such Optionee, and shall be obligated (i) to contribute to the Partnership the portion of the Capital Contribution then due from the Optionor equal to the percentage of the Optioned Partnership Interest purchased by such Optionee and (ii) to pay the same percentage of any further contributions which would have otherwise been due from such Optionor.

(f)     Upon the purchase by the General Partner of any portion of the Optioned Partnership Interest in the Partnership pursuant to subsection (c), the General Partner shall also become a Limited Partner to the extent of such interest.

(g)     Upon the purchase of any portion of any Optioned Partnership Interest by an Optionee, the General Partner or other person pursuant to this Section, the Optionor shall have no further rights or obligations under this Agreement with respect to such portion.

(h)     Upon the purchase of any portion of the Optioned Partnership Interest, for purposes of computing such purchaser's aggregate Capital Contributions, such purchaser shall be deemed to have aggregate Capital Contributions (or the aggregate Capital Contributions of any Optionee, shall be increased by an amount) equal to the percentage of the defaulting Limited Partner's aggregate Capital Contribution which the purchased portion of the Optioned Partnership Interest represents of the defaulting Limited Partner's entire Partnership interest, and the aggregate Capital Contributions of such defaulting Limited Partner shall be reduced by a corresponding amount.

6.     Adjustment of Capital Accounts.

6.01     Establishment of Capital Accounts.  There will be established on the books of the Partnership an Opening Capital Account for each Partner which will be adjusted in accordance with the definitions and methods of allocation prescribed in this Agreement.

6.02     Time of Adjustment of Capital Accounts.  The Opening Capital Account of each Partner will be adjusted in accordance with Section 6.03 as of the following dates:  (i) the close of each fiscal year of the Partnership; (ii) the day before the date of the admission of an Additional Limited Partner or increase in any Limited Partner's Commitment; (iii) immediately

before the dissolution of the Partnership; (iv) the date of a distribution; and (v) such other dates as this Agreement may provide.

6.03    Capital Accounts; Allocations.    The Partnership shall maintain a separate capital account for each Partner (each, a "Capital Account") according to the rules of U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv). For this purpose, the Partnership may, upon the occurrence of any of the events specified in U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv)(g) to reflect a revaluation of Partnership property. Items of Partnership income, gain, loss, expense or deduction for any fiscal period shall be allocated among the Partners in such manner that, as of the end of such fiscal period and to the extent possible, the Capital Account of each Partner shall be equal to the respective net amount, positive or negative, which would be distributed to such Partner from the Partnership or for which such Partner would be liable to the Partnership under this Agreement, determined as if the Partnership were to (a) liquidate the assets of the Partnership for an amount equal to their book value (determined according to the rules of U.S. Department of Treasury Reg. §1.704-1(b)(2)(iv)) and (b) distribute the proceeds in liquidation in accordance with Section 8.

6.04    Tax Matters.

(a)    In the event any Partner unexpectedly receives any adjustments, allocations or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain shall be specially allocated to such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible, provided that an allocation pursuant to this Section 6.04(a) shall be made only if and to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VI have been tentatively made as if this Section 6.04(a) were not in the Agreement. This provision is intended to provide a "qualified income offset" as such term is defined in the Treasury Regulations under Code Section 704(b) and shall be interpreted consistently therewith.

(b)    "Partner nonrecourse deductions" (as defined in Treasury Regulations Section 1.704-2(i)), if any, of the Partnership shall be allocated for each fiscal year, or other applicable period, to the Partner that bears the economic risk of loss for such deductions within the meaning of Treasury Regulations Section 1.704-2(i). "Nonrecourse deductions" (as defined in Treasury Regulations Section 1.704-2(b)), if any, of the Partnership shall be allocated for each fiscal year, or other applicable period, in the same manner as Net Profits and Net Losses are allocated for such period pursuant to Section 6.03 hereof. This Agreement shall be deemed to include the minimum gain chargeback provisions as defined in Treasury Regulations under Section 704(b) of the Code and, accordingly, items of gross income and gain of the Partnership shall be allocated to the Partners so as to give effect to such provisions.

(c)    No allocation of items of loss or deduction shall be made to any Partner to the extent that such allocation would create or increase an Adjusted Capital Account Deficit of such Partner.

31

6.05    Other Allocation Rules.

(a)    For purposes of determining the Net Profits, Net Losses, or any other items allocable to any period, Net Profits, Net Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partner using any permissible method under Code Section 706 and the Treasury Regulations thereunder and consistent with the SBIC Act.

(b)    The Partners are aware of the income tax consequences of the allocations made by this Article VI of the Agreement and hereby agree to be bound by the provisions of this Article VI of this Agreement in reporting their shares of Partnership income and loss for income tax purposes.

(c)    By executing this Agreement, each Partner authorizes and directs the General Partner to cause the Partnership to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "Notice") (or any similar guidance that is issued in final form by the Internal Revenue Service) apply to any Interest in the Partnership transferred to a service provider by the Partnership on or after the effective date of such Revenue Procedure in connection with services provided to the Partnership.  For purposes of making such Safe Harbor election, the General Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Partnership and, accordingly, execution of such Safe Harbor election by the General Partner constitutes execution of a "Safe Harbor Election" in accordance with Section 3.03(1) of the Notice.  The Partnership and each Partner agree to comply with all requirements of the Safe Harbor described in the Notice (or any similar guidance that is issued in final form by the Internal Revenue Service), including, without limitation, the requirement that each Partner shall prepare and file all federal income tax returns reporting the income tax effects of each Safe Harbor Interest issued by the Partnership in a manner consistent with the requirements of the Notice (or similar final guidance).  A Partner's obligations to comply with the requirements of this Section 6.05(c) shall survive such Partner's ceasing to be a Partner and/or the termination, dissolution, liquidation and winding up of the Partnership.

(d)    Upon issuance of final guidance by the Internal Revenue Service relating to the federal income tax treatment of the issuance by the Partnership of an interest in the Partnership to a service provider, each Partner authorizes the General Partner, in its sole discretion, to amend this Agreement to the extent necessary to comply with such final guidance; provided that such amendment is not materially adverse to the rights of any Partner (as compared with the after-tax consequences that would result if the provisions of the Notice applied to all interests in the Partnership transferred to a service provider by the Partner in connection with services provided to the Partnership).

6.06    Tax Allocations.

(a)    Section 704(b) Allocations.  Each item of income, gain, loss, deduction or credit for federal income tax purposes which corresponds to an item of income, gain, loss or expense that is either taken into account in computing Net Profits or Net Losses or specially allocated pursuant to Section 6.04 (a "Book Item") shall be allocated among the Partners in the

same proportions as the corresponding Book Item is allocated among them pursuant to Section 6.03 and Section 6.04 of the Agreement.

(b)  Tax Allocations / Code Section 704(c).  In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial book value.  In the event the book value of any Partnership asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f), subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its adjusted book value in the same manner as under Code Section 704(c) and the Regulations thereunder.  Any elections and other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement, including, without limitation, any election or other decision relating to the selection of a method under Code Section 704(c).  Allocations pursuant to this Section 6.06(b) are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Net Profits, Net Losses and other items.

(c)  Tax Elections.  Upon the request of a transferee of an interest in the Partnership or any other Partner, the Partnership may, in the sole discretion of the General Partner, make the election provided for in Section 754 of the Code.

6.07  Tax Controversies.  The General Partner is designated as the Partnership's "Tax Matters Partner" pursuant to Section 6231(a)(7) of the Code, and, to the extent authorized or permitted under applicable law, the General Partner is authorized and required to represent the Partnership and each Limited Partner in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs connected therewith.  Each Limited Partner agrees to cooperate with the General Partner and to do or refrain from doing any and all such things reasonably required by the General Partner to conduct such proceedings.

6.08  Proceedings.  The General Partner must keep the Partners informed of all administrative and judicial proceedings with respect to Partnership tax returns or the adjustment of Partnership items.  Any Partner who enters into a settlement agreement with respect to Partnership items must promptly give the General Partner notice of the settlement agreement and terms that relate to Partnership items.

7.  Distributions.

7.01  Distributions to Partners.

(a)  General; Short-Term Investment Income.  The Partnership must make distributions of cash and/or property, if any, at such times as the SBIC Act requires and may make distributions of cash and/or property at such other times as the SBIC Act permits and as are determined under this Agreement.  Distributions pursuant to subsections 7.01(a), (b) and (c) shall

33

be made from Retained Earnings Available for Distribution or otherwise as provided in the SBIC Act. Short-Term Investment Income available for distribution will be distributed, at such time as the General Partner determines, among the Partners according to their respective proportionate interests in the Partnership property or funds that produced such Short-Term Investment Income, as reasonably determined by the General Partner. During the first five (5) years from the Commencement Date, the General Partner shall (to the extent permitted under the SBIC Act) distribute any income of the Partnership after the expiration of thirteen (13) months from the date of the Investment which created such income.

(b)     Net Cash Flow. Subject to Section 7.01(a) and 7.01(c) and except as otherwise provided in Section 8, cash and/or property, if any, remaining after distributions under Section 7.01(a) shall be distributed to the Partners, at such times as the General Partner may determine, in its sole discretion, in the following order and priority:

(i)     First, 100% to the Partners (including the Investment Adviser/Manager) pro rata according to their respective Investment Contributions with respect to Realized Investments until each Partner (other than a defaulting partner) has received distributions pursuant to this Section 7.01(b)(i) equal to such Partner's aggregate Investment Contributions made with respect to Realized Investments, reduced by such Partner's pro rata share of cumulative distributions to the Investment Adviser/Manager pursuant to clause (x) of the last sentence of this Section 7.01(b).

(ii)     Second, 100% to the Partners (including the Investment Adviser/Manager) pro rata according to their respective Cost Contributions until each Partner (other than a defaulting partner) has received distributions pursuant to this Section 7.01(b)(ii) equal to the Allocable Share of such Partner's Cost Contributions, reduced by such Partner's pro rata share of cumulative distributions to the Investment Adviser/Manager pursuant to clause (y) of the last sentence of this Section 7.01(b).

(iii)     Third, 100% to the Partners (including the Investment Adviser/Manager) pro rata according to their respective Commitments until the Unpaid Preferred Return of each Partner (other than a defaulting partner) is reduced to zero.

(iv)     Fourth, 100% to the General Partner until the General Partner has received on account of the Carried Interest 20% of all distributions made pursuant to Section 7.01(b)(iii) and made or being made pursuant to this Section 7.01(b)(iv).

(v)     Fifth, thereafter, (A) 20% to the General Partner and (B) 80% to all Partners (including the Investment Adviser/Manager) pro rata according to their respective Commitments.

Notwithstanding anything in this Agreement to the contrary and prior to any other distribution pursuant to Section 7.01(b) and (c), to the extent the Available Profits at the time of any such distribution exceed the cumulative prior distributions to the Investment Manager/Adviser with respect to Waiver Contributions, the Investment Adviser/Manager shall be entitled to receive an amount of distributions equal to: (x) the Waiver Contributions made on its behalf with respect to

34

Realized Investments and (y) its Allocable Share of Waiver Contributions made on its behalf with respect to Cost Contributions.

      (c)      Tax Distributions.

          (i)      Subject to Section 7.01(a), to the extent such Partner has not received a distribution with respect to a Fiscal Year equal to such amount, the General Partner, in its sole discretion, may elect to cause the Partnership to distribute to each Partner annually in cash no later than ninety (90) days after the close of each Fiscal Year, an amount determined in the discretion of the General Partner that is equal to a percentage of such partner's share of the taxable income of the Partnership allocated to such Partner for such Fiscal Year. Such percentage shall be determined by the General Partner in its absolute discretion based upon an estimate of the highest marginal Federal income tax rates for corporations or individuals, whichever is higher, applicable to ordinary income and capital gain income and the proportions of such types of income earned by the Partnership during such Fiscal Year, plus the highest marginal Illinois income tax rates for corporations or individuals, whichever is higher, applicable to ordinary income and capital gain income and the proportions of such types of income earned by the Partnership during such Fiscal Year (such Illinois rate to be federally tax effected) (the "Maximum Tax Liability"). The amount, if any, distributed pursuant to this Section 7.01(c)(i) shall be reduced by all other distributions made in such fiscal year or other period (other than distributions made to fund tax liabilities pursuant to this Section 7.01(c)(ii)). Distributions pursuant to this Section 7.01(c)(i) shall be treated as advances of distributions pursuant to Section 7.01(b).

          (ii)      The Partnership shall at all times be entitled to make payments with respect to any Partner in amounts required to discharge any legal obligation of the Partnership to withhold or make payments to any governmental authority with respect to any Federal, state and local tax liability of such Partner arising as a result of such Partner's interest in the Partnership. Each such payment will be debited to such Partner's Capital Account, as provided in Section 6.02, and will be treated as a distribution for all purposes of this Agreement.

      7.02      Distributions of Noncash Assets in Kind.

      (a)      Subject to the provisions of Section 7.01(a) and this Section 7.02, the Partnership at any time may distribute in kind Noncash Assets.

      (b)      Noncash Assets distributed in kind under this Section 7.02 will be subject to such conditions and restrictions as are legally required, including, without limitation, such conditions and restrictions required to assure compliance by the Partners and/or the Partnership with the aggregation rules and volume limitations under Rule 144 promulgated under the Securities Act.

      7.03      Distributions Violative of the Act Prohibited.      Anything contained in this Agreement to the contrary notwithstanding, no distribution may be made by the Partnership if and to the extent that such distribution would violate the Act.

      7.04      Distributions in Respect of Interests Transferred. Distributions of the Partnership shall be made only to persons who, according to the books and records of the Partnership, are the

owners of record of the interests in the Partnership in respect of which such distributions are made on the date determined by the General Partner as of which owners of interest in the Partnership are entitled to such distributions. The General Partner and the Partnership shall incur no liability for making distributions in accordance with the provisions of this Section 7.04, whether or not the General Partner or the Partnership has knowledge or notice of any transfer of ownership of any interests in the Partnership.

7.05    Clawback.    Upon dissolution and winding up of the Partnership, the General Partner will be required to restore monies to the Partnership to enable the Partnership to make distributions to the Limited Partners in an aggregate amount equal to the excess, if any, of the total amount actually received by the General Partner in excess of twenty percent (20%) of (A) the aggregate amount of distributions that would have been received by the Limited Partners if there had been no distributions to the General Partner less (B) the aggregate amount of all Capital Contributions by the Limited Partner under this Agreement. The obligation of the General Partner to make such payment to the Partnership will be limited to the cumulative amounts actually received by the General Partner from the Partnership in respect of its Carried Interests.

8.    Dissolution, Liquidation, Winding Up and Withdrawal.

8.01    Dissolution.

(a)    The Partnership will be dissolved upon the first to occur of the following:

(i)    subject to Section 8.04 of this Agreement, the withdrawal, dissolution or bankruptcy of the General Partner or the occurrence of any other event that causes the General Partner to cease to be a general partner of the Partnership, including but not limited to an event of withdrawal (as defined in Section 17-101(3) and 17-402 of the Act) of the General Partner;

(ii)    the later of:

(A)    ten (10) years from the Commencement Date; or

(B)    two years after all Limited Partners have withdrawn from the Partnership and all Outstanding Leverage has matured; or

(iii)    the determination of the Partners to dissolve and terminate the Partnership as provided in Section 8.01(c).

(b)    The Partnership will not dissolve upon the withdrawal, dissolution, bankruptcy, death or adjudication of incompetency or insanity of any Limited Partner.

(c)    The General Partner and a Majority in Interest of the Limited Partners may elect to dissolve the Partnership by giving notice to each Partner and SBA of the election. Any notice of an election to dissolve the Partnership may only be given: (i) ten (10) years after the Commencement Date; (ii) if all Outstanding Leverage has been repaid or redeemed; and (iii) if all amounts due SBA, its agent or trustee have been paid.

36

(d)     The General Partner may, in the exercise of its sole discretion, elect to extend the date set forth in Section 8.01(a)(ii) for an additional period of up to two years in the form of two one-year extensions.

8.02    Winding Up.

(a)     Subject to the SBIC Act and Section 8.03, when the Partnership is dissolved, the property and business of the Partnership will be liquidated by the General Partner or if there is no General Partner or the General Partner is unable to act, a person designated by the holders of a Majority in Interest of the Limited Partners (the "Liquidator").

(b)     Within a reasonable period (and subject to the requirements of Treasury Regulation §§1.704-1(b)(2)(ii)(g) and 1.704-1(b)(2)(ii)(b)(2)) after the effective date of dissolution of the Partnership, the affairs of the Partnership will be wound up and the Partnership's assets will be distributed as provided in the SBIC Act and the Act. The liquidation shall be carried out as promptly as practicable with obtaining the fair value of the Partnership's Assets. The General Partner or Liquidator shall take full account of the Partnership's assets and liabilities and shall determine which assets shall be distributed in kind and which assets shall be liquidated. Notwithstanding the foregoing, the General Partner or Liquidator shall notify any Limited Partner that is a banking institution prior to making any distributions in kind and, upon written direction from such Limited Partner, shall sell such Portfolio Securities and distribute the net proceeds from such sale to such Limited Partner. Assets of the Partnership or the proceeds therefrom, if the General Partner or the Liquidator elects to liquidate the same, to the extent sufficient therefor, shall be applied and distributed in the following order:

(i)     To the payment and discharge of all the Partnership's debts and liabilities to the SBA and thereafter to others.

(ii)     To the setting up of such reserves as the General Partner or the Liquidator, as applicable, may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership arising out of or in connection with the Partnership's business, provided that any such reserve will be held by the General Partner or the Liquidator, as applicable, for the purpose of disbursing such reserves in payment of any such liabilities or obligations and at the expiration of such period as the General Partner or Liquidator, as applicable, shall deem advisable (but in no event to exceed eighteen months from the date of liquidation, unless an extension of the time is consented to by a Majority in Interest of the Limited Partners), to distribute the balance remaining as provided in this Section 8.02(b).

(iii)     The balance of such assets or proceeds shall be distributed to the General Partner and Limited Partners in accordance with Article VII. Notwithstanding the preceding sentence or anything to the contrary in Article VII, at any time on or after the earliest of (i) the liquidation and winding up of the Partnership, (ii) the time at which all Commitments of the Limited Partners have been fully funded, (iii) the fifth anniversary of the final closing date and (iv) at the sole election of the General Partner, such time as the Partnership's ability to make new Investments is terminated, if the Unapplied Waived Fee Amounts are greater than zero, then the General Partner may elect in its sole discretion to cause amounts otherwise distributable to the Partners pursuant to Section 7.01(b) or this Section 8.02(b) to be distributed as follows:

(A) first, an amount equal to the lesser of (1) the Unapplied Waived Fee Amounts and (2) the excess of Available Profits over the cumulative distributions to the Investment Adviser/Manager with respect to Waiver Contributions, shall be distributed to the Investment Adviser/Manager, and (B) thereafter, any remaining amounts shall be distributed to the Partners according to Article VII. The General Partner may provide a Capital Call Notice pursuant to Section 5.02 in order to obtain funds for such distribution as if the amount to be distributed were a Partnership expense.

Distributions pursuant to this Section 8.02 may be distributed to a trust established for the benefit of the Partners for the purposes of liquidating Partnership Assets, collecting amounts owed to the Partnership, and paying any contingent or unforeseen liabilities or obligations of the Partnership arising out of or in connection with the Partnership. The assets of any such trust shall be distributed to the Partners from time to time, in the reasonable discretion of the General Partner or the Liquidator, as applicable, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the Partners pursuant to this Agreement. An individual or entity that is a creditor of the Partnership by reason of its withdrawal or termination as a Limited Partner shall be entitled to receive distributions pursuant to this Section 8.02 only at the time of and from funds available for distribution to the Limited Partners and shall not have any priority in receipt of such funds senior to that of the Partners.

8.03    Withdrawal of the General Partner.

(a)    Except as provided in Section 4.03 and Section 4.04, the General Partner may not withdraw as the general partner of the Partnership without the approval of seventy-five percent (75%) in interest of the Limited Partners. If the General Partner withdraws as a general partner of the Partnership by notice from SBA as provided in the SBIC Act or otherwise, then the entire interest of the General Partner in the Partnership will be converted into an interest of a non-voting Limited Partner on the terms provided in Section 8.12, and the interest of the non-voting Limited Partner shall be disregarded with respect to calculating any required percentage of Limited Partners necessary to approve any action under this Agreement.

(b)    To the extent required by the SBIC Act, no transfer of the interest of the General Partner, or any portion of such interest, will be effective without the consent of SBA.

(c)    Except as provided in Section 8.03(a), 8.03(b), 8.12, 10.01(b), 10.01(c), 10.01(d) or 10.01(e), any person who acquires the interest of the General Partner, or any portion of such interest, in the Partnership, will not be a General Partner but will become a special Limited Partner (a "Special Limited Partner") upon his written acceptance and adoption of all the terms and provisions of this Agreement. Such person will acquire no more than the interest of the General Partner in the Partnership as it existed on the date of the transfer, but will not be entitled to any priority given to the Limited Partners, their successors and assigns, in respect of the interest. No such person will have any right to participate in the management of the affairs of · the Partnership or to vote with the Limited Partners, and the interest acquired by such person will be disregarded in determining whether any action has been taken by any percentage of the limited partnership interests.

(d)     Upon an event of withdrawal of the General Partner without continuation of the Partnership, the affairs of the Partnership will be wound up in accordance with the provisions of Section 8.02.

(e)     In the event of the death, disablement, incapacity, bankruptcy or withdrawal of an individual member of the General Partner or the dissolution, bankruptcy or withdrawal of any entity member of the General Partner, the Partnership will continue as provided in this Agreement.

8.04    Continuation of the Partnership After the Withdrawal of the General Partner. Upon the occurrence of an event of withdrawal (as defined in the Act) of the General Partner, the Partnership will not be dissolved, if, within ninety (90) days after the event of withdrawal, seventy-five percent (75%) or more in interest of the Limited Partners agree in writing to continue the business of the Partnership and to the appointment of one or more additional general partners (subject to the approval of SBA), effective as of the date of withdrawal of the General Partner.  If the Limited Partners so agree to continue the Partnership, the interest of the former General Partner shall be terminated in accordance with Section 8.12.

8.05    Withdrawals of Capital.  Except as specifically provided in this Agreement, withdrawals by a Partner of any amount of its Capital Account are not permitted.

8.06    Withdrawal by ERISA Regulated Pension Plans.  Notwithstanding any other provision of this Agreement, any Limited Partner that is an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Limited Partner or the General Partner obtains an opinion of counsel to the effect that, as a result of ERISA, (i) the withdrawal of the Limited Partner from the Partnership to such extent is required to enable the Limited Partner to avoid a violation of, or breach of the fiduciary duties of any person under, ERISA (other than a breach of the fiduciary duties of any such person based upon the investment strategy or performance of the Partnership) or any provision of the Code related to ERISA or (ii) all or any portion of the assets of the Partnership (as opposed to the Limited Partner's partnership interest) constitute assets of the Limited Partner for purposes of ERISA and are subject to the provisions of ERISA to substantially the same extent as if owned directly by the Limited Partner.

8.07    Withdrawal by Government Plans Complying with State and Local Law. Notwithstanding any other provision of this Agreement, any Limited Partner that is a "government plan" within the meaning of ERISA may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Limited Partner or the General Partner obtains an opinion of counsel to the effect that as a result of state statutes, regulations, case law, administrative interpretations or similar authority applicable to the "government plan", the withdrawal of such Limited Partner from the Partnership to such extent is required to enable the Limited Partner or the Partnership to avoid a violation (other than a violation based upon the investment performance of the Partnership) of the applicable state law.

8.08    Withdrawal by Government Plans Complying with ERISA.  Notwithstanding any other provision of this Agreement, any Limited Partner that is a "government plan" within the meaning of ERISA may elect to withdraw from the Partnership in whole or in part, if the "government plan" obtains an opinion of counsel to the effect that, as a result of ERISA, (i) the withdrawal of the "government plan" from the Partnership to such extent would be required if it were an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, to enable the "government plan" to avoid a violation of, or breach of the fiduciary duties of any person under ERISA (other than a breach of the fiduciary duties of any such person based upon the investment strategy or performance of the Partnership) or any provision of the Code related to ERISA or (ii) all or any portion of the assets of the Partnership would constitute assets of the "government plan" for the purposes of ERISA, if the "government plan" were an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA and would be subject to the provisions of ERISA to substantially the same extent as if owned directly by the "government plan."

8.09    Withdrawal by Tax Exempt Limited Partners.  Notwithstanding any other provision of this Agreement, any Limited Partner that is exempt from taxation under Section 501(a) or 501(c)(3) of the Code may elect to withdraw from the Partnership in whole or in part, if the Limited Partner obtains an opinion of counsel to the effect that as a result of applicable statutes, regulations, case law, administrative interpretations or similar authority, the withdrawal of the Limited Partner from the Partnership to such extent is required to enable the tax exempt Limited Partner to avoid loss of its tax exempt status under Section 501(a) or 501(c)(3) of the Code.

8.10    Withdrawal by Registered Investment Companies.  Notwithstanding any other provision of this Agreement, any Limited Partner that is an "investment company" subject to registration under the Investment Company Act, may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Limited Partner or the General Partner obtains an opinion of counsel to the effect that, as a result of the Investment Company Act, the withdrawal of the Limited Partner from the Partnership to such extent is required to enable such Limited Partner or the Partnership to avoid a violation of applicable provisions of the Investment Company Act or the requirement that  the Partnership register as an investment company under the Investment Company Act.

8.11    Distributions on Withdrawal.

(a)    Subject to the provisions of Sections 5.02, 5.11 and 8.11(b), upon withdrawal by a Limited Partner under any provision of this Agreement, the General Partner will value the interest of the withdrawing Limited Partner and that value will be paid to the withdrawing Limited Partner when determined by the General Partner in the exercise of its sole discretion either (i) at the time and in the amounts that the withdrawing Limited Partner would have been entitled had it remained a Limited Partner with an interest (including a Capital Account) in the Partnership equal to its interest at the time of withdrawal or (ii) at such times after withdrawal as the General Partner determines would permit the Partnership to make a reasonable distribution.

40

(b)    The Partnership will not make any distribution to any Partner in connection with its withdrawal under any provision of this Agreement or the Act, unless the distribution is permitted by the SBIC Act and SBA has given its consent to such distribution before the distribution is made.

(c)    Except in the case of distributions made as permitted under subsection (b), the right of any Partner to receive any distribution from the Partnership as a result of such Partner's withdrawal, including any right any Partner may have as a creditor of the Partnership with respect to the amount of any such distribution, is subordinate to any amount due to SBA by the Partnership.

8.12    Liquidation of General Partner's Interest Upon Election of Limited Partners to Continue the Partnership.  If, upon occurrence of the resignation, dissolution or bankruptcy of the General Partner, or any other event that causes the General Partner to cease to be a general partner of the Partnership, the Partnership continues under a successor General Partner, the assets of the Partnership shall be valued in accordance with Section 3.10 (except that for all purposes determinations to be made by the General Partner shall be made by the successor General Partner) as of the date of the resignation, dissolution or bankruptcy.  The Net Profits or Net Losses will be determined as if all assets had been sold at their fair market value as of the applicable date, and the aggregate amount of the General Partner's Capital Account as of such date shall be determined.  The terminating General Partner's  interest in the Partnership, including its then existing Capital Account, as so valued shall be converted to and treated going forward as the interest of a non-voting Limited Partner as provided in Section 8.03(a), and the terminating General Partner shall cease to be entitled to any allocation or distribution or any other right relating to the General Partner.

9.    Accounts, Reports and Auditors.

9.01    Books of Account.

(a)    The Partnership must maintain books and records in accordance with the provisions of the SBIC Act regarding financial accounts and reporting and, except as otherwise provided in this Agreement, generally accepted accounting principles.

(b)    The books and records of the Partnership must be kept at the principal place of business of the Partnership.  Each Partner will have access, upon reasonable notice and during regular business hours, to all books and records of the Partnership for all proper purposes as a Partner of the Partnership. Each Partner will have the right to receive copies of such books and records, subject to payment of the reasonable costs of such copies.

(c)    The Partnership will not be required to disclose, however, any confidential or proprietary information received by the Partnership in connection with its investment operations, except for any disclosure to SBA required by the SBIC Act.

9.02    Audit and Reports.

(a)    Audit. The financial statements of the Partnership must be audited and certified as of the end of each fiscal year by a firm of independent certified public accountants selected by the Partnership.

(b)    Financial Statements. The General Partner shall cause an annual report of the operations of the Partnership to be prepared within ninety days following the end of the fiscal year. Said annual report shall include:

(i)    a balance sheet of the Partnership;

(ii)    a statement of operations for the year;

(iii)    a statement of cash flows;

(iv)    a statement of changes in partners' capital, and such Partner's Closing Capital Account;

(v)    a statement of the Assets, valued as provided under this Agreement;

(vi)    the amount of such Partner's share in the Partnership's taxable income or loss for the year, in sufficient detail to enable it to prepare its Federal, state and other tax returns;

(vii)    any other information the General Partner, after consultation with any Limited Partner requesting the same, deems necessary or appropriate;

(viii)    upon request by any Partner, such other information as is needed by such Partner in order to enable it to file any of its tax returns; and

(ix)    such other information as any Partner may reasonably request for the purpose of enabling it to comply with any reporting or filing requirements imposed by any statute, rule, regulation or otherwise by any governmental agency or authority.

(c)    Income Tax Information. The General Partner shall provide each Partner within ninety days after the end of each fiscal year (i) the information necessary for the Partner to complete its Federal and state income tax returns, and (ii) if requested by a Limited Partner, a copy of the Partnership's Federal, state and local income tax or information returns for the year. The General Partner shall cause to have prepared and filed all required income tax returns for the Partnership.

9.03    Fiscal Year. The fiscal year of the Partnership will be a twelve-month year (except for the first and last partial years, if any) ending on December 31 ("Fiscal Year").

9.04    Banking and Portfolio Securities. All funds of the Partnership shall be deposited in such separate bank account or accounts as shall be determined by the General Partner, which

42

funds shall be maintained separately from other bank accounts of the General Partner, or any other person or entity. All withdrawals therefrom shall be made upon checks signed by the General Partner or by any person authorized to do so by the General Partner. All Portfolio Securities of the Partnership shall be held by the General Partner separately from other securities held by the General Partner for its own account.

10.  Miscellaneous.

    10.01  Assignability.

        (a)  Limited Partner Transfer.  No Limited Partner may assign, pledge or otherwise grant a security interest in its or his interest in the Partnership or in this Agreement, except:

            (i)  by operation of law;

            (ii)  to a receiver or trustee in bankruptcy for that Partner; or

            (iii)  with the prior written consent of the General Partner (which consent may be withheld in the reasonable discretion of the General Partner);

provided in each instance: (A) the proposed transferee is fully qualified under the SBIC Act to do so and assumes all the obligations of the original Limited Partner; (B) the General Partner has no reasonable belief that admitting the proposed transferee as a Limited Partner would be harmful to the Partnership or any Partner; (C) the proposed transfer would not, in the opinion of the Partnership's counsel, create a material risk of subjecting the Partnership or any Partner to any governmental regulation or require any registration which the General Partner believes to be significant; (D) each transferee agrees to become and assume the obligations of a Limited Partner pursuant to this Agreement on terms and conditions acceptable to the SBA and the General Partner; and (E) SBA shall have given its consent if such consent is required by the SBIC Act.

        (b)  SBA Approval.  No General Partner or Limited Partner may transfer any interest of ten percent (10%) or more in the capital of the Partnership without the prior approval of SBA.

        (c)  General Partner Transfer.  The General Partner may not assign, pledge or otherwise grant a security interest in its interest in the Partnership or in this Agreement, except with the prior consent of SBA and the prior approval of seventy-five percent (75%) or more in interest of the Limited Partners.  In these instances where such Limited Partner and SBA approvals have been obtained: (i) a transferee of all or a part of the interest of a General Partner shall be admitted to the Partnership as a general partner of the Partnership only if seventy-five percent (75%) or more in interest of the Limited Partners approves in writing the admission of such transferee; (ii) the admission shall be effective upon the filing of an amendment to the Certificate of Limited Partnership with the Secretary of State of the State of Delaware that indicates such transferee has been admitted to the Partnership as a general partner of the Partnership; and (iii) for all purposes the admission shall be deemed to have occurred immediately prior to the time the transferor General Partner ceases to be a general partner of the Partnership.  Such additional or successor General Partner is hereby authorized to and shall

43

continue the Partnership without dissolution. Upon the filing of an amendment to the Certificate of Limited Partnership with the Secretary of State of the State of Delaware that indicates that a General Partner is no longer a general partner of the Partnership, such General Partner shall at that time cease to be a general partner of the Partnership. Any transferee of or successor in interest to a General Partner shall have only the rights and liabilities of a Limited Partner pending SBA's written approval of such transfer or succession.

(d)  Conditions to Transfer. No transfer of any interest in the Partnership will be allowed if such transfer or the actions to be taken in connection with that transfer would: (i) result in any violation of the SBIC Act; (ii) result in a violation of any law, rule or regulation by the Partnership; (iii) cause the termination or dissolution of the Partnership; (iv) cause the Partnership to be classified other than as a partnership for Federal income tax purposes; (v) result in the transfer of a limited partnership interest of less than 100% of the total limited partnership interest or cause the Partnership to be classified as a "publicly traded partnership" within the meaning of Section 469(k)(2) of the Code or for the purposes of Section 512(c)(2) of the Code; (vi) result in a violation of the Securities Act; (vii) require the Partnership to register as an investment company under the Investment Company Act; (viii) require the Partnership, the General Partner or the Investment Adviser/Manager to register as an investment adviser under the Investment Advisers Act; (ix) cause the Assets of the Partnership to be treated as assets of an employee benefit plan under regulations adopted pursuant to ERISA; or (x) result in a termination of the Partnership for Federal or state income tax purposes. The Limited Partner transferring its interest shall bear all reasonable costs of the Partnership in effecting such transfer. The transferor and transferee shall execute such documents and instruments and supply such opinions of counsel as the General Partner reasonably requests.

(e)  Substituted Limited Partners. Notwithstanding a transfer pursuant to Section 10.01, no transferee shall become a substituted Limited Partner within the meaning of the Act unless the General Partner expressly and in writing consents to the substitution, and such transferee:

(i)  elects to become a substituted Limited Partner by delivering a written notice of such election to the General Partner;

(ii)  executes and acknowledges such other agreements and instruments as the General Partner may deem necessary or advisable to effect the admission of such person as a substituted Limited Partner, including without limitation the written acceptance and adoption by such person of the provisions of this Agreement and the execution of a subscription agreement; and

(iii)  pays a reasonable transfer fee to the Partnership which is sufficient to cover all reasonable expenses connected with the admission of such person as a substituted Limited Partner within the meaning of the Act; and if all steps shall be taken which, in the opinion of the General Partner, are reasonably necessary to admit such person under the Act and this Agreement as a substituted Limited Partner, then such person shall thereupon become a substituted Limited Partner within the meaning of the Act.

44

10.02 <u>Binding Agreement</u>. Subject to the provisions of Section 10.01, this Agreement is binding upon, and inures to the benefit of, the heir, successor, assign, executor, administrator, committee, guardian, conservator or trustee of any Partner.

10.03 <u>Gender</u>. As used in this Agreement, masculine, feminine and neuter pronouns include the masculine, feminine and neuter; and the singular includes the plural.

10.04 <u>Notices</u>. All notices under this Agreement must be in writing and may be given by personal delivery, telegram, private courier service or registered or certified mail. A notice is deemed to have been given: (i) by personal delivery, telegram, or private courier service, as of the day of delivery of the notice to the addressee; and (ii) by mail, as of the third (3rd) day after the notice is mailed. Notices must be sent to: (i) the Partnership or the General Partner, at 222 West Adams Street, Suite 1980, Chicago, IL 60606, or such other address or addresses as to which the other Partners have been given notice; (ii) the Limited Partners, at the addresses in Schedule A attached to this Agreement (as Schedule A may be amended from time to time) or such other addresses as to which the Partnership has been given notice; and (iii) SBA, at the address of the Investment Division of SBA and, if so required under any Section of this Agreement, in duplicate at the address of the Office of the General Counsel of SBA.

10.05 <u>Consents and Approvals</u>. A consent or approval required to be given by any party under this Agreement will be deemed given and effective for purposes of this Agreement only if the consent or approval is: (i) given by such party in writing, and (ii) delivered by such party to the party requesting the consent or approval in the manner provided for notices to such party under Section 10.04.

10.06 <u>Counterparts</u>. This Agreement and any amendment to this Agreement may be executed in any number of counterparts with the same effect as if all parties executed and had signed one document. All counterparts shall be construed together and shall constitute one agreement, but each must be signed by the General Partner.

10.07 <u>Amendments</u>.

(a) <u>General Amendments</u>. This Agreement may not be amended except by an instrument in writing executed by the holders of a seventy-five percent (75%) in interest of the Limited Partners who have not withdrawn as of the effective date of that amendment and the General Partner, and approved by SBA. In addition, any amendment that: (i) increases the amount of a Limited Partner's Commitment requires that Limited Partner's consent; (ii) may cause a Limited Partner to become liable as a general partner of the Partnership requires the written consent of that Limited Partner; or (iii) amends this sentence requires the consent of all Partners.

(b) <u>Regulatory Amendments</u>. Notwithstanding anything in this Agreement to the contrary, upon the request of any Limited Partner the General Partner may, in its discretion, but subject to SBA approval, effect such amendments to this Agreement and the Certificate of Limited Partnership (the "Amendments"), without the consent of any Limited Partner, (i) as shall be needed in order to permit the requesting Limited Partner to remain in compliance with the provisions of ERISA, the Federal Deposit Insurance Act, as amended, the National Bank Act, as

45

amended, the Bank Holding Company Act of 1956, as amended (the "Holding Company Act"), Title 29, Section 1002(3) of the United States Code and any similar laws or regulations, including state laws and regulations, thereunder ("Governmental Plan Regulations"), applicable to such Limited Partner, as in effect now or at any time during the term of this Agreement with respect to the investment of such Limited Partner in the Partnership; provided, however, that in the event the General Partner considers the Amendments to be onerous for the Partnership, the General Partner need not effect the Amendments or (ii) to preclude the assets of the Partnership from being considered to be "plan assets" for purposes of Section 3 of ERISA and regulations thereunder and Section 4975 of the Code.  In the event the General Partner does not effect the Amendments after a request to do so by a Limited Partner and such Limited Partner delivers to the General Partner an opinion of counsel (including an attorney general's opinion or an opinion from a regulatory authority) to the effect that the Limited Partner must withdraw from the Partnership in order for such Limited Partner to be in compliance with ERISA, the Holding Company Act, the Federal Deposit Insurance Act, as amended, the National Bank Act, as amended, or the Governmental Plan Regulations unless the Amendments are effected, or in the event that the General Partner effects the Amendments and the Limited Partner delivers to the General Partner such an opinion of counsel to the effect that after the Amendments the Limited Partner must withdraw from the Partnership in order for such Limited Partner to be in compliance with ERISA, the Holding Company Act, the Federal Deposit Insurance Act, as amended, the National Bank Act, as amended, or the Governmental Plan Regulations, then the General Partner, subject to SBA approval to the extent required by the SBIC Act, shall either (i) effect such Amendments as would enable such Limited Partner to be in compliance with ERISA, the Holding Company Act, the Federal Deposit Insurance Act, as amended, the National Bank Act, as amended, or the Governmental Plan Regulations without withdrawing from the Partnership; or (ii) to the extent permissible under applicable securities laws cause the Partnership to distribute to such Limited Partner its pro rata share of assets of the Partnership, including cash and cash equivalents, or (iii) cause the Partnership to repurchase the Limited Partnership interest owned by such Limited Partner at a price equal to such Limited Partner's pro rata share of the net asset value of the Partnership payable to such Limited Partner upon termination of the Partnership, or as soon as practicable after the election by the General Partner to repurchase the Limited Partnership interest, payment therefor to be made by a promissory note of the Partnership which shall be payable to such Limited Partner upon the earlier of termination of the Partnership or eight years from the date of the note and which shall bear interest at a rate per annum equal to the rate that the Wall Street Journal publishes from time to time as the "prime rate" for unsecured commercial loans during the term of the Note or such lesser rate of interest as is equal to the maximum rate of interest permissible, or (iv) dissolve the Partnership; provided, however, that insofar as any such withdrawing Limited Partner becomes a creditor of the Partnership by reason of such withdrawal, its creditor position shall be junior to that of SBA.  Any opinion delivered to the General Partner pursuant to this Section 10.07(b) must be acceptable to the General Partner (which acceptance shall not be unreasonably withheld).

(c)     The General Partner will distribute in the manner provided for notices in Section 10.04, to each Limited Partner and SBA a copy of:  (i) any Certificate of Amendment to the Certificate of Limited Partnership, and (ii) any amendment to this Agreement.

10.08   Limited Partner Consents.  Each Limited Partner consents to:  (i) the admission of Additional Limited Partners and the increase in any Limited Partner's Commitment in

46

accordance with Section 5.09; (ii) the transfer of a Partner's interest in accordance with Section 10.01 and the admission of a substituted Partner under such transfer; (iii) any amendment of this Agreement or the Certificate of Limited Partnership necessary to effect such transfer or admission; (iv) any amendment to this Agreement or the Certificate of Limited Partnership pursuant to Section 10.07(b); and (v) any amendment of this Agreement or the Certificate of Limited Partnership to comply with or conform to any amendments of applicable laws governing the Partnership.

      (a)    The General Partner must distribute to each Limited Partner and SBA a copy of (i) any Certificate of Amendment to the Certificate of Limited Partnership, and (ii) any amendment to this Agreement.

      (b)    Copies of any Certificate of Amendment to the Certificate of Limited Partnership, and any amendment to this Agreement must be distributed in the same manner as provided for notices in Section 10.04.

    10.09  Power of Attorney.

      (a)    Appointment.  Each Limited Partner appoints the General Partner, and each other person designated by the General Partner, with full power of substitution, as its true and lawful representative and attorney-in-fact, for it and in its name, place and stead, to make, execute, sign and file: (i) any amendments of this Agreement necessary to reflect: (A) the transfer of a Partner's interest; (B) the admission of a Limited Partner or substituted Limited Partner; (C) the admission of an Additional Limited Partner or the increase in the Commitment of a Limited Partner; (D) amendment of this Agreement adopted by the Partners; and (E) the consents set forth in Section 10.08; (ii) the exercise by the General Partner of any of the powers granted to it under this Agreement; (iii) the admission to the Partnership of any General Partner or Special Limited Partner or the withdrawal of any Limited Partner or General Partner in the manner prescribed in this Agreement; (iv) to incorporate such changes as are required by the SBA or the SBIC Act; and (v) all instruments, documents and certificates which, from time to time, may be required by the law of the United States of America, the State of Delaware or any other state in which the Partnership determines to do business, or any political subdivision or agency thereof, to execute, implement and continue the valid and subsisting existence of the Partnership and in conformance to the provisions of this Agreement. Each Limited Partner authorizes each such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Limited Partner might or could do if personally present, and hereby ratifying and confirming all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. The authorization set forth in this power of attorney includes the right to amend this Agreement to respond to comments from the SBA in connection with the Partnership's SBIC license application.

      (b)    Attributes.  The power of attorney granted pursuant to Section 10.09 hereof:

(i)      is a special power of attorney coupled with an interest and is irrevocable except that such power shall terminate with respect to any particular person so appointed at the time such person ceases to be a principal or designee of the General Partner;

(ii)      if allowed by applicable law, may be executed by such attorney-in-fact by listing all of the Limited Partners executing any agreement, certificate, instrument or document with the single signature of any such attorney-in-fact acting as attorney-in-fact for all of them; and

(iii)      shall survive the delivery of an assignment by a Limited Partner of its interest in the Partnership, except that where the purchaser, transferee or assignee thereof has the right to be, or with the consent of the General Partner is admitted as, a substituted Limited Partner, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling such attorney-in-fact to execute, acknowledge and file any such agreement, certificate, instrument or document necessary to effect such substitution.

10.10    Applicable Law.  This Agreement is governed by, and construed in accordance with, applicable Federal laws and the laws of the State of Delaware.

10.11    Severability.  If any one or more of the provisions contained in this Agreement, or any application of any such provision, is invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and all other applications of any such provision will not in any way be affected or impaired.

10.12    Entire Agreement.  This Agreement, and all other written agreements executed by or on behalf of the General Partner and/or the Limited Partners and  executed or approved by SBA, up to and including the date of this Agreement (such other written agreements, collectively,  the "SBA Agreements"),  state the entire understanding among the parties relating to the subject matter of this Agreement and the SBA Agreements.  Any and all prior conversations, correspondence, memoranda or other writings are merged in, and replaced by this Agreement and the SBA Agreements, and are without further effect on this Agreement and the SBA Agreements.  No promises, covenants, representations or warranties of any character or nature other than those expressly stated in this Agreement and the SBA Agreements have been made to induce any party to enter into this Agreement or any SBA Agreement.

10.13    Section Headings.  Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provisions hereof.

10.14    Right to Rely upon the Authority of General Partner.  No person dealing with the General Partner shall be required to determine its authority to make any commitment or undertaking on behalf of the Partnership, nor to determine any fact or circumstance bearing upon the existence of its authority.

10.15    Jurisdiction.  Any action to enforce, arising out of, or relating in any way to this Agreement may be brought and prosecuted in any Federal or state court or courts located in Cook County, Illinois, and each Partner (a) consents to the jurisdiction of any such state court located in Cook County, Illinois, or any such federal court located in that county and to service

48

of process by registered or certified mail, return receipt requested, or by any other matter provided by law, and (b) agrees not to object to venue of any such court; provided, however, that, without its written consent, SBA does not consent to the jurisdiction of any state court.

10.16 <u>Description of Partnership</u>. The terms of this Agreement supersede any description of the Partnership appearing in any other document, including any offering documents.

10.17 <u>Written Consent</u>. Any action to be taken by the Partners may be taken at any time upon the written consent of such Partners holding at least the minimum interest in the Partnership that would be necessary to authorize or take that action.

10.18 <u>Partition</u>. Each Partner agrees that it shall not cause a partition of any of the Partnership's property, whether by court action or otherwise, it being agreed that any such action would cause a substantial hardship to the Partnership and would be in breach and contravention of this Agreement.

10.19 <u>Legal Counsel</u>. Each Partner hereby agrees and acknowledges that:

(a)     Kirkpatrick & Lockhart Nicholson Graham LLP has been retained by the General Partner in connection with the formation of the Partnership and the offering of Limited Partner interests and in such capacity has provided legal services to the General Partner and the Partnership. The General Partner expects to retain Kirkpatrick & Lockhart Nicholson Graham LLP to provide legal services to the General Partner and the Partnership in connection with the management and operation of the Partnership.

(b)     Kirkpatrick & Lockhart Nicholson Graham LLP will not represent the Limited Partners in connection with the formation of the Partnership, the offering of Limited Partner interests, the management and operation of the Partnership, or any dispute which may arise between the Limited Partners on one hand and the General Partner and the Partnership on the other hand (the "Partnership Legal Matter"). Each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect thereto and will pay all fees and expenses of such independent counsel.

(c) Each Limited Partner hereby agrees that Kirkpatrick & Lockhart Nicholson Graham LLP may represent the General Partner and the Partnership in connection with any and all Partnership Legal Matters (including any dispute between the General Partner and one or more Limited Partners) and waives any present or future conflict of interest with Kirkpatrick & Lockhart Nicholson Graham LLP regarding Partnership Legal Matters.

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement as of the date first set forth above.

"General Partner"

**GRANITE CREEK GP FLEXCAP I, L.L.C.**

By: _____

Its: ____MANAGING PARTNER____

"Limited Partner"

_____
*(Print Name of Limited Partner)*

_____
*(Signature)*

_____
*(Print Name of Signatory)*

(Title of Signatory, if applicable)

50

*Schedule A*

As of May __, 2007

**GRANITE CREEK FLEXCAP I, L.P.**

**CAPITAL COMMITMENTS**
**GENERAL PARTNER AND LIMITED PARTNERS**

| General Partner | Commitment |
|---|---|
| Granite Creek GP FlexCap I, L.L.C.<br>222 West Adams Street<br>Suite 1980<br>Chicago, IL  60606 | $1,000 |

| Limited Partners | Commitment |
|---|---|
| Robert Riter<br>Chairman<br>American Chartered Bank<br>1199 East Higgins Road<br>Schaumburg, IL  60173 | $1,000,000 |
| Kenneth A. Lehman 1992 E Family Trust UAD 12/11/1992<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL  60201 | $1,000,000 |
| Betsy Ganford Lehman 1999 Irrevocable Trust UAD 1/1/1999<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL  60201 | $250,000 |
| Amy Ganford Lehman 1999 Irrevocable Trust UAD 1/1/1999<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL  60201 | $250,000 |
| Peter Ganford Lehman 1999 Irrevocable Trust UAD 1/1/1999<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL  60201 | $1,000,000 |

Schedule A-1

| Limited Partners | Commitment |
|---|---|
| Bedford Oak Partners, LP<br>c/o Harvey Eisen<br>100 South Bedford Road<br>Mt. Kisco, NY 10549 | $100,000 |
| Billy Creek Associates, L.P.<br>ATTN: Brian Brunner<br>56 North Main Street<br>Zionsville, IN 46077 | $1,000,000 |
| Peter Dvorak<br>4482 Lake Monroe Drive<br>Bloomington, IN 47401 | $3,000,000 |
| Joyce and Joe Pignotti<br>832 Birdie View Pt.<br>Sanibel Island, FL 33957 | $500,000 |
| John McKay<br>109 Planters Row<br>Geneva, IL 60134 | $1,500,000 |
| Tim and Carol Hart<br>3012 N. Dickerson Street<br>Arlington, VA 22207 | $1,000,000 |
| Brent Kaczmarek<br>12314 Ox Ridge Rd.<br>Fairfax, VA 22033 | $250,000 |
| Frank and Laura Colen<br>50 Riverside Drive, Apt 6D<br>New York, NY 10024 | $250,000 |
| William Bartholomay<br>180 E. Pearson Street<br>Chicago, IL 60611 | $50,000 |

Schedule A-2

| Limited Partners | Commitment |
|---|---|
| Eric Noviki<br>6901 Man O' War Lane<br>Mason, OH 45040 | $300,000 |
| John Herrmann<br>1105 Park Avenue, #1C<br>New York, NY 10128 | $250,000 |
| Jeff A. Wandell<br>305 South Duncan Road<br>Champaign, IL 61822 | $200,000 |
| Eric Moore<br>51107 Brenshire Ct.<br>Granger, IN 46530 | $250,000 |
| Peer Pedersen<br>584 Fletcher Circle<br>Lakeforest, IL 60045 | $500,000 |
| Howard Warren<br>161 East Chicago, Apt 38B<br>Chicago, IL 60611 | $500,000 |
| Larry Feinberg<br>250 Round Hill Rd.<br>Greenwich, CT 06831 | $3,000,000 |
| Jon Bartos<br>4269 Betheny Road<br>Mason, OH 45040 | $100,000 |
| Keith Stuckert<br>7286 Charter Cup Lane<br>West Chester, OH 45069 | $1,000,000 |
| Jeff Sink<br>20 Cascade Ct.<br>Springboro, OH 45066 | $250,000 |

Schedule A-3

| Limited Partners | Commitment |
|---|---|
| Mark A. Radzik, declaration of self-directed and revocable trust DTD 1/22/04<br>1064 Laurel Creek Drive<br>Chesterton, IN 46304 | $500,000 |
| Francis Florez<br>15 Warwick Place<br>Cincinnati, OH 45246 | $300,000 |
| Michael Wandell 2003 trust dated 3/29/2003<br>22238 North 55th<br>Phoenix, AZ 85040 | $100,000 |
| Joe DeZenzo<br>5083 Plantation Ct.<br>Mason, OH 45040 | $110,000 |
| Craig Cleveland<br>6634 Paxton Guinea<br>Loveland, OH 45140 | $100,000 |
| Jason Apple<br>870 Maintain Drive<br>Deerfield, IL 60015 | $150,000 |
| Granite Creek Partners, LLC<br>222 West Adams Street, Suite 1980<br>Chicago, IL 60606 | $1,000 |
| Kimberly Wahlund<br>4769 Tillinghast Ct.<br>Mason, OH 45040 | $100,000 |
| Mark Coghlin<br>6778 Willow Lane<br>Mason, OH 45040 | $50,000 |

Schedule A-4

| Limited Partners | Commitment |
|---|---|
| Mark A. Radzik, declaration of self-directed and revocable trust DTD 1/22/04 <br> 1064 Laurel Creek Drive <br> Chesterton, IN 46304 | $1,000,000 |
| Montana Street Investments, LLC <br> 175 Linden Park Place <br> Highland Park, IL  60035 | $500,000 |
| Brian Boorstein <br> 175 Linden Park Place <br> Highland Park, IL  60035 <br> (Back-Up for Montana Street Investments, LLC)[1] | [$500,000] |
| Philip Holdings, LLC <br> 4549 Raynor Ct. <br> Mason, Ohio 45040 | $500,000 |
| Jeff Philip <br> 4549 Raynor Ct. <br> Mason, Ohio 45040 <br> (Back-Up for Philip Holdings, LLC)[2] | [$500,000] |
| Texas Riflemens/Jon Sion Self Directed Trust <br> 37 Long Common Road <br> Riverside, IL  60546 | $500,000 |
| Jon Sion <br> 37 Long Common Road <br> Riverside, IL  60546 <br> (Back-Up for Texas Riflemens/Jon Sion Self Directed Trust)[3] | [$500,000] |

---

[1] If Montana Street Investments, LLC makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Brian Boorstein shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Brian Boorstein at the time shall be reduced by the same amount.

[2] If Philip Holdings, LLC makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Jeff Philip shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Jeff Philip at the time shall be reduced by the same amount.

Schedule A-5

| Limited Partners | Commitment |
|---|---|
| Terry Diamond IRA<br>905 North Michigan Avenue<br>Chicago, IL 60611 | $400,000 |
| Terry Diamond<br>905 North Michigan Avenue<br>Chicago, IL 60611<br>(Back-Up for Terry Diamond IRA)[4] | [$400,000] |
| Bartol Family Partnership<br>301 Beacon Street<br>Boston, MA 02116 | $500,000 |
| MidAmerica Bank<br>55th and Holmes<br>Claredon Hills, IL 60514 | $250,000 |
| Michael Barry<br>417 Pr airie Avenue<br>Elmhurst, IL 60126 | $200,000 |
| Barry Holdings<br>417 Prairie Avenue<br>Elmhurst, IL 60126 | $200,000 |
| Robert Hellman<br>950 Tower Lane, Suite 800<br>Foster City, GA 94404 | $200,000 |

---

[3] If Texas Riflemens/Jon Sion Self Directed Trust makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Jon Sion shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Jon Sion at the time shall be reduced by the same amount.

[4] If Terry Diamond IRA makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Terry Diamond shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Terry Diamond at the time shall be reduced by the same amount.

Schedule A-6

| Limited Partners | Commitment |
|---|---|
| Scott Vesley<br>2141 North Clifton<br>Chicago, IL 60614 | $250,000 |
| Lucy Lehman<br>c/o KKP Group<br>1603 Orrington Avenue<br>Suite 1880<br>Evanston, IL 60201 | $50,000 |
| Blair and Gordon Macinnes<br>26 Old Harter Road<br>Morristown, NJ 07960 | $250,000 |
| Scott Lang<br>2203 North Burling<br>Chicago, IL 60614 | $200,000 |
| Kurt and Elizabeth Weisenborn<br>379 Caballo<br>Carbondale, CO 81623 | $250,000 |
| Walid Firkri declaration of trust dtd 7/5/2005<br>2120 West Wilson Avenue<br>Chicago, IL 60625 | $100,000 |
| Gail Werner<br>1215 North 136th Street<br>Omaha, NE 68154 | $100,000 |
| Jeff Walton<br>1449 Candlewood Drive<br>Columbus, OH 43235 | $100,000 |
| Kenneth Rusche<br>6813 Ross Lane<br>Mason, OH 45040 | $200,000 |

Schedule A-7

| Limited Partners | Commitment |
|---|---|
| Dale Pierce<br>8380 Berringer Point Drive<br>Gainesville, GA  30506 | $200,000 |
| Glen Marder<br>545 Standish<br>Deerfield, IL  60015 | $100,000 |
| George McCown Trust/c/o AIM LP<br>950 Tower Lane, Suite 800<br>Foster City, CA  94404 | $50,000 |
| Robert Gensel<br>1305 Bent Creek Drive<br>Southlake, TX  76092 | $50,000 |
| Kevin Tedford<br>4420 Village Ridge Drive<br>Mason, OH  45040 | $100,000 |
| Tom Schaff<br>11933 Hill Top Greens Drive<br>St. Louis, MO  63128 | $300,000 |
| GK Partners/Goldberg Kohn<br>55 East Monroe<br>Chicago, IL  60603 | $80,000 |
| Steve and Patricia Kahn<br>8900 Terwillingers Trail<br>Cincinnati, OH  45249 | $300,000 |
| Kyle Kamin Revocable Living Trust<br>1401 Weiland #G<br>Chicago, IL  60610 | $50,000 |
| Greg and Julia Lee Owens<br>7370 Saint Ives Place<br>West Chester, OH  45069 | $350,000 |

Schedule A-8

| Limited Partners | Commitment |
|---|---|
| Landex Capital (Nevada) Inc.<br>c/o Alastair Macdonald<br>3800 Howard Hughes Parkway/7th Floor<br>Las Vegas, NV 89109 | $250,000 |
| Chris and Juie Larger<br>4924 Carriage Drive<br>Mason, OH 45040 | $50,000 |
| Rob Bumb<br>1427 Lant Circle<br>Evansville, IN 47714 | $50,000 |
| FiservISS-John Leahy<br>PO Box 173859<br>Denver, CO 80217 | $250,000 |
| John Leahy<br>329 Locust Road<br>Winnetka, IL 60093<br>(Backup for FiservISS-John Leahy)[5] | [$250,000] |
| North Avenue, LLC<br>1370 Linden Avenue<br>Highland Park, IL 60035 | $500,000 |
| David Rosenstein<br>1370 Linden Avenue<br>Highland Park, IL 60035<br>(Backup for North Avenue, LLC)[6] | [$500,000] |

---

[5] If FiservISS-John Leahy makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of John Leahy shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by John Leahy at the time shall be reduced by the same amount.

[6] If North Avenue, LLC makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of David Rosenstein shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by David Rosenstein at the time shall be reduced by the same amount.

Schedule A-9

| <u>Limited Partners</u> | <u>Commitment</u> |
|---|---|
| Todd Lippman Revocable Trust dtd 6/10/98<br>861 Grove Street<br>Glencoe, IL  60022 | $100,000 |
| Todd Lippman<br>861 Grove Street<br>Glencoe, IL  60022<br>(Backup for Todd Lippman Revocable Trust dtd 6/10/98)[7] | [$100,000] |

---

[7] If Todd Lippman Revocable Trust dtd 6/10/98 makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Todd Lippman shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Todd Lippman at the time shall be reduced by the same amount.

Schedule A-10

*Exhibit A*

**VALUATION GUIDELINES**

General

      The General Partner has sole responsibility for determining the Asset Value of each of the Loans and Investments and of the portfolio in the aggregate.

      Loans and Investments shall be valued individually and in the aggregate at least semi-annually - as of the end of the second quarter of the fiscal year-end and as of the end of the fiscal year. Fiscal year-end valuations are audited as set forth in SBA's Accounting Standards and Financial Reporting Requirements for Small Business Investment Companies.

      This Valuation Policy is intended to provide a consistent, conservative basis for establishing the Asset Value of the portfolio. The Policy presumes that Loans and Investments are acquired with the intent that they are to be held until maturity or disposed of in the ordinary course of business.

Interest-Bearing Securities

      Loans shall be valued in an amount not greater than cost with Unrealized Depreciation being recognized when value is impaired. The valuation of loans and associated interest receivables on interest-bearing securities should reflect the portfolio concern's current and projected financial condition and operating results, its payment history and its ability to generate sufficient cash flow to make payments when due.

      When a valuation relies more heavily on asset versus earnings approaches, additional criteria should include the seniority of the debt, the nature of any pledged collateral, the extent to which the security interest is perfected, the net liquidation value of tangible business assets, and the personal integrity and overall financial standing of the owners of the business. In those instances where a loan valuation is based on an analysis of certain collateralized assets of a business or assets outside the business, the valuation should, at a minimum, consider the net liquidation value of the collateral after reasonable selling expenses. Under no circumstances, however, shall a valuation based on the underlying collateral be considered as justification for any type of loan appreciation.

      Appropriate unrealized depreciation on past due interest which is converted into a security (or added to an existing security) should be recognized when collection is doubtful. Collection is presumed to be in doubt when one or both of the following conditions occur: (i) interest payments are more than 120 days past due; or (ii) the small concern is in bankruptcy, insolvent, or there is substantial doubt about its ability to continue as a going concern.

      The carrying value of interest bearing securities shall not be adjusted for changes in interest rates.

Valuation of convertible debt may be adjusted to reflect the value of the underlying equity security net of the conversion price.

Equity Securities - Companies

Investment cost is presumed to represent value except as indicated elsewhere in these guidelines.

Valuation should be reduced if a company's performance and potential have significantly deteriorated. If the factors which led to the reduction in valuation are overcome, the valuation may be restored.

The anticipated pricing of a Small Concern's future equity financing should be considered as a basis for recognizing Unrealized Depreciation, but not for Unrealized Appreciation. If it appears likely that equity will be sold in the foreseeable future at a price below the Licensee's current valuation, then that prospective offering price should be weighed in the valuation process.

Valuation should be adjusted to a subsequent significant equity financing that includes a meaningful portion of the financing by a sophisticated, unrelated new investor. A subsequent significant equity financing that includes substantially the same group of investors as the prior financing should generally not be the basis for an adjustment in valuation. A financing at a lower price by a sophisticated new investor should cause a reduction in value of the prior securities.

If substantially all of a significant equity financing is invested by an investor whose objectives are in large part strategic, or if the financing is led by such an investor, it is generally presumed that no more than 50% of the increase in investment price compared to the prior significant equity financing is attributable to an increased valuation of the company.

Where a company has been self-financing and has had positive cash flow from operations for at least the past two fiscal years, Asset Value may be increased based on a very conservative financial measure regarding P/E ratios or cash flow multiples, or other appropriate financial measures of similar publicly-traded companies, discounted for illiquidity. Should the chosen valuation cease to be meaningful, the valuation may be restored to a cost basis, or if of significant deterioration in performance or potential, to a valuation below cost to reflect impairment.

With respect to portfolio companies that are likely to face bankruptcy or discontinue operations for some other reason, liquidating value may be employed. This value may be determined by estimating the realizable value (often through professional appraisals or firm offers to purchase) of all assets and then subtracting all liabilities and all associated liquidation costs.

Warrants should be valued at the excess of the value of the underlying security over the exercise price.

Equity Securities - Public Companies

Exhibit A-2

Public securities should be valued as follows: (a) For over-the-counter stocks, take the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, take the average of the close for the valuation date and the preceding two days.

The valuation of public securities that are restricted should be discounted appropriately until the securities may be freely traded. Such discounts typically range from 10% to 40%, but the discounts can be more or less, depending upon the resale restrictions under securities laws or contractual agreements.

When the number of shares held is substantial in relation to the average daily trading volume, the valuation should be discounted by at least 10%, and generally by more.

Exhibit A-3

_Schedule A_

As of July 1, 2007

## GRANITE CREEK FLEXCAP I, L.P.

### CAPITAL COMMITMENTS
### GENERAL PARTNER AND LIMITED PARTNERS

| General Partner | Commitment |
|---|---|
| Granite Creek GP FlexCap I, L.L.C.<br>222 West Adams Street<br>Suite 1980<br>Chicago, IL 60606 | $1,000 |

| Limited Partners | Commitment |
|---|---|
| American Chartered Bank<br>c/o Robert Riter<br>Chairman<br>1199 East Higgins Road<br>Schaumburg, IL 60173 | $1,000,000 |
| Kenneth A. Lehman 1992 E Family Trust UAD 12/11/1992<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL 60201 | $1,000,000 |
| Betsy Ganford Lehman 1999 Irrevocable Trust UAD 1/1/1999<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL 60201 | $250,000 |
| Amy Ganford Lehman 1999 Irrevocable Trust UAD 1/1/1999<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL 60201 | $250,000 |
| Peter Ganford Lehman 1999 Irrevocable Trust UAD 1/1/1999<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL 60201 | $500,000 |

Schedule A-1

| Limited Partners | Commitment |
|---|---|
| Bedford Oak Partners, LP<br>c/o Harvey Eisen<br>100 South Bedford Road<br>Mt. Kisco, NY  10549 | $100,000 |
| Billy Creek Associates, L.P.<br>ATTN: Brian Brunner<br>56 North Main Street<br>Zionsville, IN  46077 | $1,000,000 |
| Peter Dvorak<br>4482 Lake Monroe Drive<br>Bloomington, IN 47401 | $3,000,000 |
| Joyce and Joe Pignotti<br>832 Birdie View Pt.<br>Sanibel Island, FL  33957 | $500,000 |
| John McKay<br>109 Planters Row<br>Geneva, IL 60134 | $1,500,000 |
| Tim and Carol Hart<br>3012 N. Dickerson Street<br>Arlington, VA 22207 | $1,000,000 |
| Brent Kaczmarek<br>12314 Ox Ridge Rd.<br>Fairfax, VA 22033 | $250,000 |
| Frank and Laura Colen<br>50 Riverside Drive, Apt 6D<br>New York, NY 10024 | $250,000 |
| William Bartholomay<br>180 E. Pearson Street<br>Chicago, IL  60611 | $50,000 |

Schedule A-2

| Limited Partners | Commitment |
|---|---|
| Eric Noviki<br>6901 Man O' War Lane<br>Mason, OH 45040 | $300,000 |
| John Herrmann<br>1105 Park Avenue, #1C<br>New York, NY 10128 | $250,000 |
| Jeff A. Wandell<br>305 South Duncan Road<br>Champaign, IL 61822 | $200,000 |
| Eric Moore<br>51107 Brenshire Ct.<br>Granger, IN 46530 | $250,000 |
| Peer Pedersen<br>584 Fletcher Circle<br>Lakeforest, IL 60045 | $500,000 |
| Howard Warren<br>161 East Chicago, Apt 38B<br>Chicago, IL 60611 | $500,000 |
| Larry Feinberg<br>250 Round Hill Rd.<br>Greenwich, CT 06831 | $3,000,000 |
| Jon Bartos<br>4269 Betheny Road<br>Mason, OH 45040 | $100,000 |
| Keith Stuckert<br>7286 Charter Cup Lane<br>West Chester, OH 45069 | $1,000,000 |
| Jeff Sink<br>20 Cascade Ct.<br>Springboro, OH 45066 | $250,000 |

Schedule A-3

| <u>Limited Partners</u> | <u>Commitment</u> |
|---|---|
| Mark A. Radzik, declaration of self-directed and revocable trust DTD 1/22/04<br>1064 Laurel Creek Drive<br>Chesterton, IN 46304 | $500,000 |
| Francis Florez<br>15 Warwick Place<br>Cincinnati, OH 45246 | $300,000 |
| Michael Wandell 2003 trust dated 3/29/2003<br>22238 North 55th<br>Phoenix, AZ 85040 | $100,000 |
| Joe DeZenzo<br>5083 Plantation Ct.<br>Mason, OH 45040 | $110,000 |
| Equity Trust Company Custodian FBO<br>Craig Cleveland IRA<br>6634 Paxton Guinea<br>Loveland, OH 45140 | $100,000 |
| Jason and Wendy Apple<br>870 Maintain Drive<br>Deerfield, IL 60015 | $150,000 |
| Granite Creek Partners, LLC<br>222 West Adams Street, Suite 1980<br>Chicago, IL 60606 | $1,001,000 |
| Kimberly Wahlund<br>4769 Tillinghast Ct.<br>Mason, OH 45040 | $150,000 |
| Mark Coghlin<br>6778 Willow Lane<br>Mason, OH 45040 | $50,000 |

Schedule A-4

| Limited Partners | Commitment |
|---|---|
| Mark A. Radzik, declaration of self-directed and revocable<br>trust DTD 1/22/04<br>1064 Laurel Creek Drive<br>Chesterton, IN 46304 | $500,000 |
| Granite Creek Partners, LLC<br>222 West Adams Street, Suite 1980<br>Chicago, IL 60606 | $500,000 |
| Brian Boorstein<br>175 Linden Park Place<br>Highland Park, IL 60035<br>(Back-Up for Granite Creek Partners, LLC)[1] | [$500,000] |
| Philip Holdings, LLC<br>4549 Raynor Ct.<br>Mason, Ohio 45040 | $500,000 |
| Jeff Philip<br>4549 Raynor Ct.<br>Mason, Ohio 45040<br>(Back-Up for Philip Holdings, LLC)[2] | [$500,000] |
| Texas Riflemens/Jon Sion Self Directed Trust<br>37 Long Common Road<br>Riverside, IL 60546 | $500,000 |
| Jon Sion<br>37 Long Common Road<br>Riverside, IL 60546<br>(Back-Up for Texas Riflemens/Jon Sion Self Directed Trust)[3] | [$500,000] |

---

[1] If Granite Creek Partners, LLC makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Brian Boorstein shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Brian Boorstein at the time shall be reduced by the same amount.

[2] If Philip Holdings, LLC makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Jeff Philip shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Jeff Philip at the time shall be reduced by the same amount.

Schedule A-5

| <u>Limited Partners</u> | <u>Commitment</u> |
|---|---|
| Terry Diamond IRA<br>905 North Michigan Avenue<br>Chicago, IL 60611 | $400,000 |
| Terry Diamond<br>905 North Michigan Avenue<br>Chicago, IL 60611<br>(Back-Up for Terry Diamond IRA)[4] | [$400,000] |
| Bartol Family Partnership<br>301 Beacon Street<br>Boston, MA 02116 | $500,000 |
| MidAmerica Bank<br>55th and Holmes<br>Claredon Hills, IL 60514 | $250,000 |
| Michael Barry<br>417 Prairie Avenue<br>Elmhurst, IL 60126 | $200,000 |
| Barry Holdings<br>417 Prairie Avenue<br>Elmhurst, IL 60126 | $200,000 |
| Robert Hellman<br>950 Tower Lane, Suite 800<br>Foster City, GA 94404 | $200,000 |

---

[3] If Texas Riflemens/Jon Sion Self Directed Trust makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Jon Sion shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Jon Sion at the time shall be reduced by the same amount.

[4] If Terry Diamond IRA makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Terry Diamond shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Terry Diamond at the time shall be reduced by the same amount.

Schedule A-6

| Limited Partners | Commitment |
|---|---|
| Scott Vesley<br>2141 North Clifton<br>Chicago, IL  60614 | $250,000 |
| Lucy Lehman<br>c/o KKP Group<br>1603 Orrington Avenue<br>Suite 1880<br>Evanston, IL  60201 | $50,000 |
| Blair and Gordon Macinnes<br>26 Old Harter Road<br>Morristown, NJ  07960 | $250,000 |
| Scott Lang<br>2203 North Burling<br>Chicago, IL  60614 | $200,000 |
| Kurt and Elizabeth Weisenborn<br>379 Caballo<br>Carbondale, CO  81623 | $250,000 |
| Walid Firkri declaration of trust dtd 7/5/2005<br>2120 West Wilson Avenue<br>Chicago, IL  60625 | $100,000 |
| Gail Werner<br>1215 North 136th Street<br>Omaha, NE  68154 | $100,000 |
| Jeff Walton<br>1449 Candlewood Drive<br>Columbus, OH  43235 | $100,000 |
| Kenneth Rusche<br>6813 Ross Lane<br>Mason, OH  45040 | $200,000 |

Schedule A-7

| Limited Partners | Commitment |
|---|---|
| Dale Pierce<br>8380 Berringer Point Drive<br>Gainesville, GA 30506 | $200,000 |
| Glen Marder<br>545 Standish<br>Deerfield, IL 60015 | $100,000 |
| George McCown Trust/c/o AIM LP<br>950 Tower Lane, Suite 800<br>Foster City, CA 94404 | $50,000 |
| Robert Gensel<br>1305 Bent Creek Drive<br>Southlake, TX 76092 | $50,000 |
| Equity Trust Company Custodian FBO<br>Kevin Tedford IRA<br>4420 Village Ridge Drive<br>Mason, OH 45040 | $100,000 |
| Tom Schaff<br>11933 Hill Top Greens Drive<br>St. Louis, MO 63128 | $300,000 |
| GK Partners I<br>Goldberg Kohn<br>c/o Deni Caplan<br>55 East Monroe<br>Suite 3700<br>Chicago, IL 60603 | $80,000 |
| Steve and Patricia Kahn<br>8900 Terwillingers Trail<br>Cincinnati, OH 45249 | $300,000 |
| Kyle Kamin Revocable Living Trust<br>1401 Weiland #G<br>Chicago, IL 60610 | $50,000 |

Schedule A-8

| Limited Partners | Commitment |
|---|---|
| Greg and Julia Lee Owens<br>7370 Saint Ives Place<br>West Chester, OH 45069 | $350,000 |
| Granite Creek Partners, LLC<br>222 West Adams Street, Suite 1980<br>Chicago, IL 60606 | $500,000 |
| Granite Creek Partners, LLC<br>222 West Adams Street, Suite 1980<br>Chicago, IL 60606 | $500,000 |
| Landex Capital (Nevada) Inc.<br>c/o Alastair Macdonald<br>3800 Howard Hughes Parkway/7th Floor<br>Las Vegas, NV 89109 | $250,000 |
| Chris and Juie Larger<br>4924 Carriage Drive<br>Mason, OH 45040 | $50,000 |
| Rob Bumb<br>1427 Lant Circle<br>Evansville, IN 47714 | $50,000 |
| FiservISS-John Leahy<br>PO Box 173859<br>Denver, CO 80217 | $250,000 |
| John Leahy<br>329 Locust Road<br>Winnetka, IL 60093<br>(Backup for FiservISS-John Leahy)[5] | [$250,000] |

---

[5] If FiservISS-John Leahy makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of John Leahy shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by John Leahy at the time shall be reduced by the same amount.

Schedule A-9

| Limited Partners | Commitment |
|---|---|
| North Avenue, LLC<br>1370 Linden Avenue<br>Highland Park, IL  60035 | $500,000 |
| David Rosenstein<br>1370 Linden Avenue<br>Highland Park, IL  60035<br>(Backup for North Avenue, LLC)[6] | [$500,000] |
| Todd Lippman Revocable Trust dtd 6/10/98<br>861 Grove Street<br>Glencoe, IL  60022 | $100,000 |
| Todd Lippman<br>861 Grove Street<br>Glencoe, IL  60022<br>(Backup for Todd Lippman Revocable Trust dtd 6/10/98)[7] | [$100,000] |

---

[6] If North Avenue, LLC makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of David Rosenstein shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by David Rosenstein at the time shall be reduced by the same amount.

[7] If Todd Lippman Revocable Trust dtd 6/10/98 makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Todd Lippman shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Todd Lippman at the time shall be reduced by the same amount.

Schedule A-10

*Exhibit A*

Schedule A-11

<u>*Schedule A*</u>

As of May 29, 2008

**GRANITE CREEK FLEXCAP I, L.P.**

**CAPITAL COMMITMENTS**
**GENERAL PARTNER AND LIMITED PARTNERS**

| General Partner | Commitment |
| --- | --- |
| Granite Creek GP FlexCap I, L.L.C.<br>222 West Adams Street<br>Suite 1980<br>Chicago, IL  60606 | $1,000 |

| Limited Partners | Commitment |
| --- | --- |
| American Chartered Bank<br>c/o Robert Riter<br>Chairman<br>1199 East Higgins Road<br>Schaumburg, IL  60173 | $1,000,000 |
| Kenneth A. Lehman 1992 E Family Trust UAD 12/11/1992<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL 60201 | $1,000,000 |
| Betsy Ganford Lehman 1999 Irrevocable Trust UAD 1/1/1999<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL 60201 | $250,000 |
| Amy Ganford Lehman 1999 Irrevocable Trust UAD 1/1/1999<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL 60201 | $250,000 |
| Peter Ganford Lehman 1999 Irrevocable Trust UAD 1/1/1999<br>c/o KKP Group<br>1603 Orrington Avenue, Suite 1880<br>Evanston, IL 60201 | $500,000 |

| Limited Partners | Commitment |
|---|---|
| Bedford Oak Partners, LP<br>c/o Harvey Eisen<br>100 South Bedford Road<br>Mt. Kisco, NY 10549 | $100,000 |
| Billy Creek Associates, L.P.<br>ATTN: Brian Brunner<br>56 North Main Street<br>Zionsville, IN 46077 | $1,000,000 |
| Peter Dvorak Custodial Account #1040000853<br>c/o Busey Trust Company<br>100 West University<br>Champaign, IL 61821 | $3,000,000 |
| Joyce and Joe Pignotti<br>832 Birdie View Pt.<br>Sanibel Island, FL 33957 | $500,000 |
| John McKay<br>109 Planters Row<br>Geneva, IL 60134 | $1,500,000 |
| Tim and Carol Hart<br>3012 N. Dickerson Street<br>Arlington, VA 22207 | $1,000,000 |
| Brent Kaczmarek<br>12314 Ox Ridge Rd.<br>Fairfax, VA 22033 | $250,000 |
| Frank and Laura Colen<br>50 Riverside Drive, Apt 6D<br>New York, NY 10024 | $250,000 |
| William Bartholomay<br>180 E. Pearson Street<br>Chicago, IL 60611 | $50,000 |

Schedule A-2

| Limited Partners | Commitment |
|---|---|
| Eric Noviki<br>6901 Man O' War Lane<br>Mason, OH 45040 | $300,000 |
| John Herrmann<br>1105 Park Avenue, #1C<br>New York, NY  10128 | $250,000 |
| Jeff A. Wandell<br>305 South Duncan Road<br>Champaign, IL  61822 | $200,000 |
| Eric Moore<br>51107 Brenshire Ct.<br>Granger, IN 46530 | $250,000 |
| Peer Pedersen<br>584 Fletcher Circle<br>Lakeforest, IL  60045 | $500,000 |
| Howard Warren<br>161 East Chicago, Apt 38B<br>Chicago, IL 60611 | $500,000 |
| Larry Feinberg<br>250 Round Hill Rd.<br>Greenwich, CT  06831 | $3,000,000 |
| Jon Bartos<br>4269 Betheny Road<br>Mason, OH  45040 | $100,000 |
| Keith Stuckert<br>7286 Charter Cup Lane<br>West Chester, OH 45069 | $1,000,000 |
| Jeff Sink<br>20 Cascade Ct.<br>Springboro, OH  45066 | $250,000 |

Schedule A-3

| <u>Limited Partners</u> | <u>Commitment</u> |
|---|---|
| Mark A. Radzik, declaration of self-directed and revocable trust DTD 1/22/04<br>1064 Laurel Creek Drive<br>Chesterton, IN 46304 | $500,000 |
| Francis Florez<br>15 Warwick Place<br>Cincinnati, OH  45246 | $300,000 |
| Michael Wandell 2003 trust dated 3/29/2003<br>22238 North 55th<br>Phoenix, AZ  85040 | $100,000 |
| Joe DeZenzo<br>5083 Plantation Ct.<br>Mason, OH 45040 | $110,000 |
| Equity Trust Company Custodian FBO<br>Craig Cleveland IRA<br>6634 Paxton Guinea<br>Loveland, OH  45140 | $100,000 |
| Jason and Wendy Apple<br>870 Maintain Drive<br>Deerfield, IL  60015 | $150,000 |
| Granite Creek Partners, LLC<br>222 West Adams Street, Suite 1980<br>Chicago, IL 60606 | $1,001,000 |
| Kimberly Wahlund<br>4769 Tillinghast  Ct.<br>Mason, OH  45040 | $150,000 |
| Mark Coghlin<br>6778 Willow Lane<br>Mason, OH  45040 | $50,000 |

Schedule A-4

| Limited Partners | Commitment |
|---|---|
| Mark A. Radzik, declaration of self-directed and revocable<br>trust DTD 1/22/04<br>1064 Laurel Creek Drive<br>Chesterton, IN 46304 | $500,000 |
| Granite Creek Partners, LLC<br>222 West Adams Street, Suite 1980<br>Chicago, IL 60606 | $500,000 |
| Brian Boorstein<br>175 Linden Park Place<br>Highland Park, IL 60035<br>(Back-Up for Granite Creek Partners, LLC)[1] | [$500,000] |
| Philip Holdings, LLC<br>4549 Raynor Ct.<br>Mason, Ohio 45040 | $500,000 |
| Jeff Philip<br>4549 Raynor Ct.<br>Mason, Ohio 45040<br>(Back-Up for Philip Holdings, LLC)[2] | [$500,000] |
| Texas Riflemens/Jon Sion Self Directed Trust<br>37 Long Common Road<br>Riverside, IL 60546 | $500,000 |
| Jon Sion<br>37 Long Common Road<br>Riverside, IL 60546<br>(Back-Up for Texas Riflemens/Jon Sion Self Directed Trust)[3] | [$500,000] |

---

[1] If Granite Creek Partners, LLC makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Brian Boorstein shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Brian Boorstein at the time shall be reduced by the same amount.

[2] If Philip Holdings, LLC makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Jeff Philip shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Jeff Philip at the time shall be reduced by the same amount.

Schedule A-5

| Limited Partners | Commitment |
|---|---|
| Terry Diamond IRA<br>905 North Michigan Avenue<br>Chicago, IL 60611 | $400,000 |
| Terry Diamond<br>905 North Michigan Avenue<br>Chicago, IL 60611<br>(Back-Up for Terry Diamond IRA)[4] | [$400,000] |
| Bartol Family Partnership<br>301 Beacon Street<br>Boston, MA 02116 | $500,000 |
| MidAmerica Bank<br>55th and Holmes<br>Claredon Hills, IL 60514 | $250,000 |
| Michael Barry<br>417 Prairie Avenue<br>Elmhurst, IL 60126 | $200,000 |
| Barry Holdings<br>417 Prairie Avenue<br>Elmhurst, IL 60126 | $200,000 |
| Robert Hellman<br>950 Tower Lane, Suite 800<br>Foster City, GA 94404 | $200,000 |

---

[3] If Texas Riflemens/Jon Sion Self Directed Trust makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Jon Sion shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Jon Sion at the time shall be reduced by the same amount.

[4] If Terry Diamond IRA makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Terry Diamond shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Terry Diamond at the time shall be reduced by the same amount.

| Limited Partners | Commitment |
|---|---|
| Scott Vesley<br>2141 North Clifton<br>Chicago, IL  60614 | $250,000 |
| Lucy Lehman<br>c/o KKP Group<br>1603 Orrington Avenue<br>Suite 1880<br>Evanston, IL 60201 | $50,000 |
| Blair and Gordon Macinnes<br>26 Old Harter Road<br>Morristown, NJ  07960 | $250,000 |
| Scott Lang<br>2203 North Burling<br>Chicago, IL 60614 | $200,000 |
| Kurt and Elizabeth Weisenborn<br>379 Caballo<br>Carbondale, CO  81623 | $250,000 |
| Walid Firkri declaration of trust dtd 7/5/2005<br>2120 West Wilson Avenue<br>Chicago, IL 60625 | $100,000 |
| Gail Werner<br>1215 North 136th Street<br>Omaha, NE  68154 | $100,000 |
| Jeff Walton<br>1449 Candlewood Drive<br>Columbus, OH  43235 | $100,000 |
| Kenneth Rusche<br>6813 Ross Lane<br>Mason, OH  45040 | $200,000 |

Schedule A-7

| Limited Partners | Commitment |
|---|---|
| Dale Pierce<br>8380 Berringer Point Drive<br>Gainesville, GA  30506 | $200,000 |
| Glen Marder<br>545 Standish<br>Deerfield, IL  60015 | $100,000 |
| George McCown Trust/c/o AIM LP<br>950 Tower Lane, Suite 800<br>Foster City, CA  94404 | $50,000 |
| Robert Gensel<br>1305 Bent Creek Drive<br>Southlake, TX  76092 | $50,000 |
| Equity Trust Company Custodian FBO<br>Kevin Tedford IRA<br>4420 Village Ridge Drive<br>Mason, OH  45040 | $100,000 |
| Tom Schaff<br>11933 Hill Top Greens Drive<br>St. Louis, MO  63128 | $300,000 |
| GK Partners I<br>Goldberg Kohn<br>c/o Deni Caplan<br>55 East Monroe<br>Suite 3700<br>Chicago, IL  60603 | $80,000 |
| Steve and Patricia Kahn<br>8900 Terwillingers Trail<br>Cincinnati, OH  45249 | $300,000 |
| Kyle Kamin Revocable Living Trust<br>1401 Weiland #G<br>Chicago, IL  60610 | $50,000 |

| Limited Partners | Commitment |
|---|---|
| Greg and Julia Lee Owens<br>7370 Saint Ives Place<br>West Chester, OH  45069 | $350,000 |
| Granite Creek Partners, LLC<br>222 West Adams Street, Suite 1980<br>Chicago, IL 60606 | $500,000 |
| Granite Creek Partners, LLC<br>222 West Adams Street, Suite 1980<br>Chicago, IL 60606 | $500,000 |
| Landex Capital (Nevada) Inc.<br>c/o Alastair Macdonald<br>3800 Howard Hughes Parkway/7th Floor<br>Las Vegas, NV  89109 | $250,000 |
| Chris and Juie Larger<br>4924 Carriage Drive<br>Mason, OH  45040 | $50,000 |
| Rob Bumb<br>1427 Lant Circle<br>Evansville, IN  47714 | $50,000 |
| FiservISS-John Leahy<br>PO Box 173859<br>Denver, CO  80217 | $250,000 |
| John Leahy<br>329 Locust Road<br>Winnetka, IL  60093<br>(Backup for FiservISS-John Leahy)[5] | [$250,000] |

---

[5] If FiservISS-John Leahy makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of John Leahy shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by John Leahy at the time shall be reduced by the same amount.

Schedule A-9

| <u>Limited Partners</u> | <u>Commitment</u> |
|---|---|
| North Avenue, LLC<br>1370 Linden Avenue<br>Highland Park, IL  60035 | $500,000 |
| David Rosenstein<br>1370 Linden Avenue<br>Highland Park, IL  60035<br>(Backup for North Avenue, LLC)[6] | [$500,000] |
| Todd Lippman Revocable Trust dtd 6/10/98<br>861 Grove Street<br>Glencoe, IL  60022 | $100,000 |
| Todd Lippman<br>861 Grove Street<br>Glencoe, IL  60022<br>(Backup for Todd Lippman Revocable Trust dtd 6/10/98)[7] | [$100,000] |

---

[6] If North Avenue, LLC makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of David Rosenstein shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by David Rosenstein at the time shall be reduced by the same amount.

[7] If Todd Lippman Revocable Trust dtd 6/10/98 makes a cash Capital Contribution to the Partnership, then simultaneously with such cash Capital Contribution, the Capital Commitment of Todd Lippman shall be reduced in an amount equal to that cash Capital Contribution and the Capital Contribution required to be made by Todd Lippman at the time shall be reduced by the same amount.

Schedule A-10

*Exhibit A*

Schedule A-11

**EXHIBIT 6**



**RKPT** | **ROBBINS KELLY PATTERSON TUCKER**
A Legal Professional Association

**Richard O. Hamilton, Jr.**
*rhamilton@rkpt.com*

October 19, 2018

**VIA EMAIL ONLY**

Craig R. Karpe, Esq.
Karpe Litigation Group
19 W. 19th Street
Indianapolis, IN 46202
*crkarpe@injurylaw.tv*

John L. O'Shea, Esq.
Cohen, Todd, Kite & Stanford, LLC
250 E. 5th Street, Suite 2350
Cincinnati, OH 45202
*joshea@ctks.com*

Dear Counsel:

RE: *Faith Lawley, LLC, et al. v. John W. McKay*
Warren County Court of Common Pleas Case No.: 18CV91051
RKPT File No.: CL2362 L001

Enclosed please find *Plaintiffs' Reply to Defendant's Counterclaim* which has been filed in the above-captioned matter.

In addition, this letter is being provided to you pursuant to Rule 11 of the Ohio Rules of Civil Procedure. As you will note, attached to the Answer is the Request for Approval of Transfer Certificate, wherein Mr. McKay, Granite Creek FlexCap I, LP, and the SBA have each provided their signatures and consent to the transfer of Mr. McKay's 100% interest in Granite Creek to Faith Lawley, LLC. We have also included herewith emails Bates Labeled FL000001 – FL000016.

Mr. McKay's claims are wholly without merit as they are based on the assumption that no consent was provided. He also failed to exercise his option under the Transfer Agreement. We take Mr. McKay's continued improper filings and unfounded, baseless claims as frivolous. We are assuming Mr. McKay did not advise you of this consent prior to filing these counterclaims.

October 19, 2018
Page 2 of 3

More troubling is Mr. McKay's claims are based on his own self-serving emails.  The first such email is dated December 17, 2012.  Mr. McKay alleges this is an understanding between the parties.  That email is nothing more than a proposal from Mr. McKay, by its own terms.  It literally states, "My proposal that has me sharing on the back end as we discussed."  Then it closes with, "Let me know.  I think this is fair...I am open to ideas if you have an easier way to do it."  This is obviously an offer or solicitation from Mr. McKay, not an understanding between anyone.  We must assume that you have seen this email since it is specifically referenced in the Complaint, though not attached to it.

Next, there is the email from Mr. McKay dated May 4, 2016, which serves as the basis for accepting an alleged offer made January 7, 2013, more than 3 years prior.  There was no offer made on January 7, 2013, and the notes Mr. McKay references were for illustrative purposes during discussions.  There is no indication that those notes make an offer.  Further, as Mr. McKay acknowledges the Transfer Agreement covers the interest he is attempting to obtain, it specifically requires an agreement in writing executed by all parties.  No such documentation exists.

There exist additional emails after January 7, 2013 from Mr. McKay making various offers.  For example, on May 27, 2013, Mr. McKay makes an offer where he provides a "structure," and then asks Dr. Lawley if he could talk with Mr. Novicki and let him know if his proposal was acceptable.  This offer by Mr. McKay subsequent to the alleged January 2013 offer would be considered a counteroffer, which under basic contract law constitutes a rejection of any prior offer.

Another example is on October 1, 2014.  Mr. McKay again did not reference any meeting on January 7, 2013, but instead solicited Mr. Novicki to reconsider a "catchup" that was discussed in December 2012.  Mr. McKay is making yet another offer.  Even if you assume there was an offer in January 2013, that offer is destroyed by Mr. McKay's more recent offer in October 1, 2014, which was never accepted.

In a June 12, 2013 email, Mr. McKay then followed up directly with Mr. Novicki and asked him directly if a deal could be reached under a proposed structure.

In a September 22, 2013 email, Mr. McKay then makes another proposal where he asks Mr. Novicki to "Pls tell me yeah or nay."  He specifically references the January meeting where he states, "This is more than I think you had on the table in January..."  He closes with "Pls let me know so we can hopefully put this to bed."  Basic contract law results the alleged January 2013 offer as rejected, again.  Mr. Novicki responds on September 25, 2013, "...I think you and Chris are not on the same page.  I forwarded him the email so you guys should probably speak."  On October 12, 2013, Mr. McKay asks Mr. Novicki whether he and Dr. Lawley were OK with a "backend deal."  Mr. Novicki responded on October 24, 2013 that Dr. Lawley told him, "...in no uncertain terms that he has not agreed to that."  Further, it is indicated that Mr. McKay has not even spoken to Dr. Lawley about his last "backend deal."  It is clear there was no acceptance of any deals proposed by Mr. McKay.

Even if you assume an offer existed on January 7, 2013, which it did not,

October 19, 2018
Page 3 of 3

> ...an offer may be terminated by rejection on the part of the offeree, the lapse of time, the occurrence of a condition set forth in the offer as resulting in termination, or revocation by the offeror. Where an offer is terminated in one of these ways a contract cannot be created by subsequent acceptance.

*Auto-Owners Mut. Ins. Co. v. Mohammed*, 2011-Ohio-4009, ¶ 31, 195 Ohio App. 3d 224, 231, 959 N.E.2d 568, 573. All of the foregoing emails are referenced in the subject line as "backend settlement." There are numerous offers made by Mr. McKay following the alleged offer of January 7, 2013. Nearly three and a half years passed after the alleged offer was made and before Mr. McKay attempted to assert an acceptance. Clearly this is cannot constitute acceptance within a reasonable time. It is interesting to note that none of these emails from Mr. Novicki or Dr. Lawley contain any type of offer. It is readily apparent that there was no offer and no agreement had by Mr. McKay's self-serving May 4, 2016 email.

Mr. McKay also appears to allege he retains interest in Granite Creek. As noted above, he sold one-hundred percent of his ownership interest. He also appears to allege he has ownership interest in Faith Lawley, LLC. He has never owned and does not own any interest in Faith Lawley, LLC.

We question the basic investigation of the claims prior to being asserted in the Counterclaim.

As such, we are demanding that Mr. McKay dismiss the claims, with prejudice, within 10 days of the date of this letter. Unless Mr. McKay dismisses his counterclaims against all Plaintiffs, we intend to take this matter up with the Court at the appropriate time and move for sanctions, including attorney fees and expenses associated with handling this matter.

Sincerely,

Richard O. Hamilton, Jr.

ROH:pnn
Enclosure
cc:     Faith Lawley, LLC

**EXHIBIT A**

# REQUEST FOR APPROVAL OF TRANSFER CERTIFICATE

| LICENSEE: GRANITE CREEK FLEXCAP I, L.P. | |
|---|---|
| TRANSFEROR: JOHN MCKAY | TRANSFEREE: FAITH LAWLEY, LLC |
| DATE: March 29, 2010 | |

AS A MATERIAL INDUCEMENT FOR THE U.S. SMALL BUSINESS ADMINISTRATION ("SBA") TO CONSENT TO THE TRANSFER OF THE LIMITED PARTNERSHIP INTEREST DESCRIBED BELOW, EACH OF THE LICENSEE, TRANSFEROR AND TRANSFEREE HEREBY REPRESENTS, WARRANTS AND COVENANTS AND AGREES AS FOLLOWS:

1.     Transferor is a limited partner in Licensee with a commitment of <u>One Million five hundred thousand</u> Dollars (<u>$1,500,000</u>) to Licensee ("Partnership Interest"), of which <u>Nine hundred and sevnty-five thousand</u> Dollars (<u>$975,000</u>) has been contributed to Licensee. Transferor represents and warrants that it is not in default of its obligations to the Licensee for payment of its Partnership Interest or in default of any other material obligation owed to the Licensee.

2.     Transferor and Transferee have entered into an agreement ("Transfer Agreement") under which Transferor proposes to transfer to Transferee <u>one hundred percent (100 %)</u> of Transferor's Partnership Interest, including all of Transferor's rights, title and interest therein (the "Transferred Interest"). Following such transfer, Transferee's ownership interest in Licensee will equal <u>five point forty-five percent (5.45 %)</u>. 

3.     [*Transferor and Transferee check applicable box, respectively*]
Transferor **does** ☒ **does not** ☐ qualify as an Institutional Investor under 13 CFR §107.50.
Transferee **does** ☒ **does not** ☐ qualify as an Institutional Investor under 13 CFR §107.50.

4.     Transferor and Transferee each represent and warrant that the proposed transfer of the Transferred Interest is lawful, including without limitation that the proposed transfer will not violate any federal or state laws governing securities. The Licensee represents and warrants that it does not possess knowledge of any facts about the proposed transfer that would make the transfer unlawful, including without limitation facts that the proposed transfer would violate federal or state laws governing securities.

5.     Licensee represents and warrants that it is in compliance with all laws and regulations governing Small Business Investment Companies.

6.     Licensee represents and warrants that the proposed transfer of the Transferred Interest does not and will not result in a transfer of Control, as that term is defined in SBA's regulations in Part 107 of Title 13 of the Code of Federal Regulations.

7.     Under the Transfer Agreement, Transferee (i) accepts the Transferred Interest, (ii) agrees to comply with, be bound by and subject to all of the terms, conditions and provisions of Licensee's agreement of limited partnership ("Partnership Agreement"), (iii) undertakes and assumes all of Transferor's duties and obligations under the Partnership Agreement, including the obligation to contribute any unfunded commitment attributable to the Transferred Interest, and (iv) makes all representations required of a limited partner under the Partnership Agreement.

8.      Transferee further represents, acknowledges and agrees that it (i) has been furnished and has read the Partnership Agreement and the reports that are required to be given to limited partners under the Partnership Agreement, (ii) understands the risks of acquiring and owning the Transferred Interest, (iii) has conducted its own independent review and analysis of the proposed transfer without reliance upon any advice or guidance from the Licensee or SBA, (iv) has been provided with access to and an opportunity to ask questions of and receive answers from the Licensee's principals and/or the Licensee's General Partner, and (v) performed such due diligence and consulted with its advisers as to the financial, tax, legal and related matters concerning the acquisition of the Transferred Interest as Transferee deemed necessary or advisable. Transferee agrees to indemnify and hold harmless the Licensee and SBA from any claim whatsoever arising from the proposed transfer of the Transferred Interest.

9.      Licensee and Licensee's general partner have consented to the release of Transferor and the transfer of the Transferred Interest and the admission of Transferee as a limited partner in Licensee. Licensee shall provide SBA with a copy of the Partnership Agreement signature page executed by Transferee. Licensee has attached to this Transfer Certificate an updated Capital Certificate which reflects the transfer of the Transferred Interest.

10.     There is no agreement, side letter or other document or arrangement modifying, terminating, adding to or otherwise changing any of the terms, conditions or provisions of the Partnership Agreement with respect to the Transferred Interest. In the event of any actual or asserted conflict or inconsistency as between any provisions or terms contained in this Request for Approval of Transfer Certificate and provisions or terms of any other agreement, written document or other instrument concerning the Transferred Interest, then the provisions or terms contained in this Request for Approval of Transfer Certificate shall govern.

11.     The terms, conditions, obligations, representations and warranties contained in this Request for Approval of Transfer Certificate, as well as the Transferee's underlying obligation to fully fund any unfunded commitment attributable to the Transferred Interest, shall be enforceable by the Licensee and/or SBA in any court of competent jurisdiction and shall not be subject to arbitration notwithstanding any other agreement or provision of any agreement to the contrary.

12.     Transferor, Transferee and Licensee each acknowledge that any intentionally false statement or willful misrepresentation contained in this certificate is a violation of Federal law and is subject to criminal prosecution and civil penalties under 18 USC §§287, 371, 1001, and 1006; 15 USC §645; and 31 USC §3729.

IN WITNESS WHEREOF, THE UNDERSIGNED HAVE EXECUTED AND DELIVERED THIS TRANSFER CERTIFICATE AS OF THE DATE SET FORTH ABOVE. THIS TRANSFER CERTIFICATE IS NOT VALID WITHOUT WRITTEN CONSENT OF SBA.

LICENSEE
By:

TRANSFEROR          TRANSFEREE          SBA Consents to the Transfer of the Limited Partnership Interest Described Above
By:                 By:                 By:
                                        [AREA CHIEF]

**EXHIBIT 7**

# KARPE LITIGATION GROUP
## TRIAL ATTORNEYS

19 West 19th Street                                                  Telephone (317) 251-1840
Indianapolis, Indiana 46202                                      Facsimile (317) 536-0493

November 1, 2018

Richard O. Hamilton Jr.                                   **BY EMAIL TO**
Robbins, Kelly Patterson & Tucker, LPA            *rhamilton@rkpt.com*
7 West 7th Street, Suite 1400
Cincinnati, Ohio 45202

      RE:    *Faith Lawley, LLC, et al. v. John W. McKay*
              Warren County Court of Common Pleas Case No.: 18CV91051

Mr. Hamilton:

      Please allow this letter to serve as response to your missive of October 19, 2018. Therein you allege that John McKay's claims are frivolous in part because the General Partner of Granite Creek FlexCap I, LP, (Granite Creek) signed off on the Small Business Administration "Request for Approval of Transfer Certificate" (RATC). As an initial matter, the document you attached as "Exhibit A" to your pleading styled, "Plaintiffs' Answer to Counterclaim" is incomplete. As per paragraph 9 of the RATC, the SBA required an updated Capital Certificate to be attached. We would request you amend your pleading with the full RATC including attachments so that we can avoid a motion to strike.

      As you should be aware, the RATC is only the first step in completing a transfer of interest in a Small Business Investment Company (SBIC). In 2010, the SBA required the RATC to be approved prior to execution of any agreement for transfer of an ownership interest under 10 percent. The regulation was based on previous SBA guidance circulated in memorandum form by the SBIC Operations Division of the Office of Investment and Innovation. The requirement for prior SBA approval remained in effect until 2014. See "Transfer of Limited Partnership Interests – Recent Changes", published by the SBA on December 11, 2014. Thereafter, prior approval of transfers by the SBA was still required if section 10.01(f) of the SBA's "Model Limited Partnership Agreement" was not included in the SBIC's Limited Partnership Agreement.

      Please note that the Transfer Agreement you attached to your Complaint for Declaratory Judgment purports to be executed on February 26, 2010, whereas the RATC you rely on was not executed until March 29, 2010. The prior transfer agreement did not comply with SBA regulations and so was ineffective under both the SBA rules and paragraph 10 of the RATC.

      Further, your clients should have obtained the Granite Creek General Partner's written approval of the Transfer Agreement, not just the RATC. Clearly the Transfer Agreement assigns

rights beyond those contained in the RATC, including the right of John McKay to repurchase his interest in Granite Creek. Section 10.01 of the Granite Creek LP agreement requires the General Partner's written approval for such an agreement to be enforceable. General Partner Mark Radzik expressly refused to sign off on the Transfer Agreement in an email dated February 24, 2010. (See attached Exhibit "A"). Your clients failed to follow up with Mr. Radzik and make changes necessary for his approval.

In short, to complete the transfer of John McKay's LP interest, your clients should have redone the Transfer Agreement after the SBA approval of the RATC to the satisfaction of the Granite Creek General Partner, and obtained the General Partner's written approval. Your clients' failure to do so renders the Transfer Agreement void. Undoubtedly you will argue with some of this, but our position is plainly not frivolous.

As to the remainder of your letter, it appears you are trying to draw implications and legal conclusions from an incomplete set of facts. If you want a quick resolution of factual matters, I suggest we undertake discovery in earnest. To that extent, please provide dates for the deposition of Eric Novicki and Christopher Lawley. I also request you respond to the Request for Production sent with this letter prior to your clients' depositions.

Please let me know if you have any questions or comments. Thank you for your attention.


Sincerely,

Craig Karpe


Cc: John O'Shea

**EXHIBIT "A"**

**From:** Mark Radzik [mailto:Mark@granitecreek.com]
**Sent:** Wednesday, February 24, 2010 1:45 PM
**To:** John McKay
**Subject:** RE: Transfer Agreement


I don't think I can sign this.


_____


Mark Radzik

Granite Creek Partners, L.L.C.

222 West Adams

Suite 1980

Chicago, IL 60606

TEL: 312.895.4503

FAX: 312.895.4509


_____

**From:** John McKay [mailto:cubsandhoosiers@sbcglobal.net]
**Sent:** Wednesday, February 24, 2010 6:32 AM
**To:** Mark Radzik
**Subject:** FW: Transfer Agreement


See attached. closing is Friday. Based on consent language in your LP agreements, Helfrich thought best if you signed our transfer indicating consent. That ok? In addition to the GC docs they need to sign? Thanks.

**EXHIBIT 8**



RKPT | ROBBINS
KELLY
PATTERSON
TUCKER
A Legal Professional Association

**Richard O. Hamilton, Jr.**
*rhamilton@rkpt.com*

November 5, 2018

Craig R. Karpe, Esq.                    **VIA EMAIL ONLY - *crkarpe@injurylaw.tv***
Karpe Litigation Group
19 W. 19th Street
Indianapolis, IN 46202

Dear Mr. Karpe:

RE:    *Faith Lawley, LLC, et al. v. John W. McKay*
       Warren County Court of Common Pleas Case No.: 18CV91051
       RKPT File No.: CL2362 L001

Thank you for your position statement dated November 1, 2018. We find no common law or statutory authority to support your client's position. Even the limited citations you do provide do not deal with nor stand for the propositions claimed. If you have actual authority for your client's position, provide it so we can consider.

Regardless, even if we assumed there was some purported defect that needed to be cured almost nine years after the closing, your client has an affirmative continuing contractual duty to cooperate in effectuating the transfer under the Transfer Agreement (para. 9, 10). If it is determined somehow that there is a defect in the transfer, we will be seeking Mr. McKay's cooperation "...in order more effectively to consummate or document the transactions contemplated by [the Transfer Agreement]." (para. 10). There is no remedy available to declare the transaction void; merely your client's continued cooperation is required, whether voluntarily or involuntarily. We see no basis to support an attempt to void the agreement. Again we are asking your client to dismiss his baseless claims.

Sincerely,

Richard O. Hamilton, Jr.

ROH:pnn

cc:    John O'Shea, Esq. (via email only)
       Faith Lawley, LLC

EXHIBIT 9

`IN THE COURT OF COMMON PLEAS
WARREN COUNTY, OHIO

COMMON PLEAS COURT
WARREN COUNTY, OHIO
FILED

2019 SEP 10  PH 12: 34

JAMES L. SPAETH
CLERK OF COURTS

FAITH LAWLEY, LLC, *et.al.*          :

PLAINTIFFS,                          :
                                     :
v.                                   :
                                     :
JOHN W. MCKAY,                       :
                                     :
DEFENDANT.                           :

_____

JOHN MCKAY,                          :
                                     :
COUNTER-PLAINTIFF,                   :
                                     :
V.                                   :
                                     :
FAITH LAWLEY, LLC                    :
                                     :
and                                  :     Case No. 18CV091051
                                     :
ERIC NOVICKI                         :     JUDGE PAIGE CROSSLEY-TATE
                                     :
and                                  :     DEFENDANT'S AMENDED ANSWER,
                                     :     AFFIRMATIVE DEFENSES, AND
CHRISTOPHER LAWLEY                   :     COUNTERCLAIMS
                                     :
COUNTER-DEFENDANTS.                  :     JURY TRIAL REQUESTED

Defendant/Counter-Plaintiff, John McKay (McKay), by counsel, hereby offers his

amended answer, affirmative defenses, and counterclaims, against Plaintiffs/Counter-Defendants

Faith Lawley LLC, Eric Novicki, and Christopher Lawley (collectively "Lawley").

Defendant/Counter-Plaintiff states as follows:

A.    **ANSWER**

1.  Defendant/Counter-Plaintiff admits the allegations contained in paragraph one (1) of

Plaintiff/Counter-Defendants' Complaint to the extent that McKay attempted to enter into the Transfer Agreement with Lawley.

2. Defendant/Counter-Plaintiff admits the allegations contained in paragraph two (2) of Plaintiff/Counter-Defendants' Complaint.

3. Defendant/Counter-Plaintiff admits the allegations contained in paragraph three (3) of Plaintiff/Counter-Defendants' Complaint.

4. Defendant/Counter-Plaintiff has insufficient knowledge to admit or deny the allegations contained in paragraph four (4) of Plaintiff/Counter-Defendants' Complaint and therefore denies the same.

5. Defendant/Counter-Plaintiff admits the allegations contained in paragraph five (5) of Plaintiff/Counter-Defendants' Complaint.

6. Defendant/Counter-Plaintiff admits the allegations contained in paragraph six (6) of Plaintiff/Counter-Defendants' Complaint.

7. Defendant/Counter-Plaintiff admits the allegations contained in paragraph seven (7) Of Plaintiff/Counter-Defendants' Complaint.

8. Defendant/Counter-Plaintiff denies the allegations contained in paragraph eight (8) of Plaintiffs/Counter-Defendants' Complaint.

9. Defendant/Counter-Plaintiff denies the allegations contained in paragraph nine (9) of Plaintiffs/Counter-Defendants' Complaint.

10. Defendant/Counter-Plaintiff denies the allegations contained in paragraph ten (10) of Plaintiffs/Counter-Defendants' Complaint.

11. Defendant/Counter-Plaintiff denies the allegations contained in paragraph eleven (11) of Plaintiffs/Counter-Defendants' Complaint.

12. Defendant/Counter-Plaintiff denies the allegations contained in paragraph twelve (12) of Plaintiffs/Counter-Defendants' Complaint.

13. Defendant/Counter-Plaintiff admits the allegations contained in paragraph thirteen (13) of Plaintiff/Counter-Defendants' Complaint.

14. Defendant/Counter-Plaintiff admits the allegations contained in paragraph fourteen (14) of Plaintiff/Counter-Defendants' Complaint.

15. Defendant/Counter-Plaintiff denies the allegations contained in paragraph fifteen (15) of Plaintiffs/Counter-Defendants' Complaint.

16. Defendant/Counter-Plaintiff admits the allegations contained in paragraph sixteen (16) of Plaintiff/Counter-Defendants' Complaint to the extent that a written offer was made by Lawley.

17. Defendant/Counter-Plaintiff admits the allegations contained in paragraph seventeen (17) of Plaintiff/Counter-Defendants' Complaint.

18. Defendant/Counter-Plaintiff denies the allegations contained in paragraph eighteen (18) of Plaintiffs/Counter-Defendants' Complaint.

19. Defendant/Counter-Plaintiff denies the allegations contained in paragraph nineteen (19) of Plaintiffs/Counter-Defendants' Complaint.

20. Defendant/Counter-Plaintiff admits the allegations contained in paragraph twenty (20) of Plaintiff/Counter-Defendants' Complaint.

21. Defendant/Counter-Plaintiff admits the allegations contained in paragraph twenty-one (21) of Plaintiff/Counter-Defendants' Complaint.

22. Defendant/Counter-Plaintiff has insufficient knowledge to admit or deny the

allegations contained in paragraph twenty-two (22) of Plaintiff/Counter-Defendants' Complaint and therefore denies the same.

23. Defendant/Counter-Plaintiff has insufficient knowledge to admit or deny the allegations contained in paragraph twenty-three (23) of Plaintiff/Counter-Defendants' Complaint and therefore denies the same.

WHEREFORE, Defendant/Counter-Plaintiff respectfully prays that the Plaintiff/Counter-Defendants take nothing by their complaint, and that the Defendant/Counter-Plaintiff be awarded Judgment against Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income, for incidental and consequential damages, attorney fees, for the costs of this action, exemplary damages, for pre-judgment interest at the statutory rate on the value of McKay's pre-transfer equity in Granite Creek from the date of the alleged transfer to the date of judgment, and all other just and proper relief.

**B.    AFFIRMATIVE DEFENSES**

Defendant/Counter-Plaintiff, John McKay, by counsel, hereby offers his affirmative defenses, as more fully set forth in his counterclaims, and states as follows:

a.  Plaintiff/Counter-Defendants failed to fulfill the terms of the agreement they seek to enforce and should be denied the relief they seek because of breach of contract;

b.  Plaintiff/Counter-Defendants made representations to Defendant/Counter-Plaintiff to induce him to enter into the contract in question, when Plaintiff/Counter-Defendants knew or should have known that said representations were untrue, so that the contract should be void or voidable.

c. Plaintiff/Counter-Defendants have constructively and intentionally waived the terms of the contract they seek to enforce.

d. Plaintiff/Counter-Defendants have made representations to Defendant/Counter-Plaintiff when they should have known those representations were untrue, and Defendant/Counter-Plaintiff relied on those representations to his detriment, so that Plaintiff/Counter-Defendants should be barred by equitable estoppels from enforcing the terms of the contract.

e. Plaintiff/Counter-Defendants' claims are barred by failure of consideration and impossibility.

WHEREFORE, Defendant/Counter-Plaintiff respectfully prays that the Plaintiff/Counter-Defendants take nothing by their complaint, and that the Defendant/Counter-Plaintiff be awarded damages including rescission of contract, restitution, out-of-pocket expenses, prejudgment interest, equitable relief, exemplary damages, the benefit of Defendant/Counter-Plaintiff's bargain, and all other just and proper relief in the premises.

## C.  COUNTERCLAIMS

Defendant/Counter-Plaintiff, John McKay (McKay), by counsel, for his counterclaims againt Plaintiffs/Counter-Defendants Faith Lawley LLC, Eric Novicki, and Christopher Lawley (collectively "Lawley"), states as follows:

### STATEMENT OF FACTS

1.  From the period of approximately June 2006 through the first quarter of 2013, Granite Creek Flexcap I, L.P. (Granite Creek) is funded by McKay, Novicki and Lawley in an amount equal to $1,320,000.  Of the $1,320,000, McKay personally funded $900,000.

5

2.    In early 2010, in order to avoid losing his investment and/or diluting McKay's investment due to a capital call of $75,000, it was agreed between McKay, Novicki, and Lawley that the defendant entity, Faith Lawley, LLC would be formed in order to buy and hold McKay's investment in Granite Creek. The Transfer Agreement set forth consideration (agreed to be reduced from market value as part of the agreement between McKay, Novicki and Lawley), to be paid to McKay to transfer his membership interest in Granite Creek into the Plaintiffs' Faith Lawley entity (Transfer Agreement).  The Transfer Agreement attached here as Exhibit "A" is identical to the to the signed copy attached to Plaintiffs' Complaint for Declaratory Judgment without redactions.

3.    Paragraph 2 of the executed Transfer Agreement provides:

> "The (Granite Creek) Limited Partnership Agreement remains in full force and effect and has not been modified, amended, or terminated."

4.    Paragraph 4 of the executed Transfer Agreement provides:

> "Faith Lawley (i) accepts the transfer of the Limited Partnership Interest, (ii) agrees to comply with, be bound by and subject to all of the terms, conditions, and provisions of the Limited Partnership Agreement, (iii) undertakes and assumes all of McKay's duties and obligations under the Limited Partnership Agreement, including but not limited to the obligation to contribute any unfunded commitment attributable to the Limited Partnership Interest, and (iv) makes all representations required of a limited partner under the Limited Partnership Agreement."

The Granite Creek Limited Partnership Agreement in effect at the time of the Transfer Agreement, and incorporated by reference in the Transfer Agreement, is attached here as Exhibit "B".

5.    Paragraph 5 of the executed Transfer Agreement provides:

6

"Faith Lawley agrees that it shall execute and deliver any and all documents required by the Limited Partnership and/or the Small Business Administration ("**SBA**") in order to obtain the consent of the Limited Partnership and its general partner, and/or the consent of the SBA to the transactions contemplated hereby."

6.     Section 10.01 of the Granite Creek LP Agreement provides:

"10.01 Assignability.

(a) Limited Partner Transfer. No Limited Partner may assign, pledge or otherwise grant a security interest in its or his interest in the Partnership or in this Agreement, except: (i) by operation of law; (ii) to a receiver or trustee in bankruptcy for that Partner; or (iii) with the prior written consent of the General Partner (which consent may be withheld in the reasonable discretion of the General Partner) . . ."

Lawley failed to obtain written consent and updated forms necessary to complete the transfer of McKay's Granite Creek interest from the General Partner of Granite Creek. Lawley further failed to obtain written consent of the General Partner to McKay's option to repurchase his interest in the Transfer Agreement.

7.     Contemporaneously with the attempted transfer by McKay of his membership interest in Granite Creek to Faith Lawley, the newly formed Faith Lawley entity paid, constructively on McKay's behalf, the capital call of $75,000.

8.     Paragraph 8 of the executed Transfer Agreement provides:

"Faith Lawley hereby grants to McKay the right to repurchase the Limited Partnership Interest, at the option of McKay (the "**Option**"), upon the following terms and conditions:

a.     Expiration of Option. The Option may be exercised at any time from the date hereof through and including December 31, 2012 (the "**Option Period**"). In order to timely exercise said Option, McKay must give Faith Lawley written notice of an intent to exercise said Option delivered to the address of Faith Lawley as first set forth hereinabove, and must pay Faith Lawley the Option Price, as hereinafter defined, prior to the expiration of the Option Period.

7

b. <u>Option Price</u>. In order to exercise the Option to repurchase the Limited Partnership Interest, McKay must pay Faith Lawley the following (the "**Option Price**"):

   i. The original Purchase Price of One Hundred Twenty-five Thousand Dollars ($125,000.00) plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of Closing through the date of payment of the Option Price; plus

   ii. The Initial Cash Call paid by Faith Lawley in the amount of Seventy-five Thousand Dollars ($75,000.00), plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of payment of the Initial Cash Call through the date of payment of the Option Price; plus

   iii. The amount of any other cash call paid by Faith Lawley with respect to the Limited Partnership Interest, plus interest accruing at the rate of twenty-five percent (25%) per annum from the date of payment of any such cash call through the date of payment of the Option Price; plus

   iv. An amount equal to the Tax Adjustment Payment, if any, calculated pursuant to Section 8(e) hereinbelow;

provided, however, the total accrued interest pursuant to clauses i, ii, and iii hereinabove shall not be less than a total of Twenty Thousand Dollars ($20,000.00); and provided further, however, in the event that Faith Lawley fails to make any cash call payment with respect to the Limited Partnership Interest when due, or within five (5) days prior to the expiration of any grace period for the payment of any such cash call (an "**Event of Default**"), then the total Option Price shall only be an amount equal to One Hundred Dollars ($100.00), and shall not include any payment or reimbursement for the original Purchase Price of One Hundred Twenty-five Thousand Dollars ($125,000.00), any interest accrual, nor any amounts paid by Faith Lawley with respect to any cash call.

c. <u>Residual Rights</u>. Following the repurchase by McKay of the Limited Partnership Interest pursuant to the Option, Faith Lawley shall continue to be entitled to receive from McKay the "Applicable Percentage", as hereinafter defined, of any dividends or other distributions of profit (but not of principal or capital repayment) made to McKay by the Limited Partnership with respect to McKay's Limited Partnership Interest. For purposes of this Agreement, the "Applicable Percentage" shall be as follows:

   i. If Faith Lawley did not make any cash call payments during the period of time Faith Lawley owned the Limited Partnership Interest, other

8

than payment of the Initial Cash Call, or upon an Event of Default, then the Applicable Percentage shall be zero percent (0%).

    ii. Otherwise, the Applicable Percentage shall be the sum of all cash calls paid by Faith Lawley during the period of its ownership of the Limited Partnership Interest, including the amount of the Initial Cash Call, divided by One Million Five Hundred Thousand Dollars ($1,500,000.00).

d.     <u>Distribution Adjustment</u>. In the event that the Limited Partnership makes dividend distributions or other distributions of profit to Faith Lawley during the period of its ownership of the Limited Partnership Interest, then upon the exercise of the Option by McKay, Faith Lawley shall transfer and pay to McKay an amount equal to such distributions, less the Applicable Percentage of such distributions, with the Applicable Percentage being calculated as of the time of such distribution.

e.     <u>Tax Adjustment Payment</u>. The parties understand and agree that during the period of time Faith Lawley owns the Limited Partnership Interest, it will be allocated for federal and state income tax purposes a portion of any gains or losses incurred by the Limited Partnership. Upon the exercise of the Option by McKay, to the extent that the distributions retained by Faith Lawley pursuant to Section 8 d. hereinabove are less than the federal and state income tax liability incurred by the members of Faith Lawley with respect to the income recognized by virtue of ownership of said Limited Partnership Interest, net of any losses or other deductions recognized with respect to ownership of such Limited Partnership Interest, the Tax Adjustment Payment shall be an amount equal to such deficiency, plus interest accruing at the rate of five percent (5%) per annum from the date of payment of such tax liability, on a portion of such deficiency, which portion is equal to the deficiency multiplied by the remainder of one minus Faith Lawley's Applicable Percentage. For example, assume that the members of Faith Lawley incurred tax liability of $120,000 as a result of their ownership of the Limited Partnership Interest, and retained $20,000 of distributions pursuant to Section 8 d. above, upon exercise by McKay of his Option to repurchase the Limited Partnership Interest. Further, assume that Faith Lawley's Applicable Percentage calculated pursuant to Section 8 c. above is 40%. In such an example, there would be a $100,000 deficiency between the tax liability incurred by the members ($120,000) and amount of distributions retained by Faith Lawley ($20,000). The Tax Adjustment Payment would be an amount equal to the $100,000 deficiency, plus interest accruing at the rate of 5% per annum from the date of payment of such tax liability on a portion of such deficiency. The portion of the deficiency which would accrue interest would be an amount equal to the deficiency ($100,000) multiplied by one minus the Applicable Percentage (40%), which is equal to 60%, which would mean that $60,000 of the deficiency would

9

accrue interest and the remaining $40,000 of the deficiency would not accrue interest in calculating the Tax Adjustment Payment."

9.      Faith Lawley did not obtain the written approval of the General Partner of Granite Creek LP to the Transfer Agreement repurchase option set forth in paragraph eight (8) above.

10.      Over the remainder of 2010 and during the years of 2011 and 2012, Novicki and Lawley would orally discuss with McKay the status of the Granite Creek business and distribution predictions by Granite Creek to Faith Lawley/McKay. During that period Plaintiffs and Defendant discussed the transfer of John McKay's remaining interest for additional consideration.

11.      In an effort to memorialize and further evidence the discussions between McKay, Novicki, and Lawley from 2010 through 2012, McKay sent an e-mail to Novicki on or about December 17, 2012 outlining the understanding between McKay, Novicki, and Lawley as members of and acting with the authority of and on behalf of Faith Lawley, LLC.

12.      On or about January 7, 2013, McKay met in person with Novicki and Lawley who, on behalf of Faith Lawley LLC, outlined and presented in writing to McKay the status of the Granite Creek investment being held in the Faith Lawley entity. The presentation included a proposal for Plaintiffs to compensate John McKay for his remaining interest in Faith Lawley LLC and Granite Creek, and in return McKay would abandon his option to repay and retake full ownership.

13.      On or about January 8, 2013, Novicki e-mailed McKay advising that going forward McKay should finalize details of the deal directly with Lawley who was authorized to act as agent of Faith Lawley. Novicki also wrote that McKay could still exercise his option to

10

repurchase. Novicki confirmed at deposition this meant repurchase under the terms in the Transfer Agreement.

14. McKay and Lawley, throughout the period from March 2013 and June of 2016 communicated multiple times, including but not limited to March 23, 2013, April 21, 2013, May 25, 2013, June 12, 2013, September 22, 2013, October 12, 2013, October 1, 2014 and various communications continuing through May of 2016 discussing and evidencing the agreement whereby Faith Lawley, authorized and agreed to by Lawley, when funds were available, pay to McKay his share of the following: (a) return of initial $861,570.15 from Granite Creek to Faith Lawley, (b) the next $200,000 from Granite Creek to be paid equally to McKay and Faith Lawley, (c) the next $100,000 to Faith Lawley and (d) all remaining proceeds and distributions to be paid and split between Faith Lawley receiving 80% and McKay 20%.

15. On May 4, 2016 John McKay formally accepted the proposed agreement for his remaining interest in Granite Creek. Lawley then repudiated their offer and reneged on consummating the agreement. Christopher Lawley emailed McKay on behalf of Lawley, "I don't see a way to do that at this time". Novicki also separately emailed McKay repudiating the offer.

## COUNT I: BREACH OF CONTRACT

16. Defendant/Counter-Plaintiff McKay realleges and incorporates by reference each and every allegation contained in paragraphs one (1) through fifteen (15) above.

17. Lawley has not complied with the Granite Creek Limited Partnership agreement requirement to obtain prior written consent from the General Partner of Granite Creek for the transfer of McKay's interest.

11

18. Lawley did not obtain prior written approval from the General Partner of Granite Creek LP to the option to repurchase interest for McKay included in the Transfer Agreement.

19. Lawley failed to complete the transfer by not obtaining approval from the General Partner of Granite Creek LP to the transfer and repurchase option. These failures are a material and fatal breach of contract.

20. McKay sustained damages because of Lawley's breach, including incidental and consequential expenses, attorney fees, loss of interest and income, and the illegitimate exercise of ownership and control over McKay's Granite Creek interest by Lawley.

21. Because Lawley breached the contract by failing to complete the transfer, said contract should be held as void, and restitution so the parties are placed in the position they would be in at this time if the transfer agreement never existed.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income and interest, for incidental and consequential damages, attorney fees, for the costs of this action, that Plaintiffs take nothing by way of their complaint, and all other just and proper relief.

## COUNT II: FRAUD IN THE INDUCEMENT TO CONTRACT

22. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs one (1) through twenty-one (21) above.

23. Lawley misrepresented to McKay that they would perform all formalities required to complete the transfer, including obtaining prior written consent from the General Partner of

12

Granite Creek for the transfer of the interest and prior written consent to the option to repurchase by McKay.

24.     Lawley never obtained prior written consent of the Granite Creek General Partner or updated documents to complete the transfer, and never obtained prior written consent for the option to repurchase.

25.     This was a material misrepresentation.

26.     Lawley's misrepresentations were made knowingly or with reckless disregard for truth of the matter.

27.      McKay relied on the misrepresentations made by the Lawley in signing the Transfer Agreement with Lawley.

28.     McKay was damaged as a direct and proximate result of the Lawley's fraudulent misrepresentations.

29.     McKay sustained damages, including incidental and consequential cost, attorney fees, loss of interest and income, and the illegitimate exercise of ownership and control over McKay's Granite Creek interest by Lawley.  The Transfer Agreement should therefore be held as void, and restitution awarded so the parties are placed in the position they would be in at this time if the transfer agreement never existed.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income and interest, for incidental and consequential damages, attorney fees, for the costs of this action, that Plaintiffs take nothing by way of their complaint, and all other just and proper relief.

13

## COUNT III: ESTOPPEL BARRING CONTRACT ENFORCEMENT

30.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs one (1) through twenty-nine (29) above.

31.     Lawley misrepresented to McKay that Lawley would complete all formalities to transfer McKay's interest in Granite Creek and retain an option for McKay to repurchase, which Lawley failed to do.

32.     Lawley reasonably expected McKay to rely upon Lawley's misrepresentations.

33.     McKay did rely on the Lawleys' representations in signing the Transfer Agreement with Lawley.

34.     McKay was damaged by the misrepresentations of Lawley.  McKay sustained damages including incidental and consequential costs, attorney fees, loss of interest and income, and the illegitimate exercise of ownership and control over McKay's Granite Creek interest by Lawley.

35.     Injustice can only be avoided by barring defendants through promissory estoppel from enforcing the terms of the contract, and by ordering accounting and restitution, repayment of consideration, lost interest and income, as well as incidental and consequential damages.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income and interest, for incidental and consequential damages, attorney fees, for the costs of this action, that Plaintiffs take nothing by way of their complaint, and all other just and proper relief.

14

## COUNT IV: ESTOPPEL AND WAIVER
## OF LIMITATION OF TIME TO EXECUTE REPURCHASE OPTION

36.     Counter-Plaintiff McKay realleges and incorporates by reference each and every allegation contained in paragraphs one (1) through thirty-five (35) above.

36.     The executed Transfer Agreement provided that McKay had the option to repurchase his transferred interest in Granite Creek until December 31, 2012.

37.     Lawley represented to McKay that Lawley would pay additional consideration to McKay for his forbearance from exercising his option to repurchase his Granite Creek interest. Lawley made these representations both before and after December 31, 2012.

38.     Lawley represented to McKay that Lawley would allow McKay to exercise his option to repurchase his Granite Creek interest after December 31, 2012 if a compensation for forbearance agreement was not reached.   Lawley made these representations both before and after December 31, 2012.

39.     Lawley reasonably expected McKay to rely upon Lawley's misrepresentations as set forth in paragraphs thirty-seven and thirty-eight above.

40.     McKay did rely on the Lawley's misrepresentations in failing to exercise McKay's option to repurchase the Granite Creek Limited Partnership interest by December 31, 2012.

41.     McKay was damaged because of his reasonable reliance on misrepresentations as set forth in paragraphs thirty-seven and thirty-eight above.  .

42.     Lawley should be found to have waived the time limitation on McKay's option to repurchase his interest in Granite Creek by:

    a.    Lawley's agreement to allow McKay to exercise his repurchase option after the December 31, 2012 deadline under the Transfer Agreement terms;

    b.    Lawley's continued negotiation with McKay for additional consideration for McKay's forbearance in exercising his option to repurchase before and after December 31, 2012.

43.    Equity and justice require Lawley be barred by promissory estoppel from enforcing the contractual limitation of time on McKay's option to repurchase his interest in Granite Creek, and that Novicki and Lawley pay restitution for all money they unjustly received because of their misrepresentations.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution by Novicki and Lawley, repayment of consideration, payment of lost income and interest, for judgment allowing McKay to exercise his option to repurchase his interest per the Transfer Agreement, for incidental and consequential damages, attorney fees, for the costs of this action, and all other just and proper relief.

## COUNT V: FRAUD

44.    Defendant/Counter-Plaintiff McKay incorporates herein by reference paragraphs one (1) through forty-three (43) of his complaint above.

45.    Eric Novicki, Christopher Lawley, and Faith Lawley LLC represented to McKay that they would:

    a. Negotiate in good faith with McKay regarding additional consideration for McKay's forbearance from exercising his contractual option to repurchase his interest in Granite Creek; and

    b. Allow McKay's to exercise his option to repurchase his interest in Granite Creek after the December 31, 2012 contractual deadline as an alternative to paying additional consideration for McKay's forbearance from exercising his option.

46.    Each representation by Lawley set forth in paragraph 51 above was untrue and material to the transaction.

47.    Lawley knew of the falsity of said representations, or made said representations with such utter disregard and recklessness as to it truth that knowledge may be inferred.

48.    Lawley intended to mislead McKay into relying on said false representations.

49.    McKay justifiably relied on Lawleys' false representations to his detriment.

50.    As a result of McKay's reliance on Lawleys' false representations, McKay has suffered damages, and continues to suffer damages, proximately caused and directly traceable to the wrongful conduct of Lawley, including loss of income, unjust enrichment to Christopher Lawley and Eric Novicki, lost interest, attorney fees, and the cost of this action. Lawley should further be subject to judgment for exemplary damages based on their fraudulent conduct.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income and interest, for incidental and consequential damages, attorney fees, for the costs of this action, for exemplary damages for bad faith, prejudgment

interest, that Plaintiffs take nothing by way of their complaint, and all other just and proper relief.

## COUNT VI:    PREJUDGMENT INTEREST

51.    Defendant/Counter-Plaintiff McKay incorporates herein by reference paragraphs one (1) through fifty (50) of his complaint as if fully set forth herein.

52.    McKay is entitled to the full present value of his interest in Granite Creek as if the Transfer Agreement was never executed.

53.    In order to be fully compensated for his loss of use of his money, McKay should also be paid interest from the date of the execution of the Transfer Agreement.

54.    Ohio Rev. Code § 1343.03(A) provides:

[W]hen money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or contract or other transaction, the creditor is entitled to interest in the rate per annum determined pursuant to section 5703.47 of the Revised Code.

55.    Ohio courts agree that an award of prejudgment interest is compensation to the claimant for the period of time between accrual of the claim and judgment. *Royal Elec. Constr. Corp. v. Ohio State Univ.* (1995), 73 Ohio St.3d 110, 117, 652 N.E.2d 687.

56.    Lawley had the beneficial use of the McKay's funds and Lawley will enjoy a windfall due to its delay of payment of this claim.

57.    McKay is entitled to recover prejudgment interest on the present value of his interest in Granite Creek as if the Transfer Agreement was never executed, at the rate provided

18

by section 5703.47 of the Ohio Revised Code at the time judgment is entered.

WHEREFORE, Defendant/Counter-Plaintiff McKay prays for a Judgment against the Lawley in the form of voiding of the Transfer Agreement, accounting, restitution, repayment of consideration, payment of lost income, for incidental and consequential damages, attorney fees, for the costs of this action, exemplary damages, for pre-judgment interest at the statutory rate on the value of McKay's pre-transfer equity in Granite Creek from the date of the alleged transfer to the date of judgment, that Plaintiffs take nothing by way of their complaint, and all other just and proper relief.

## REQUEST FOR JURY TRIAL

Defendant/Counter-Plaintiff McKay respectfully requests that all matters herein be set for trial by jury.

Respectfully submitted,

Craig R. Karpe (PHV20654)

Attorney for Defendant/
Counter-Plaintiff John McKay

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been served upon the following counsel of record through US mail, postage prepaid, this 9 day of October, 2018.

Richard O. Hamilton Jr.
Robbins, Kelly Patterson & Tucker, LPA
7 West 7th Street, Suite 1400
Cincinnati, OH, 45202

_____
Craig R. Karpe

KARPE LITIGATION GROUP
19 West 19th Street
Indianapolis, IN 46202
(317) 251-1840

9/10/19
CM to ALL Defendants- SD

CERTIFIED COPY
JAMES L. SPAETH, CLERK
WARREN COUNTY, OHIO
COMMON PLEAS COURT
BY _____
DEPUTY

20

**EXHIBIT 10**

Filed in Warren County on 03/12/2020 3:19:35 PM

IN THE COURT OF COMMON PLEAS
STATE OF OHIO, COUNTY OF WARREN
GENERAL DIVISION

**FAITH LAWLEY, LLC, et al.,**      :

                                    :      **CASE NO. 18CV91051**

**Plaintiffs**                      :

                                    :

**v.**                              :      <u>**MAGISTRATE'S DECISION**</u>

                                    :

**JOHN MCKAY,**                     :

                                    :

**Defendant**                       :

Pending before the undersigned Magistrate are cross-motions for summary judgment filed by Plaintiffs and Defendant on December 13, 2019, submitted on January 23, 2020. For the reasons that follow, this Magistrate recommends that summary judgment be granted to the Plaintiffs.

**Uncontested Facts**

The following facts are not disputed. The Defendant, John McKay, owned an interest in small business investment company Granite Creek FlexCap I, LP. This is a fund organized and governed by the rules set by the federal Small Business Administration for the purpose of providing venture capital to developing small businesses, and managed by Mark Radznik. Mr. McKay had committed $1,500,000 in capital to this fund, and prior to 2010 had already paid in some $900,000.

In early 2010, Granite Creek made another capital call, requiring Mr. McKay to pay in an additional sum of $75,000 by a deadline of February 26, 2010, which he was not able to do. Faced with the penalties provided in the Limited Partnership agreement for failure to meet a capital call, which meant forfeiting his interest as well as any capital he had paid in to that date, McKay was prompted to see if he could sell it while it still had some value.

McKay approached a friend who was also an "accredited investor," Eric Novicki, and offered to transfer his interest to him, retaining an Option that would allow him to repurchase that interest at a later date. Mr. Novicki contacted another investor, Christopher Lawley, and the two of them formed a new entity to purchase and hold the Granite Creek interest. This entity became Faith Lawley, LLC, and its sole members are Eric Novicki and Christopher Lawley.

McKay and his attorney prepared the Articles of Incorporation for Faith Lawley LLC, and they also prepared the Transfer Agreement, a copy of which is attached to Mr. Novicki's December 9, 2019 affidavit, and submitted them to Novicki and Lawley for review on February 23, 2010. On February 26, 2010, the parties executed the Transfer Agreement, Lawley and Novicki paid McKay the agreed upon sum of $125,000 for his interest, and further paid Granite Creek the sum of $75,000 to satisfy its capital call. Time was of the essence in making these payments, as a

failure to pay the capital call of $75,000 could have meant the forfeiture of the interest, and the purpose of the transaction could have been entirely frustrated.

Due to the nature of the investment, the transfer could not take place without the oversight and approval of Granite Creek. Faith Lawley subscribed for an interest in Granite Creek in the amount of $1,500,000, which was the entirety of McKay's interest. The Subscription Agreement between Granite Creek and Faith Lawley, LLC was executed by member Christopher Lawley on March 9, 2010, and was accepted by Mark Radznik, the general partner of Granite Creek FlexCap I, on March 29, 2010.

The Transfer Agreement among the parties to this action required Novicki and Lawley to pay to McKay the sum of $125,000 as a purchase price, to "undertake and assume all of McKay's duties and obligations under the Limited Partnership Agreement [with Granite Creek] including, but not limited to, the obligation to contribute any unfunded commitment attributable to the Limited Partnership interest. . . . Faith Lawley specifically acknowledges that it will timely make the Seventy-Five Thousand Dollar ($75,000) cash call payment to the Limited Partnership on or before the due date of February 26, 2010."

The Option Clause of the agreement provides in relevant part as follows:

Faith Lawley hereby grants to McKay the right to repurchase the Limited Partnership Interest, at the option of McKay (the Option), upon the following terms and conditions:

a.  <u>Expiration of Option</u> the Option may be exercised at any time from the date hereof through and including December 31, 2012 (the "Option Period").  In order to timely exercise said Option, McKay must give Faith Lawley written notice of an intent to exercise said Option delivered to the address of Faith Lawley as first set forth hereinabove, and must pay Faith Lawley the Option Price, as hereinafter defined, prior to the expiration of the Option Period.

It is not contested that Mr. McKay did not deliver a written notice to Faith Lawley of his intent to exercise the Option prior to December 31, 2012, did not tender the Option Price prior to December 31, 2012, and did not procure a written extension of the Option Period prior to December 31, 2012.  Instead, beginning in September 2012, some three months before the expiration of the Option Period, McKay approached Novicki and Lawley to discuss an alternative arrangement, which he called a "back-end deal" or a "tail agreement."  McKay sought another arrangement that would allow him to buy back in to the Granite Creek partnership.  The parties did not succeed in reaching any alternative agreement, though McKay continued to seek such an agreement up through 2016, and McKay did not ultimately repurchase any part of the Faith Lawley subscription in Granite Creek.  By 2016, the Granite Creek investment began to yield some return, as it was not doing from 2010 to 2014 or so.

From this point the parties' positions begin to diverge, although this appears to be the result of their respective interpretations of events than the result of some disagreement about what took place during the events themselves.  The parties

apparently stipulate to the authenticity of copies of agreements and emails that were attached to affidavits and are part of the record.  Further discussion of the facts will be had as necessary to disposition below.

**The Pending Claims**

Plaintiffs seek a declaration that Defendant John McKay has received all of the compensation he is due under the parties' Transfer Agreement for the transfer of his subscription interest in Granite Creek to Faith Lawley, that he is due nothing further from any monies that interest has earned, and that he has no further rights under the Transfer Agreement.

Defendant's September 10, 2019 Amended Answer and Counterclaim asserts five causes of action[1] against individual Plaintiff Christopher Lawley, three of which are apparently aimed at avoiding the Transfer Agreement altogether, and the latter two of which seek to affirm the contract and seek money damages or some other restitutionary remedy.  The fifth cause of action is brought against Mr. Novicki and Faith Lawley, LLC in addition to Mr. Lawley.  This Magistrate parenthetically notes here that no party has briefed the issue of election of remedies.

Count I is for a breach of contract based upon Lawley's alleged failure to obtain a prior written consent from the Granite Creek entity to allow McKay to transfer his interest in the first instance, and a consent to the Option Clause specifically; Count

---

[1] There is a Count VI, but this asserts a right to prejudgment interest and does not describe a separate legal basis of liability.

II asserts that this same failure to obtain a prior written consent from Granite Creek constitutes a fraud in the inducement to enter into the Transfer Agreement. Count III, Estoppel, is premised on the same factual averments as Count II.

Count IV is Estoppel and Waiver. Here, Defendant asserts that Plaintiff Christopher Lawley misled Defendant into missing the December 31, 2012 deadline to exercise his Option, and should be held to have waived the December 31, 2012 expiration date. Count V is another Fraud claim, this one directed to Mr. Novicki, Mr. Lawley, and Faith Lawley, LLC. Defendant here alleges that the Plaintiffs fraudulently engaged Defendant in a negotiation around the time Defendant's option to repurchase was to expire, and told him either that they proposed to pay Defendant additional money to forbear from exercising his Option to repurchase, or if those negotiations failed, they would hold his Option open so that he could exercise it at some later date.

**Standard**

Summary judgment is a procedure for moving beyond the allegations in the pleadings and analyzing the evidentiary materials in the record to determine whether an actual need for a trial exists.[2] The Court must "examine the evidence to determine whether as a matter of law no genuine issues exist for trial."[3] "Summary judgment is proper when 1) no genuine issue as to material fact remains to be

---

[2] *Ormet Primary Aluminum Corp. v. Employers' Ins. Of Wasau* (2000), 88 Ohio St.3d 292, 300
[3] *Hillstreet Fund III, LP v. Bloom*, Twelfth Dist. App. No. CA2009-07-178, 2010-Ohio-2961, par 8

litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party."[4] "Regardless of who may have the burden of proof at trial, the burden is upon the party moving for summary judgment to establish that there is no genuine issue of material fact and that he is entitled to a judgment as a matter of law."[5] "The nonmoving party must then present evidence to show that there is some issue of material fact yet remaining for the trial court to resolve."[6] "Evidence of a possible inference is insufficient."[7] A "material fact" is one that "affects the outcome of the litigation."[8] A dispute is genuine if it is supported by substantial evidence that exceeds the allegations in the complaint.[9]

**Breach of Contract**

Count I of McKay's counterclaim asserts that Lawley was bound by the parties' February 26, 2010 Transfer Agreement to obtain a prior written consent from Mark Radznik of Granite Creek FlexCap I to the transfer of his interest, and further to obtain a prior written consent from Mr. Radznik to the option clause specifically.  By

---

[4] *Welco Industries, Inc .v. Applied Cos.*(1993), 67 Ohio St.3d 344, 346
[5] *AAA Enterprises, Inc. v. River Place Comm. Urban Redev. Corp.* (1990), 50 Ohio St.3d 157, paragraph 2 of the syllabus
[6] *Hillstreet Fund III, LP v. Bloom, supra,* at par. 9
[7] *Cox v. Commercial Parts & Serv.* (1994), 96 Ohio App.3d 417, 421
[8] *Myers v. Jamar Ents.,* Twelfth Dist. No. CA2001-06-056
[9] *Myers v. Jamar Ents., supra*

"prior written consent," McKay suggests that the timing of Mr. Radznik's written approval of the transfer, a few weeks later than the timing of the execution of the Transfer Agreement itself, constitutes a breach of a term of the Transfer Agreement.

As noted above, the Transfer Agreement was drafted by McKay himself, with the assistance of his attorney. McKay controlled when it was drafted, when and to whom it was submitted, and when it was executed. Mr. McKay himself communicated with Mr. Radznik at Granite Creek, and provided him with drafts of the Transfer Agreement. If Mr. Radznik's explicit consent to the Option Clause within the Agreement was necessary, then McKay was the man to bring the Option Clause to Mr. Radznik's attention. McKay himself controlled the process of obtaining any necessary review and consent to the Agreement, and McKay chose the date on which he submitted it to Lawley and Novicki for execution. And time was of the essence, as the deadline for meeting Granite Creek's capital call was February 26, 2010.

McKay has presented no evidence, and does not even allege, that Mr. Lawley obstructed McKay in his submission to Mr. Radznik for his review, or that he was in any way responsible for the timing of Mr. Radznik's signing off on it in March 2010, some weeks after the parties executed the Transfer Agreement on February 26, 2010.

The Transfer Agreement merely requires Mr. Lawley to "execute and deliver any and all documents required by the Limited Partnership [Granite Creek] and/or the Small Business Administration (SBA) in order to obtain the consent of the Limited Partnership and its general partner, and/or the consent of the SBA to the transactions contemplated hereby. Faith Lawley and McKay shall each execute and deliver to the SBA the Request for Approval of Transfer Certificate in the form provided by the SBA." There is no evidence in the record suggesting that Lawley did anything but facilitate this review and approval process.

Further, there is no express provision requiring the Option Clause in the Transfer Agreement to be reviewed or agreed to separately from any other clause in the Agreement. Nor does it appear from any term in the Agreement that it will be a breach of the Agreement to sign it before Mr. Radznik has given his written consent.

McKay has failed to identify, much less to prove, any breach of the Transfer Agreement.

### Estoppel, Waiver, and Fraud

McKay alleges that he was deliberately misled by Mr. Lawley and Mr. Novicki in two ways: first, that Mr. Lawley promised McKay in 2010 that he would obtain Granite Creek's prior written consent to the Transfer Agreement and the Option Clause in it when Lawley knew that this was not true. This is the basis of his Fraud in the Inducement to Contract Claim in Count II, and his Count III for Estoppel.

Second, McKay alleges that in 2012 and 2013, Lawley and Novicki told him variously that they would pay him additional money to the agreed upon purchase price of $125,000 in recognition of its "true value;"[10] or that they would pay him additional money to forbear from exercising his option to repurchase the interest under their Agreement; or that they would work out some alternative "tail agreement" to allow him to repurchase his interest or some portion of it under terms different from those in the Transfer Agreement. Failing all of these alleged proposals, McKay urges, Lawley and Novicki assured him he could exercise the Option Clause as though it had no expiration date. These allegations form the basis of McKay's remaining causes of action for estoppel, waiver, and fraud.

### Fraud and Estoppel at Contract Formation

McKay's Count II is Fraud in the Inducement to enter into the Transfer Agreement. Fraud in the Inducement, like a claim of fraud generally, requires the complaining party to show "(1) a false representation concerning a fact, (2) knowledge of the falsity of the representation or utter disregard for its truthfulness, (3) intent to induce reliance on the representation, (4) justifiable reliance upon the representation, and (5) injury proximately caused by the reliance."[11] McKay has not identified a particular misrepresentation that he asserts he relied on in Count II, apart from provisions of the Transfer Agreement that Mr. Lawley signed. As noted

---

[10] This is not alleged in the Amended Counterclaim, but is raised in McKay's memoranda.
[11] *Barich v. Scheidler Med. Group, LLC,* Butler App. No. CA2015-01-004; 2015-Ohio-4446, at par. 18

above, there is no evidence in the record, nor is there a coherent assertion, that Lawley failed to perform any of his obligations under the Agreement, much less that he knew when he signed the Transfer Agreement that he "ha[d] no intention of keeping his promise."[12]

Count III is McKay's Estoppel claim, premised on Lawley's alleged failure to complete all required formalities to effect the transfer. Because Lawley there is no genuine issue of fact regarding whether Lawley performed all formalities called for under the contract, he is entitled to summary judgment on Mr. McKay's Count III.

**Fraud, Estoppel, and Waiver Relating to McKay's Failure to Exercise the Option**

Counts IV and V are premised on the idea that Mr. Lawley and Mr. Novicki, through their words and conduct, deliberately misled Mr. McKay into allowing the Option Period to lapse without exercising it. The direct result of this, McKay asserts, was that McKay did not exercise his Option to repurchase.

At this point it is necessary to pin down what the alleged misleading statements or promises were, and what the alleged misleading conduct was. McKay alleges in his counterclaim under Count IV, for Promissory Estoppel[13], "Lawley represented to McKay that Lawley would pay additional consideration to McKay for his forbearance from exercising his option to repurchase his Granite Creek interest.

---

[12] *Mohme v. Deaton,* Warren App. No. CA2005-12-133, 2006-Ohio-7042, at par. 30
[13] This Count is brought against Christopher Lawley only. Count V for Fraud is brought against Lawley, Eric Novicki, and Faith Lawley, LLC.

Lawley made these representations both before and after December 31, 2012," and "Lawley represented to McKay that Lawley would allow McKay to exercise his option to repurchase his Granite Creek interest after December 31, 2012 if a compensation for forbearance agreement was not reached.  Lawley made these representations both before and after December 31, 2012."  The Amended Counterclaim does not identify any particular statement or any particular letter, email, or other communication in which these promises or representations are contained.

McKay also cites to the fact of "Lawley's continued negotiation with McKay for additional consideration for McKay's forbearance in exercising his option to repurchase before and after December 31, 2012" as conduct on which he relied in allowing his Option to expire.

To establish a claim for Promissory Estoppel under Count IV, McKay must show "(1) a clear and unambiguous promise was made; (2) upon which it would be reasonable and foreseeable for the party to rely; (3) actual reliance on the promise; and (4) the party was injured as a result of the reliance."[14]  "Promissory estoppel is an equitable doctrine for enforcing the right to rely on promises."[15]  "When a party

---

[14] *AN Bros. Corp. v. Total Quality Logistics, LLC*, Clermont App. No. CA2015-02-021, 2016-Ohio-549, at par. 32
[15] *Id.*

induces another to take an action, estoppel prevents the party from later taking an inconsistent position which damages the other because of the induced action."[16]

McKay asserts that Lawley made him promises that he relied on in allowing the Option Period to expire without exercising it. It follows that the promises he relied upon must have been conveyed to him prior to the Option expiring. For *A* to cause *B*, *A* must have temporal priority to *B*. He cannot have relied on promises or representations made, or conduct occurring, after the expiration of the Option.

Mr. McKay affirms in his December 13, 2019 affidavit that in September 2012, he approached Novicki and Lawley to "begin discussing a 'tail' agreement which would provide additional payment to McKay in recognition of the full value of the Granite Creek unit. This was discussed as an alternative to McKay exercising his option to repurchase, and part of the consideration to Plaintiffs would be McKay's forbearance from exercising his repurchase option." He attached an email to Eric Novicki dated December 17, 2012, outlining "my proposal that has me sharing on the back end as we discussed." There is no mention in this email of extending the Option Period in the Transfer Agreement, and no indication that he was prepared to exercise the Option if no alternative "back end" or "tail" agreement was reached. McKay provides a fairly detailed summary of his proposal, and nowhere mentions that a "forbearance" forms any part of the proposed benefit to Novicki or Lawley.

---

[16] *Id.* at par. 34, citing *Paar v. Jackson Twp. Bd. Of Trustees,* Stark App. No. 2003-CA-00334; 2004-Ohio-5567 at par. 19

There is no reference in this email to any communication with Lawley in which he promised McKay anything. This email is addressed to Eric Novicki only. Christopher Lawley is not even copied on it.

A January 8, 2013 email from Novicki to McKay was written a day after an unsuccessful meeting among the three of them: Novicki, McKay, and Lawley. This January 7, 2013 meeting had become "heated," and Novicki left early. No agreement was reached. Lawley and Novicki wanted McKay to put up an interest he owned in another business, identified only as HVP, since he was not able to pay the full Option Price in cash. This was referred to as a "backstop" against possible losses in Granite Creek, which had not been paying any returns at that time. Novicki expressed disappointment the meeting did not go well, pointing out that he "worked really hard to even get [Lawley] to the table. . . . Believe, me, it was a constant struggle." According to Novicki, Lawley was resistant to the idea of discussing any alternative arrangement for McKay to buy back in. He reportedly asked Novicki first, "why are we doing anything [for McKay]?" and reportedly later said, *to Novicki*, he would "let [McKay] buy in for cash." Novicki wrote that he persuaded Lawley to "listen to what John [McKay] has to say," as a result of which Lawley agreed to the meeting with McKay on January 7, 2013.

Novicki's account of Lawley's attitude toward negotiating a "tail agreement" with McKay in lieu of McKay's exercising the Option is flatly inconsistent with

McKay's naked assertion that Lawley wanted an alternative "tail agreement," or that he made McKay promises to induce McKay to try to negotiate such an agreement. And there is no reference in this January 8, 2013 email to any communication between McKay and Lawley prior to December 31, 2012 in which Lawley would extend McKay's right to "buy in for cash." There is no representation, and no reference to any discussion, that the Option Period would be held open if no "tail agreement" was ultimately reached.

McKay has not referred this Magistrate to any communication from Lawley, made to him before December 31, 2012, in which Lawley promised him anything at all that would induce him to allow his unexercised Option to expire. McKay has conceded that he never exercised or attempted to exercise his option to repurchase "because we were negotiating a tail that was going to be in lieu of exercising that option."

McKay was asked directly at his deposition to identify a clear and unambiguous promise on which he might have relied, "So this is where my confusion comes in. I'm trying to figure out what did they [Lawley and Novicki] promise you prior to December 31, 2012?" McKay answered, *the intent always was to work something out* because it was a massive amount of money that they got as consideration and we were longtime friends." [Italics added.] He was later asked how much time he would have needed to raise the funds to exercise the option, and he replied, "I think

I could have got it done, but I didn't do it in lieu of being invited to structure an arrangement after the expiring." McKay then referred to Lawley and Novicki being "open to meeting at the end of the year and working out a deal," and they subsequently "invited me to the meeting on January 7, [2013]."

McKay does not identify a meeting, a telephone conversation, an email, a letter, or any other medium of communication had with Christopher Lawley prior to December 31, 2012, in which Lawley unambiguously promised that he would extend the Option Period past its December 31, 2012 expiration. Nor does he identify any communication in which Lawley offers McKay any benefit in exchange for not exercising his option to repurchase. But this is the point on which McKay's promissory estoppels claim rests. Without it, he cannot succeed in this cause of action.

McKay affirms that promises were made, and that it was his understanding the option would remain open, but it is his burden to demonstrate, with reference to admissible evidence in the record, that Christopher Lawley made a specific, clear and unambiguous promise, and that he made it to McKay, prior to December 31, 2012, inducing McKay to rely on it. McKay's affirmation that "the intent" was the option period would remain open, or that he understood it would, does not create a genuine issue of material fact regarding whether Mr. Lawley made such a promise to him before his Option expired. "[I]t is well-established that a 'party's unsupported

and self-serving assertions, offered by way of affidavit, standing alone and without corroborating materials under Civ.R. 56, will not be sufficient to demonstrate material issues of fact.'. . . To hold otherwise would 'necessarily abrogate the utility of the summary judgment exercise,' and allow the . . . nonmoving party to avoid summary judgment 'by simply submitting such a self-serving affidavit containing nothing more than bare contradictions of the evidence offered by the moving party.'"[17]

Plaintiffs have referred the Court to portions of the record that establish Mr. Lawley did not make any promise to induce Mr. McKay to fail to timely exercise his Option. On the contrary, McKay could not timely exercise his Option because he did not have the money, and he approached Novicki for some alternative arrangement he referred to as a "tail agreement". Eric Novicki deposed, "McKay came to me [some time before September 24, 2012] and said, I can't perform on the contract. I don't have the money to do it. I can't perform on the contract. Is there a way that we can modify or change the agreement or a way for me to get back in the interest [sic]? . . . John [McKay] came and said, I can't perform on the contract. Is there something else we can do." What followed from there is that Mr. Novicki, out of sympathy for his friend, approached Lawley and tried to persuade him to "listen to what John has to say." The unsuccessful January 7, 2013 meeting was the result.

---

[17] *Hillstreet Fund III, LP v. Bloom* Butler App. No. CA2009-07-178; 2010-Ohio-2961, at par. 10

Finally, Plaintiffs have referred the undersigned to an email from McKay to Novicki, in which McKay unambiguously acknowledges that he has no further rights to repurchase his interest under the Transfer Agreement. On February 19, 2013, McKay wrote a lengthy email to Novicki referring back to the unsuccessful January 7, 2013 meeting. He said he "wanted to resolve something we could both live with and move forward with our friendship." He emphasized his desire to "claw back for a little before you take the rest." He acknowledged the uncertainty of the Granite Creek fund, and potential tax consequences. "Sorry [about] my frustration [at the] meeting, but I feel I have always looked out for you and a bone, only after you make a good return, as you should for the risk, is fair." In a separate paragraph, Mr. McKay wrote, "Propose whatever you want—I know my contract rights are gone." In a postscript to the email, he added, "I'm happy to meet in Cincy or elsewhere as soon as I can if you want to do in person. Whatever we do, let's figure something out and put it behind us."

He did not refer in this email to any promise to extend the original Option Period in the Transfer Agreement. He does not announce his intention to exercise that Option. On the contrary, his keen desire to reach an alternative agreement is evident throughout the email, and this is, as he said, because his "contract rights [were] gone."

Finally, in an email dated May 4, 2016, Mr. McKay stated that he wanted to "accept the offer you both made to me on January 7, 2013 for my residual share in the Granite Creek unit." He urges that both Mr. Novicki and Mr. Lawley made the offer at this meeting, and emphasizes that there is a written record of it: "see the attached spreadsheet Eric took us through with his notes of your offer at the meeting." Mr. McKay then summarizes the discussion, and again emphasizes, "this is what Eric wrote in black pen on the bottom right of the spreadsheet as you presented the spreadsheets and took me through it." It appears that McKay anticipated some resistance to the idea that this offer was still open, three years later.

And there was. Christopher Lawley promptly replied, "Looking back at my notes. . . they included an important and substantive ingredient. It included that you backstopped any possible loss to the money needed at that time to buy the Granite Creek unit . . . with HVP stock. The reason for this contingency is that there was still risk in the Granite Creek investment and for you to come back and participate in our unit you would have to assume some of the risk. . . . I remember that when this option was brought up to you by Eric [Novicki] you refused, and the discussion became so heated that he had to leave. Since then, GC hit a home run with SMS and they are starting to pay back some of the investment and now the risk is gone. Your refusal to listen to any of the buy in scenarios proposed and join the

risk with us stopped any further discussion toward a way to invite you back into this investment."  Erick Novicki added, "After 3 years of risk, the time for that has passed."  On May 10, 2016, Lawley wrote, "John, let's be clear.  We never had an offer.  We tried having some discussions with you to take some risk with us by backstopping some losses we might have with your HVP stock. . . . You refused, and we never even got past the discussion stage."  There is no discussion in this email exchange of an extended Option that McKay might exercise once it was clear that no alternative arrangement would be agreed to.  McKay has failed to demonstrate with reference to any portion of the record other than his naked and self serving affidavits that Lawley promised him anything to induce him to let his Option expire unexercised.

McKay has likewise failed to demonstrate that Lawley's ultimate willingness to meet with him to explore some other way for McKay to purchase some of his interest back after the expiration of the Option constitutes a Waiver, or voluntary relinquishment of any right Lawley possessed under the Transfer Agreement. Nothing in the record supports that construction.  The Option period had expired before the meeting took place.  All of the evidence in the record instead points to one conclusion:  McKay did not timely exercise his Option.  He still wanted an opportunity to buy back in if he could, and he approached Novicki and Lawley to

explore the possibility of a new agreement for that.  But no new agreement was reached.

The undersigned Magistrate concludes that no reasonable finder of fact could find that Lawley made any promise to McKay that would induce McKay to allow his Option Period to expire without exercising it.  No reasonable finder of fact could find that Lawley waived any right he possessed under the Transfer Agreement simply because he agreed to consider an alternative proposal after the expiration. Lawley is entitled to summary judgment on Count IV.

Count V for Fraud is brought against all three named Plaintiffs.  The elements of fraud are outlined above.  Once again, the claim requires that McKay identify a particular misstatement of fact on which he relied in allowing his Option to expire without exercising it.  The communications McKay cites to in support of this fraud claim under Count V are just those he cited to in support of Count IV of his Amended Counterclaim.

McKay alleges in Count V, "Eric Novicki, Christopher Lawley, and Faith Lawley LLC represented to McKay that they would:  (a) Negotiate in good faith with McKay regarding additional consideration for McKay's forbearance from exercising his contractual option to repurchase his interest in Granite Creek; and (b) Allow McKay to exercise his option to repurchase his interest in Granite Creek after the December

31, 2012 contractual deadline as an alternative to paying additional consideration for McKay's forbearance from exercising his option."

As discussed in some detail above, the record is devoid of any evidence from which a reasonable finder of fact could conclude that either Lawley or Novicki sought or desired any forbearance from McKay in exercising his Option, or that they represented the Option Period would be extended if no alternative agreement was reached for McKay to buy in once the Option Period had expired. McKay's naked, self-serving assertions to the contrary are insufficient to create a genuine issue of fact on this point. Plaintiffs are entitled to judgment as a matter of law.

This Magistrate accordingly recommends that summary judgment be granted to the Plaintiffs on their Complaint, and on all counts of Defendant's Amended Counterclaim. It is further recommended that Defendant bear the costs of this action.

It is so ordered.

_____

**MAGISTRATE CROSSLEY TATE**

**<u>NOTICE TO PARTIES</u>**

The parties shall take notice that this decision may be adopted by the Court unless objections are filed within fourteen (14) days of the filing hereof in accordance with Civil Rule 53 (D)(3)(b).

   A party shall not assign as error on appeal the court's adoption of any factual findings or legal conclusions, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R.53 (D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R.53(D)(3).

**INSTRUCTIONS TO THE CLERK FOR SERVICE OF MAGISTRATE'S DECISION PURSUANT TO CIVIL RULE 5**

**PLEASE SERVE THE FOLLOWING ATTORNEY(S): Craig Karpe, John O'Shea and Richard Hamilton**

_____

**MAGISTRATE CROSSLEY TATE**

**STATE OF OHIO, WARREN COUNTY**
**COMMON PLEAS COURT**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **FAITH LAWLEY, LLC, et al.,** | : | **CASE NO. 18 CV 91051** |
| **Plaintiffs,** | : | **JUDGE ROBERT W. PEELER** |
| | | **Magistrate Paige Crossley-Tate** |
| **-vs-** | : | |
| | | <u>**DECISION OVERRULING**</u> |
| **JOHN MCKAY,** | : | <u>**DEFENDANT'S OBJECTIONS**</u> |
| | | <u>**AND ADOPTING THE**</u> |
| **Defendant.** | : | <u>**MAGISTRATE'S 3/12/2020**</u> |
| | | <u>**DECISION AS IF FULLY**</u> |
| | : | <u>**REWRITTEN HEREIN**</u> |

Pending before the Court are the objections of Defendant John McKay to the Magistrate's March 12, 2020 decision addressing cross-motions for summary judgment and finding in favor of Plaintiffs Faith Lawley, LLC, Eric Novicki, and Christopher Lawley. For the reasons set forth below, the objections are overruled.

<u>**FACTS AND PROCEDURAL POSTURE**</u>

Prior to 2010, Defendant purchased an ownership interest in a small business investment company known as Granite Creek FlexCAP I, LP ("Granite Creek"). Granite Creek is a hedge fund organized under the rules of the federal Small Business Administration and with a purpose of financing and developing small businesses. Defendant committed $1,500,000 in capital to this fund and paid in approximately $900,000.

In early 2010, Granite Creek made another capital call, requiring Defendant to pay in an additional $75,000 by February 26, 2010. Defendant was unable to meet this demand. Thus, Defendant decided to see if he could sell his interest in Granite Creek. To that end, Defendant approached Plaintiff Eric Novicki.

1

Defendant offered to transfer his interest in Granite Creek to Novicki, retaining an option to repurchase his interest at a later date. Novicki contacted another investor, Plaintiff Christopher Lawley, and the two formed Faith Lawley, LLC for the purpose of purchasing and holding the Granite Creek interest. Plaintiffs Novicki and Lawley are the sole owners of Faith Lawley, LLC.

On February 26, 2010, the parties executed a Transfer Agreement, and Plaintiffs paid Defendant the sum of $125,000 for his interest and further paid Granite Creek the sum of $75,000 to satisfy its capital call. The Transfer Agreement contained an Option Clause, which granted Defendant the right to repurchase the interest in Granite Creek "at any time from the date hereof through and including December 31, 2012." In order to timely exercise this Option, Defendant was required to give Faith Lawley, LLC "written notice of an intent to exercise said Option delivered to the address of Faith Lawley as first set forth hereinabove, and must pay Faith Lawley the Option Price, as hereinafter defined, prior to the expiration of the Option Period."

Defendant did not deliver a written notice to Plaintiffs of his intent to exercise the Option prior to December 31, 2012. Defendant did not tender the Option Price to Plaintiffs prior to December 31, 2012. Defendant did not procure a written extension of the Option Period prior to December 31, 2012. Rather, Defendant began approaching Novicki and Lawley in September 2012 seeking to discuss an alternative agreement, which he referred to as a "back-end deal" or a "tail agreement."

Defendant alleges the parties entered into such an alternative agreement, which was memorialized via email on December 17, 2012. Defendant further alleges the parties agreed to a January 7, 2013 meeting to discuss Defendant's proposal and, even though this meeting occurred after the December 31, 2012 repurchase cutoff, the parties had an "understanding" the repurchase option deadline "would not be enforced." Plaintiffs, on the other hand, claim no alternative agreement ever took place, though they admit Defendant continued to seek an alternative agreement from 2012 through 2016. According to Plaintiffs, Defendant never repurchased the Granite Creek interest.

On April 23, 2018, Plaintiffs filed suit against Defendant seeking declaratory judgment that Defendant is not entitled to: (1) any alleged share of initial funds that may have been invested in Granite Creek; (2) any distributions from Granite Creek payable to Faith

2

Lawley, LLC; and (3) any remaining proceeds or distributions paid to Faith Lawley, LLC. Plaintiffs additionally requested a finding that the Transfer Agreement had not been modified, amended, or otherwise altered in any way, and that Defendant is not entitled to any additional compensation as a result of the investment in the limited partnership that is the subject of the Transfer Agreement.

Defendant responded on October 9, 2018 with an answer and counterclaims. Defendant claims Plaintiffs' performance under the Transfer Agreement was defective and resulted in breaches of contract because (1) Plaintiffs failed to obtain Granite Creek's approval of the terms of the Transfer Agreement, including the repurchase option, and (2) Plaintiffs failed to obtain prior approval by the SBA of the Transfer Agreement. Due to these breaches, Defendant asserts completion of the Transfer Agreement was impossible and Defendant never received consideration under the terms of the Transfer Agreement.

The matter was thereafter referred to a Magistrate and summary judgment motions were filed by both parties. On March 12, 2020, the Magistrate issued her decision regarding the cross-motions for summary judgment, addressing each of Defendant's five counterclaims and Plaintiffs' declaratory judgment claim in detail. The Magistrate concluded that "the record is devoid of any evidence from which a reasonable finder of fact could conclude that either Lawley or Novicki sought or desired any forbearance from McKay in exercising his Option, or that they represented the Option Period would be extended if no alternative agreement was reached for McKay to buy in once the Option Period had expired. McKay's naked, self-serving assertions to the contrary are insufficient to create a genuine issue of fact on this point." Thus, the Magistrate recommended this Court enter judgment in favor of Plaintiffs.

On March 27, 2020, Defendant filed his objections to the Magistrate's decision, raising five arguments:

1. The Magistrate's order (sic) ruling in favor of Plaintiffs cites and relies on facts not properly submitted in the Plaintiffs' supporting affidavit.

2. The Magistrate erred in finding [Defendant's] statement that Plaintiffs promise to keep [Defendant's] repurchase option open after December 31, 2012 create no material question of fact.

3. The Magistrate erred in failing to find other material evidence of waiver and promissory estoppel.

4. The Magistrate erred in finding [Defendant] could not afford to repurchase his interest.

5. The Magistrate erred in finding the Count IV of Defendant's amended counter claim (sic) is directed to Christopher Lawley alone.

## STANDARD OF REVIEW

A party may file written objections to a magistrate's decision within 14 days of the filing of the decision. Civ.R. 53(D)(3)(b)(i). An objection to a magistrate's decision shall be specific and state with particularity all grounds for objection. Civ.R. 53(D)(3)(b)(ii). If objections are timely filed, a trial court must conduct an independent review of those objections. Civ.R. 53(D)(4)(d); *Hart v. Spenceley*, 12th Dist. Butler No. CA2011-08-165, 2013-Ohio-653, ¶ 13. A trial court may adopt, reject, or modify a magistrate's decision in whole or in part pursuant to Civ.R. 53(D)(4)(b) and (d). A trial court retains the ability to employ its own judgment in cases referred to magistrates. *Hart* at ¶ 13. A trial court has the inherent power to perform an independent review of the magistrate's decision and make credibility and factual determinations that are contrary to the magistrate's decision. *Id.* at ¶ 15. As the ultimate finder of fact, the trial court should not adopt the findings of the magistrate unless the trial court fully agrees with them. *Id.*, citing *Rapp v. Pride,* 12th Dist. Butler No. CA2009-12-311, 2010-Ohio-3138, ¶ 14, and *Inman v. Inman,* 101 Ohio App.3d 115, 118 (2d Dist.1995).

## ANALYSIS

*Objection 1*

In his first objection, Defendant takes issue with the Magistrate's reliance on an affidavit of Novicki attached to Plaintiffs' December 13, 2019 motion for summary judgment, claiming the affidavit lacks a signature, notarization, and verification of oath. However, upon review of the affidavit of Novicki filed with this Court on December 13, 2019, the Court finds the affidavit is, in fact, signed, notarized, and contains language that the statements contained therein were made after being "duly cautioned and sworn." Further,

the affidavit is accompanied by approximately 50 pages of exhibits that the Magistrate was free to rely upon in making her decision on summary judgment. The documents are properly before the Court pursuant to Civ.R. 56 and the Court, accordingly, overrules Defendant's first objection.

*Objection 2*

In his second objection, Defendant alleges the Magistrate erred in not finding a material question of fact exists regarding whether Plaintiff Novicki and Lawley promised to keep Defendant's repurchase option open after December 31, 2012. Defendant supports his second objection by reasserting the argument under his first objection that Plaintiffs failed to present a valid affidavit contradicting Defendant's assertions.

As this Court has previously established above, Plaintiffs properly provided evidentiary material to the Court for review. Further, the Court is not persuaded by Defendant's argument that the statement, "Plaintiffs told Defendant both before and after the deadline that Defendant still had the right to repurchase his interest in Granite Creek while the parties negotiated" creates a genuine issue of material fact in this case. Both the Magistrate and this Court are in a position to determine whether genuine issues of material fact remain in this case, and both find that they do not. Defendant's self-serving assertions to the contrary do not create a genuine issue of material fact in this matter.

Accordingly, Defendant's second objection is overruled.

*Objection 3*

In his third objection, Defendant claims the Magistrate erred in failing to find evidence of waiver and promissory estoppel based upon circumstantial evidence in the record. The Magistrate set forth the proper standard for a promissory estoppel claim and determined insufficient evidence was presented to create a genuine issue of material fact. Upon review, the Court finds the same. Accordingly, Defendant's third objection is overruled.

*Objection 4*

In his fourth objection, Defendant takes issue with the Magistrate's finding that Defendant "could not timely exercise his Option because he did not have the money."

Defendant claims this finding is based solely on the "bald assertion" of Plaintiffs and is directly contrary to Defendant's own testimony.

Upon review, the Court finds evidence exists in the record wherein Defendant stated both that he did and did not have sufficient funds to exercise his Option.  Nevertheless, even if this Court were to agree with Defendant that the Magistrate erred in making such a finding, the Court is unaware as to how such an error would require this Court to vacate or in any way modify the Magistrate's decision. Even if Defendant had the money to exercise the Option on December 31, 2012 or earlier, the record is clear that he did not do so. Thus, there is no need for a trier of fact to determine whether Defendant did, in fact, have the funds.

Accordingly, Defendant's fourth objection is overruled for failing to set forth a genuine argument for review.

*Objection 5*

In his fifth and final objection, Defendant claims the Magistrate erred in determining Defendant's fourth counterclaim applied only to Plaintiff Christopher Lawley. Defendant claims this is a misreading of his counterclaim, as he used the word "Lawley" to refer to all three defendants, and not only Plaintiff Christopher Lawley.

The Court finds Defendant's counterclaim was somewhat vague and alternately used "Lawley" to refer to all plaintiffs as well as just Plaintiff Christopher Lawley.  Thus, the Court cannot say the Magistrate erred in interpreting Defendant's counterclaim to mean solely Plaintiff Christopher Lawley.  That being said, even if the Magistrate did err in interpreting the fourth counterclaim to apply solely to one plaintiff and not all, the Court also finds Defendant failed to present any corroborating evidence that any promise was made to him by Plaintiffs upon which he relief and was subsequently injured.

Accordingly, Defendant's fifth objection is overruled.

## CONCLUSION

Upon a thorough and independent review of the record before this Court, the Court finds Defendant's objections to the Magistrate's decision unpersuasive. The Magistrate

diligently examined each of the parties' arguments and properly concluded that summary judgment is appropriate in favor of Plaintiffs. The Court hereby concludes the same.

Defendant's objections are hereby **OVERRULED** and the Magistrate's March 12, 2020 decision is adopted as if fully rewritten herein. Counsel for Plaintiffs shall have 30 days to present a final judgment entry to the Court for review and signature.

**IT IS SO ORDERED.**

_____

**JUDGE ROBERT W. PEELER**

Dist.  Richard O. Hamilton, Jr., Esq., *counsel for Plaintiffs*
Robert M. Ernst, Esq., *counsel for Plaintiffs*
John L. O'Shea, Esq., *counsel for Defendant*
Nicholas A. Zuccarelli, Esq., *counsel for Defendant*
Craig R. Karpe, Esq., *counsel for Defendant*
Magistrate Paige Crossley-Tate

Filed in Warren County on 07/28/2020 8:47:17 AM

Disposition Code: MAG; FAO

TO THE CLERK
SERVE NOTICE OF JUDGMENT
PURSUANT TO CIVIL RULE 58(B)

**IN THE COURT OF COMMON PLEAS**
**WARREN COUNTY, OHIO**

**EXHIBIT 12**

FAITH LAWLEY, LLC, et al.,

        Plaintiffs,

vs.

JOHN MCKAY,

        Defendant.

Case No. 18CV91051

Judge Robert W. Peeler
Magistrate Paige Crossley-Tate

**FINAL JUDGMENT ENTRY**

WHEREAS, this matter came before the Court on Plaintiffs', Faith Lawley, LLC, Eric Novicki, and Christopher Lawley, Complaint for Declaratory Judgment filed April 23, 2018 ("Plaintiffs' Complaint"). Plaintiffs' Complaint sought a judgment declaring that the subject Transfer Agreement was not modified, amended, or altered in any way; that Defendant, John McKay, is not entitled to (1) any share of the initial funds invested in Granite Creek FlexCap I, L.P. ("Granite Creek"); (2) any prior and future distributions from Granite Creek to Faith Lawley, LLC; and (3) Defendant is barred from any other claim for additional compensation from any of the Plaintiffs as a result of the Transfer Agreement. Defendant has no interest, legal or equitable, in Granite Creek.

On September 10, 2019, Defendant, John W. McKay, filed an Amended Answer to Plaintiffs' Complaint and Counterclaims for (1) Breach of Contract, (2) Fraud in the Inducement to Contract, (3) Estoppel Barring Contract Enforcement; (4) Estoppel and Waiver of Limitation of Time to Execute Repurchase Option; (5) Fraud; and (6) Prejudgment Interest (collectively "Defendant's Amended Counterclaims").

03852600-1

On December 13, 2019, Plaintiffs filed a Joint Motion for Summary Judgment and Declaratory Judgment ("Plaintiffs' Motion") which sought that Plaintiffs' request for declaratory judgment be granted and Defendant's Amended Counterclaims be dismissed. On December 13, 2019, Defendant, John McKay, filed a competing Motion for Partial Summary Judgment ("Defendant's Motion") which sought judgment on Defendant's estoppel and waiver counterclaims.

The Court previously referred this matter to the Magistrate and on March 12, 2020 the Magistrate issued a decision on the competing motions (the "Magistrate's Decision"). The Magistrate's Decision determined all the claims for relief in this matter by finding that summary judgment be granted to the Plaintiffs on their Complaint and on all counts of Defendant's Amended Counterclaims.

The Defendant filed objections to the Magistrate's Decision on March 27, 2020 ("Defendant's Objections"). The Defendant's Objections were fully briefed by the parties and on June 17, 2020, after a thorough and independent review of the Magistrate's Decision, the Defendant's Objections, and the record, this Court issued a decision overruling all of the Defendant's Objections and fully adopted the Magistrate's Decision.

The Court having reviewed all matters herein, and having issued its June 17, 2020 Decision, finds that Plaintiffs' Motion is well taken and is granted in full and Defendant's Motion is denied in its entirety.

IT IS HEREBY ORDERED AND ADJUDGED that the Magistrate's Decision entered March 12, 2020 properly determined the factual issues and appropriately applied the law and is hereby adopted in its entirety as the order of this Court.

IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED that Plaintiffs, Faith Lawley, LLC, Eric Novicki, and Christopher Lawley are hereby awarded

03852600-1

the declaratory relief requested in Plaintiffs' Complaint as there is no genuine issue as to any material fact and Plaintiffs' are entitled to such judgment as a matter of law. Specifically, the Court declares that the subject Transfer Agreement was not modified, amended, or altered in any way; Defendant, John McKay, is not entitled to any share of the initial funds invested in Granite Creek or any prior and future distributions from Granite Creek to Faith Lawley, LLC; and Defendant is barred from any other claim for additional compensation from any of the Plaintiffs as a result of the Transfer Agreement. Defendant has no interest, legal or equitable, in Granite Creek.

IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED that the relief sought in Defendant's, John W. McKay, Amended Counterclaims is denied and Defendant's Amended Counterclaims are dismissed in their entirety with prejudice as there is no genuine issue as to any material fact and Plaintiffs are entitled to such judgment as a matter of law.

IT IS FURTHER HEREBY ORDERED, ADJUDGED, AND DECREED that the costs of this action be borne by the Defendant.

This Final Judgment Entry determines all of the claims for relief in this action in the Plaintiffs' favor, is a final appealable order, and there is no just reason for delay. The Clerk is directed to notify the parties herein of this final judgment entry within 3 days of the date set forth herein and provided in Rule 58 of the Ohio Rules of Civil Procedure.

IT SO ORDERED.

_____
Judge

03852600-1

**COPIES TO:**

Richard O. Hamilton, Jr. Esq.
Robert M. Ernst, Esq.
Robbins, Kelly, Patterson & Tucker
7 West Seventh Street, Suite 1400
Cincinnati, Ohio  45202-2417
rhamilton@rkpt.com
rernst@rkpt.com
**Attorneys for Plaintiffs**


John L. O'Shea, Esq.
Nicolas A. Zuccarelli, Esq.
Cohen, Todd, Kite & Stanford, LLC
250 East Fifth Street, Suite 2350
Cincinnati, Ohio  45202
*joshea@ctks.com*
*nzuccarelli@ctks.com*
**Attorneys for Defendant**

Craig R. Karpe, Esq.
KARPE LITIGATION GROUP
19 West 19th Street
Indianapolis, IN 46202
(317) 251-1840
*crkarpe@injurylaw.tv*
**Attorney for Defendant**

03852600-1

Item Journalized
Book 1238 Page 254

**EXHIBIT 13**

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO COURT OF APPEALS
WARREN COUNTY
F I L E D

WARREN COUNTY

JUN 2 8 2021

*James L. Spaeth,* Clerk
LEBANON OHIO

FAITH LAWLEY, LLC, et al.,        :

     Appellees,        :        CASE NO. CA2020-08-052

                       :

  - vs -        :        <u>JUDGMENT ENTRY</u>

                       :

JOHN MCKAY,        :

     Appellant.        :

     The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

     It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Judgment Entry shall constitute the mandate pursuant to App.R. 27.

     Costs to be taxed in compliance with App.R. 24.

_____
Mike Powell, Presiding Judge

_____
Robert A. Hendrickson, Judge

_____
Matthew R. Byrne, Judge

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

COURT OF APPEALS
WARREN COUNTY
F I L E D

JUN 2 8 2021

*James L. Spaeth,* Clerk
LEBANON OHIO

FAITH LAWLEY, LLC, et al.,          :

    Appellees,          :          CASE NO. CA2020-08-052

                :

   - vs -          :          O P I N I O N
                6/28/2021
                :

JOHN MCKAY,          :

    Appellant.          :


CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 18CV91051


Robbins, Kelly, Patterson & Tucker, LPA, Richard O. Hamilton, Jr., Robert M. Ernst, 7 West Seventh Street, Suite 1400, Cincinnati, Ohio 45202, for appellees

Gottesman & Associates, LLC, Zachary Gottesman, 404 East 12th Street, First Floor, Cincinnati, Ohio 45202 and Crehan & Thumann, LLC, Lynne M. Longtin, 404 East 12th Street, Second Floor, Cincinnati, Ohio 45202, for appellant


BYRNE, J.

{¶1}  Defendant-appellant, John McKay, appeals from the summary judgment decision of the Warren County Court of Common Pleas. The trial court dismissed McKay's counterclaims against plaintiffs-appellees, Eric Novicki, Christopher Lawley, and Faith Lawley, LLC ("the plaintiffs"), and granted the plaintiffs' requested declaratory judgment. For the reasons set forth below, we agree that McKay failed to identify any disputed issues

of material fact precluding summary judgment. Accordingly, we affirm the trial court's decision.[1]

## I. Factual Background

{¶2}   McKay purchased an investment unit of Granite Creek Flexcap I, L.P. ("Granite Creek"), a small business investment hedge fund. McKay's funding commitment for the unit was $1.5 million. From June 2006 through the first quarter of 2010, McKay funded the unit with $900,000. McKay also paid $165,000 in taxes related to the unit.

{¶3}   In early 2010, Granite Creek issued McKay a capital call for $75,000. McKay, however, was in the midst of a divorce and facing liquidity issues. He could not afford the cash call.

{¶4}   McKay was acquaintances with Novicki and Lawley and had done business deals with them in the past. According to McKay, he approached Novicki and Lawley with a proposal that would allow him to avoid losing or diluting his investment. He would sell them the Granite Creek unit but retain an option to repurchase the unit at a later date.

{¶5}   Novicki and Lawley agreed to this transaction and together they formed Faith Lawley, LLC – of which they would be the sole members – to hold the investment. To memorialize the transfer and option to repurchase, McKay had his attorney prepare a transfer agreement ("Transfer Agreement").

{¶6}   Under the Transfer Agreement, Faith Lawley, LLC agreed to pay McKay $125,000 for the Granite Creek unit. Faith Lawley, LLC further agreed to pay the $75,000 capital call. According to McKay, the price for the unit was set "well below" his investment because the deal was intended to provide him with a quick cash infusion until he could repurchase the unit.

---

1. Pursuant to Loc.R. 6(A), we have sua sponte removed this appeal from the accelerated calendar and placed it on the regular calendar for purposes of issuing this opinion.

{¶7}    The Transfer Agreement provided McKay with an option to repurchase the Granite Creek unit at any time through and including December 31, 2012.  Thus, McKay had slightly less than two years to exercise the option.  To exercise the option, the Transfer Agreement required McKay to give Faith Lawley, LLC written notice of his intent to exercise the option and to pay the option price prior to the expiration of the option period.

{¶8}    The option price was the original purchase price of $125,0000 plus the $75,000 capital call payment, plus any other capital calls incurred by Faith Lawley, LLC, plus interest at 25% per annum on the total.[2]  McKay characterized this 25% interest as Novicki and Lawley's "additional incentive," to enter the deal.

{¶9}    The Transfer Agreement contained an integration clause.  The clause provided that no provision of the agreement could be modified, amended, or waived except by a written agreement, executed by all the parties.

{¶10}  On February 26, 2010, the parties executed the Transfer Agreement.  Faith Lawley, LLC paid McKay the purchase price and further paid Granite Creek's capital call.  The transfer of the investment unit required Granite Creek's approval, and Faith Lawley, LLC subsequently entered into a separate subscription agreement with Granite Creek.  Consequently, the transfer was completed.

{¶11}  In September 2012, approximately three months before the expiration of the option, McKay approached Lawley and Novicki to discuss what he called a "tail" agreement.  According to McKay, this would be an alternative to exercising the option and would permit him to instead buy back an interest in the Granite Creek unit.  On December 17, 2012, McKay emailed Novicki a detailed proposal containing his terms for this proposed "tail" agreement.  Novicki responded, said he would call Lawley the following week, and told

---

2. The option price also included a payment to account for certain taxes, and a minimum interest payback of $20,000.

McKay to contact Lawley about setting up a meeting. In a follow-up e-mail, Novicki told McKay to forward the proposal to Lawley. No agreement was reached concerning the "tail" agreement proposal prior to the expiration of the option.

{¶12} It is undisputed that McKay never sent Faith Lawley, LLC written notice of his intent to exercise the option prior to the December 31, 2012 option deadline, or at any other time. Nor did McKay tender the option price to Faith Lawley, LLC at any time. McKay never obtained any written extension of the option deadline from the plaintiffs.

{¶13} Following the expiration of the option deadline, McKay continued to communicate with Novicki and Lawley concerning the proposed "tail" agreement. The parties met for an in-person meeting on January 7, 2013. This meeting became "heated" and the parties left with no agreement in place. According to Lawley, McKay had refused to consider a proposal by the plaintiffs that would require McKay to "back stop" what the plaintiffs had paid into the Granite Creek unit with McKay's stock in a separate company.

{¶14} Over the next three years, McKay continued communicating with Novicki and Lawley concerning potential agreements to buy back into the Granite Creek unit. Many of these discussions were memorialized in e-mails. However, none of McKay's efforts to broker a new deal concerning the Granite Creek unit resulted in any agreement.

{¶15} On May 4, 2016, McKay e-mailed Novicki and Lawley purporting to accept a proposal that they had made to him during the in-person meeting on January 7, 2013 – more than three years earlier. Both Novicki and Lawley quickly responded, repudiating that any offer was available to accept. In Lawley's response, he reminded McKay that in 2013, the Granite Creek unit was not producing any investment return. For that reason, the plaintiffs were only willing to allow McKay to join with them in the investment if he agreed to take on some of the risk. They had asked him to share that risk by putting up his separate company stock, and he had refused. Lawley indicated that Granite Creek had since hit a

- 4 -

"home run" with one of its investments and the unit was starting to produce a return. Therefore, the risk that was present in 2013 was no longer present, and, thus, the deal that the plaintiffs would have potentially considered then was not a possibility in 2016.

## II. Procedural Background

{¶16}  McKay, an Illinois resident, filed suit against the plaintiffs in Illinois to "enforce his rights regarding the [Granite Creek] unit * * *."  The outcome of the Illinois lawsuit is not apparent from the record.

{¶17}  The plaintiffs then filed this lawsuit in Warren County.  The plaintiffs' complaint contained a single count for declaratory judgment.  The plaintiffs asked the court to declare that McKay was not entitled to any share of the funds he invested in the Granite Creek unit prior to selling it to Faith Lawley, LLC, that McKay was not entitled to any distributions or proceeds from Granite Creek payable to Faith Lawley, LLC, and that McKay was not entitled to any additional compensation from Faith Lawley, LLC.

{¶18}  In his amended answer, McKay asserted six counterclaims.  Only Count Four and Count Five are relevant to this appeal.[3]  Count Four was labeled "estoppel and waiver of limitation of time to execute repurchase option."  In it, McKay asserted that the plaintiffs had represented to him that they would pay him "additional consideration" if he were to forbear on exercising his option to repurchase the Granite Creek unit.  McKay alleged that the plaintiffs made these representations before and after the option deadline of December 31, 2012.  McKay additionally claimed that the plaintiffs represented, before and after December 31, 2012, that they would allow McKay to exercise the option after its expiration

---

3. In Counts One through Three, McKay asserted claims of breach of contract, fraud, and "estoppel barring contract enforcement."  These claims relate to McKay's argument that Faith Lawley, LLC was contractually required to obtain Granite Creek's consent to the transfer of the investment unit, and that it had failed to do so.  In the summary judgment proceedings, the plaintiffs submitted proof that Granite Creek had approved the transfer.  The trial court found likewise.  This issue has not been appealed.  Count Six was a claim for prejudgment interest, which was dismissed and also has not been appealed.

if the parties did not enter into this "forbearance agreement." McKay asserted that he reasonably relied on these representations and therefore the plaintiffs should be equitably estopped from enforcing the contractual limitation of time to exercise the option.

{¶19} In Count Five, McKay alleged fraud. McKay pled that the plaintiffs falsely represented that they would negotiate with him in good faith regarding paying him to forbear exercising the option and that they misrepresented that they would extend the option deadline in conjunction with ongoing negotiations.

{¶20} The parties filed cross-motions for summary judgment. A magistrate subsequently issued a decision recommending that summary judgment be granted to the plaintiffs. Following McKay's objections, the magistrate's decision was later adopted in full by the trial court.

{¶21} With respects to Counts Four and Five, the decision noted that McKay's amended counterclaim failed to identify any particular statements or communications by the plaintiffs wherein they had made representations concerning paying additional consideration to McKay for forbearing on the option or where they had agreed to extend the option period. The court noted that the only summary judgment evidence that McKay had presented that would indicate that the plaintiffs made any such promises was his "naked" and "self serving" affidavit, which was insufficient to create a genuine issue of material fact. The court determined that no reasonable finder of fact could find that the plaintiffs "sought or desired any forbearance from McKay in exercising his Option, or that they represented the Option Period would be extended if no alternative agreement was reached for McKay to buy in once the Option Period had expired."

{¶22} The court issued a final judgment entry granting the plaintiffs judgment as a matter of law on their request for declaratory judgment. The court dismissed all of McKay's counterclaims.

### III.  Law and Analysis

{¶23}  McKay raises the following sole assignment of error:

{¶24}  THE TRIAL COURT ERRED IN HOLDING THAT MCKAY FAILED TO OFFER EVIDENCE OF MATERIAL FACTS SUFFICIENT TO DEFEAT SUMMARY JUDGMENT OF HIS COUNTERCLAIMS OF ESTOPPEL, WAIVER AND FRAUD.

{¶25}  McKay argues that the court erred in granting summary judgment in favor of the plaintiffs on Count Four, promissory estoppel/waiver, and Count Five, fraud.  Within his discussion of this assignment of error, McKay presents three "issues" for review.

### A.  Standard of Review

{¶26}  This court reviews a trial court's summary judgment decision under a de novo standard.  *Deutsche Bank Natl. Trust Co. v. Sexton*, 12th Dist. Butler No. CA2009-11-288, 2010-Ohio-4802, ¶ 7.  Summary judgment is appropriate under Civ.R. 56 when (1) there is no genuine issue of material fact remaining to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor.  *BAC Home Loans Servicing, L.P. v. Kolenich*, 194 Ohio App.3d 777, 2011-Ohio-3345, ¶ 17 (12th Dist.), citing *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370 (1998).

{¶27}  The party requesting summary judgment bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).  Once a party moving for summary judgment has satisfied its initial burden, the nonmoving party "must then rebut the moving party's evidence with specific facts showing the existence of a genuine triable issue; it may not rest on the mere allegations or denials in its pleadings."  *Sexton* at ¶ 7; Civ.R. 56(E).

### B. Promissory Estoppel/Waiver

#### i. Whether McKay's Affidavit Creates a Genuine Issue of Material Fact

{¶28} In his first issue presented, and with reference to Count Four, promissory estoppel, McKay contends that an averment in his affidavit created a disputed issue of material fact as to whether the plaintiffs promised to extend or waive the Transfer Agreement option deadline.

{¶29} Promissory estoppel is an equitable doctrine for enforcing the right to rely on promises. *A N Bros. Corp. v. Total Quality Logistics, L.L.C.*, 12th Dist. Clermont No. CA2015-02-021, 2016-Ohio-549, ¶ 32. In order to establish a claim for promissory estoppel, a party must establish (1) a clear and unambiguous promise was made, (2) upon which it would be reasonable and foreseeable for the party to rely, (3) actual reliance on the promise, and (4) the party was injured as a result of the reliance. *Id.*

{¶30} McKay's promissory estoppel claim was premised on his allegation that the plaintiffs represented that they would waive the December 31, 2012 option deadline while attempting to negotiate the "tail" agreement. McKay points to the following averment in McKay's own affidavit as establishing a genuine issue of fact on this issue:

> Plaintiffs knew the negotiations were in lieu of McKay exercising the repurchase option. [Excerpt from Eric Novicki Deposition], page 52. Plaintiffs told Defendant both before and after the deadline that Defendant still had the right to repurchase his interest in Granite Creek while the parties negotiated." [*Id.*], page 52, line 1-9 and page 54, line 12-15.

{¶31} Even if we accept these two statements as true, neither statement clearly and unambiguously indicates that the plaintiffs made any promise concerning extending or waiving the option deadline.[4] The first sentence vaguely implies that the plaintiffs were

---

4. We note that any verbal modification to the Transfer Agreement was specifically excluded by the agreement's integration clause. This calls into question whether McKay could *reasonably* rely on a verbal promise to extend the deadline.

aware that McKay intended to negotiate a new agreement instead of exercising the option. The second sentence could be true without the plaintiffs ever having waived or extended the option deadline. The plaintiffs could have independently decided to grant McKay the right to repurchase an interest in the investment, outside of the transfer agreement.

{¶32} The two sentences of the averment cite separate portions of Novicki's deposition testimony. However, upon review, neither cited portion of Novicki's deposition involves any discussion of extending the option deadline. The testimony on page 52 involves Novicki discussing his understanding of a remark Lawley made to him about letting McKay "buy in for cash." Lawley's "buy in for cash" remark was referenced in an e-mail Novicki sent to McKay on January 8, 2013, the day following the unsuccessful meeting between the parties. The e-mail provided in relevant part:

> [McKay],
>
> I think it is better if you and [Lawley] work this out. I worked really hard to even get [Lawley] to the table. His questions and comments to me were "why are we doing anything" and "I will let him buy in for cash[.]"

{¶33} It is not clear from the e-mail when Lawley made the remark to Novicki about being willing to let McKay buy in for cash. In an uncontroverted affidavit submitted in the summary judgment proceedings, Novicki clarified that Lawley made this statement to him *prior* to the Transfer Agreement option deadline.

{¶34} However, McKay argues that because this e-mail was sent *after* the option deadline, the statement implies that Lawley was waiving the deadline. McKay further notes that during Novicki's deposition, Novicki explained that by "buy in for cash," he believed Lawley was referring to the Transfer Agreement's option provision. Thus, according to McKay, Lawley must have extended the option deadline if he was going to let him "buy in for cash" after the option expired.

- 9 -

{¶35} The "buy in for cash" comment does not support McKay's claim that there was a promise of an option extension or waiver. If it is accepted that Lawley stated that McKay could "buy in for cash" prior to December 31, 2012, then this is merely a statement of fact. It was McKay's right under the Transfer Agreement. If Lawley told Novicki that he would allow McKay to "buy in for cash," and meant after December 31, 2012, then this merely reflects ongoing negotiations regarding McKay's continued interest in obtaining an interest in the Granite Creek unit. Moreover, any statement or conduct occurring after the option deadline would be irrelevant to McKay's promissory estoppel claim.

{¶36} We next turn to McKay's citation to testimony on page 54 of Novicki's deposition. The cited testimony consists of McKay's attorney asking Novicki if he agreed with Lawley's statement about allowing McKay to buy in for cash. Novicki explained that it did not matter if he agreed or not, because (as was just discussed), this was McKay's right under the Transfer Agreement.

{¶37} Consequently, to the extent McKay's affidavit averment vaguely suggests the extension or waiver of the Transfer Agreement option, it appears unsupported by the very testimony that McKay cited. A party's unsupported and self-serving assertions, offered by way of affidavit, standing alone and without corroborating materials under Civ.R. 56, will not be sufficient to demonstrate material issues of fact. *Hillstreet Fund III, L.P. v. Bloom*, 12th Dist. Butler No. CA2009-07-178, 2010-Ohio-2961, ¶ 10.

{¶38} Other evidence in the record supports the conclusion that the plaintiffs made no promises to extend the option deadline and instead merely agreed to listen to McKay's alternative proposal. According to Novicki, the reason that McKay approached the plaintiffs about the "tail" agreement was that McKay could not afford to exercise the option. Novicki testified:

McKay came to me [some time before September 24, 2012] and

said, I can't perform on the contract. I don't have the money to do it. I can't perform on the contract. Is there a way that we can modify or change the agreement or a way for me to get back in the interest? And I said, well, I don't know. Let me talk to [Lawley].

I talked to [Lawley] and his response was, why would I give him our money? And I said, I agree, it doesn't make any sense. And I said, but [McKay] thinks he has some proposals that will make sense and maybe we should listen to him and see what he's got to propose. So [Lawley] agreed to that and that's where we were at.

{¶39}  Shortly before the option would expire, McKay e-mailed Novicki on December 17, 2012. This e-mail appeared to memorialize the terms of McKay's proposed "tail" agreement and included a very detailed summary of the proposal. However, McKay never mentioned the option. He did not discuss extending the option period. He never mentioned any proposal to "forbear" exercising the option. Nor was there any explanation of how the plaintiffs paying McKay to forbear would provide the plaintiffs with any benefit. McKay did not state he was prepared to exercise the option if the plaintiffs did not agree to this "tail" agreement. And there was no reference in the e-mail to any promises made by Novicki or the plaintiffs towards McKay. The e-mail was simply McKay's proposal to the plaintiffs.

{¶40}  Perhaps most notably, the record contains an e-mail McKay sent to Novicki in February 2013, again indicating his desire to make some deal with regard to the Granite Creek unit. In it, he referred back regretfully to the January 7, 2013 meeting and indicated he would like to "resolve something we could both live with and move forward with our friendship." He mentioned his desire to "claw back for a little bit before you take the rest" and indicated he thought it was fair to ask for "a bone, only after you make a good return." McKay then stated, "Propose whatever you want – *I know my contract rights are gone.*" (Emphasis added.) This statement flatly contradicts McKay's affidavit averments made nearly seven years later.

- 11 -

{¶41}  The evidence submitted in this case reflects that prior to the option deadline, McKay was not in a financial position to exercise the option.  Or, for reasons that are not clear from the record, McKay did not want to exercise the option but wanted to partner with the plaintiffs on the investment.  Regardless, it is clear that McKay was still seeking some way to "get back in the interest."  While the plaintiffs were dubious that McKay could propose anything that they would be interested in, they were willing to listen to his proposal.  Otherwise, as stated by Lawley, McKay could "buy in for cash."  We agree that the averment in McKay's affidavit is unsupported by the summary judgment evidence and insufficient to create a genuine issue of material fact.

{¶42}  In support of the contention that his affidavit was not "self-serving" and was sufficient to preclude summary judgment, McKay cites Judge Ringland's concurring opinion in *Hillstreet Fund*, 2010-Ohio-2961.  There, Judge Ringland distinguished cases where defendants submitted affidavits generally denying liability or contesting their involvement in an event from those cases where a party describes the statement against interest of an opposing party.  *Id.* at ¶ 17-18.  *Hillstreet* is distinguishable and does not support McKay's argument.  In *Hillstreet*, the affidavit describing the admission against interest specifically identified the person who made the statement and described the person's statement.  *Id.* at ¶ 18.  McKay's affidavit is far less detailed.  It failed to specifically identify who made the promises regarding the option deadline and only vaguely described what statements were made.  Moreover, McKay's affidavit is uncorroborated and contradicted by other evidence in the record.

{¶43}  We agree with the plaintiffs' suggestion that this case is more similar to *Citibank v. Eckmeyer*, 11th Dist. Portage No. 2008-P-0069, 2009-Ohio-2435.  There, Citibank sued the appellant for approximately $20,000 as a result of a default on a credit card agreement.  *Id.* at ¶ 2.  The appellant submitted his affidavit in which he averred that

- 12 -

he contacted Citibank to negotiate a settlement and that Citibank had agreed to settle the account for $7,000. *Id.* at ¶ 59. The court of appeals concluded that the affidavit was self-serving, failed to identify the individual whom the appellant claimed to have contacted, and failed to establish whether that person had any authority to settle the debt. In addition, the court noted that the appellant had conceded receiving a letter rejecting his offer to settle the account. *Id.* Like the present case, the affidavit in *Citibank* set forth an alleged admission by a party opponent, but was unsupported by any other evidence, and failed to identify the individual alleged to have made the statement.

{¶44} In sum, McKay has failed to point to specific facts in the summary judgment record evidencing a clear and unambiguous promise made by the plaintiffs to McKay concerning the option. There are no disputed issues of material fact precluding summary judgment. Consequently, we find no merit in McKay's first issue presented for review.

### ii. Evidence of Waiver

{¶45} In McKay's second issue presented, he argues that "a party's affidavit testifying to statements of a party opponent and accompanying evidence of the opposing party's conduct are admissible evidence of a claim of waiver." Initially, we observe that waiver is not a claim; it is an affirmative defense. *Miller v. Wikel Mfg. Co.*, 46 Ohio St.3d 76, 78 (1989). Waiver is a "voluntary relinquishment of a known right. It may be made by express words or by conduct which renders impossible a performance by the other party, or which seems to dispense with complete performance at a time when the obligor might fully perform." *List & Son Co. v. Chase*, 80 Ohio St. 42, 49 (1909). Waiver must be "intentional, with knowledge of the facts and of the party's rights." *Id.* at 51.

{¶46} As set forth above, there was no evidence presented of any intentional waiver of the option deadline by the plaintiffs. The plaintiffs' agreement to listen to McKay's proposal or negotiate an alternative agreement does not constitute a waiver of any right

under the Transfer Agreement. And as explained above, the evidence regarding allowing McKay to "buy in for cash" also does not set forth any grounds for waiver. McKay argues that the trial court ignored evidence of waiver, but in each instance cited by McKay, the evidence was discussed and sufficiently addressed by the court. McKay's arguments concerning waiver lack merit.

### C. Fraud

{¶47} In his third issue presented for review, McKay argues that his affidavit created a genuine issue of material fact as to his fraud claim. McKay incorporates the same arguments he presented with respect to his promissory estoppel claim. For the same reasons described previously, McKay failed to present evidence of any representation by the plaintiffs concerning extending the option period. Accordingly, he has failed to identify a genuine disputed issue of fact for trial as to any misrepresentation in conjunction with the fraud claim.

{¶48} For the foregoing reasons, we overrule McKay's sole assignment of error and affirm the trial court's decision dismissing McKay's counterclaims and granting the declaratory judgment requested by the plaintiffs.

{¶49} Judgment affirmed.

M. POWELL, P.J., and HENDRICKSON, J., concur.

- 14 -